469 F.Supp. 1304 (1979)
Craton LIDDELL, a minor, et al., Plaintiffs,
and
Earline Caldwell, et al., and The National Association for the Advancement of Colored People, and City of St. Louis, and Janice Adams, et al., and Mary Puleo, et al., representing the Involved Citizens Committee, and United States of America, Plaintiffs-Intervenors,
v.
The BOARD OF EDUCATION OF the CITY OF ST. LOUIS, STATE OF MISSOURI, and Daniel L. Schlafly et al., and the State of Missouri et al., Defendants.
No. 72-100C(1).
United States District Court, E. D. Missouri, E. D.
April 12, 1979.
*1305 *1306 Joseph S. McDuffie, William P. Russell, St. Louis, Mo., for plaintiffs Craton Liddell et al.
*1307 John H. Lashly, Paul B. Rava, Lashly, Caruthers, Thies, Rava & Hamel, St. Louis, Mo., for defendants, Bd. of Education, City of St. Louis, its officials and members.
Charles Kunderer, Associate City Counselor, St. Louis, Mo., for City of St. Louis.
Sheila Hyatt, Asst. Atty. Gen., Jefferson City, Mo., for State of Missouri, Arthur Mallory, Com'r of Ed. of State of Missouri, The State of Missouri Bd. of Ed.
Robert J. Koster, King, Yusman, Koster & Buechner, St. Louis, Mo., for Janice Adams et al., and The Concerned Parents for Neighborhood Schools.
Anthony J. Sestric, St. Louis, Mo., for Mary Puleo et al., and Involved Citizens Committee.
David A. Lang, Clayton, Mo., for Earline Caldwell et al.
Drew S. Days, III, J. Gerald Hebert, Asst. Attys. Gen., Thomas D. Yannucci, W. W. Johnson, Civil Rights Div., Dept. of Justice, Washington, D. C., Robert D. Kingsland, U. S. Atty., St. Louis, Mo., for the U. S.
Nathaniel R. Jones, Gen. Counsel, NAACP, New York City, Louis R. Lucas, Barbara B. Dickey, Richard B. Fields, Ratner, Sugarmon, Lucas, Salky & Henderson, Memphis, Tenn., for NAACP.

 TABLE OF CONTENTS
 I. CASE HISTORY AND PROCEDURAL POSTURE.
 II. FINDINGS OF FACT.
 A. Stipulation of Facts.
 B. The Board of Education.
 C. State of Missouri and the State Board of Education.
 D. Pre-Brown Conditions.
 1. Dual school system.
 2. Discriminatory laws.
 3. Demographics.
 4. Board activities.
 E. 1954-56 Desegregation Plan.
 F. Resegregative Factors.
 1. Socio-demographic changes in St. Louis.
 2. Housing segregation.
 3. Title I.
 G. Resulting De Facto Resegregation.
 1. Transitions in the schools.
 2. Changing pattern in school enrollment
 (excluding Harris Teacher's College).
 3. Racial imbalance in the St. Louis public schools.
 4. Schools referred to as vestiges.
 H. Actions of the Board.
 1. Adoption of the neighborhood school system.
 2. Student transfers.
 a. Transfers concomitant to desegregation.
 b. Permissive transfers.
 c. Special transfers.

*1308
 3. Boundaries and feeder patterns.
 4. Redistricting.
 5. Transportation.
 a. Intact busing.
 b. Busing 1964-78.
 6. School construction.
 7. School closings.
 8. Schools with city-wide enrollment.
 a. The Technical high schools.
 9. Staff.
 a. Faculty.
 b. Non-certificated personnel.
 c. Administrators.
 d. Pupil-teacher ratio.
 10. Curriculum and facilities.
 a. Curriculum.
 b. Facilities.
 c. Retentions and withdrawals.
 11. Magnet schools.
 a. Admissions to the magnet schools.
III. CONCLUSIONS OF LAW.
 A. Governing Constitutional Principles.
 B. Effectiveness of the 1954-56 Desegregation Plan.
 C. Burden of Proof.
 D. Racial Imbalance in the St. Louis Schools.
 IV. POSITIONS AND PLANS OF THE PARTIES.
 V. APPENDIX.
 A. Racial Composition of the Enrollment in the
 St. Louis Elementary and Secondary Schools
 by District.
 1. Year 1972-73.
 2. Year 1975-76.
 3. Year 1978-79.
 B. Consent Judgment and Decree, December 24, 1975.

*1309 MEMORANDUM

MEREDITH, Chief Judge.
This matter was tried to the Court. The Court makes the following findings of fact and conclusions of law:

I. CASE HISTORY AND PROCEDURAL POSTURE.
This is a school desegregation case involving the public schools of the City of St. Louis, Missouri. On February 18, 1972, plaintiffs, who are representatives of the Concerned Parents of North St. Louis, filed their initial complaint. Plaintiffs represent school age children and their respective parents and next friends residing in the metropolitan school district of the City of St. Louis. Plaintiffs (hereinafter Liddell, et al.), each of whom is black, brought this action as a class action on behalf of themselves and all other school age children and their parents in that area. Plaintiffs named as defendants the Board of Education of the City of St. Louis, State of Missouri, and its members (hereinafter Board), in their official capacities, as well as the then Acting Superintendent of Schools and the District Superintendents of the Board of Education of the City of St. Louis, all in their official capacities.
In their initial complaint, Liddell, et al., alleged jurisdiction under 28 U.S.C. งง 1343(3) and 1343(4), 28 U.S.C. ง 2201, 42 U.S.C. งง 1983, 1988, and 2000d, and the Fourteenth Amendment to the Constitution of the United States.
Liddell, et al., alleged that the defendants, by their methods of maintaining and operating the school system, have perpetuated racial segregation and discrimination in the St. Louis City School system. Liddell, et al., further alleged that the defendants have so acted as to incorporate segregated residential patterns into the schools, to allocate educational resources in a discriminatory manner, and to perpetuate a dual biracial school system, thus failing in their affirmative duty to establish and maintain unitary public schools.
Liddell, et al., prayed that defendants be enjoined to take all steps reasonably necessary to establish a nonsegregated, nondiscriminatory school system, and be required to submit a plan for the allocation of educational resources, geographical boundaries and transportation routes, as well as staff and pupil assignments which will satisfy the Fourteenth Amendment requirements. In addition, Liddell, et al., asked for costs, attorneys' fees, and other relief.
Defendants answered this complaint, denying the material allegations, on April 19, 1972.
On October 3, 1973, after discovery proceedings by the parties, the Court allowed this action to be maintained as a class action pursuant to Rules 23(a) and (b)(2) of the Federal Rules of Civil Procedure, and notice of the pendency of the class action was duly published. The Court also, by public notice, invited other interested parties to intervene on or before December 1, 1973.
On October 30, 1973, defendants filed a motion to join as additional parties defendant the Governor, the Attorney General, the Commissioner of Education of the State of Missouri, the State Board of Education of Missouri, the St. Louis County Superintendent of Education, and the twenty school districts in St. Louis County which constitute the first two tiers of school districts adjoining the defendant school district of the City of St. Louis. The motion was denied on December 1, 1973.
On February 28, 1974, the Court requested that the parties file a written Stipulation of Facts. This was done on June 7, 1974. Exhibits filed with the stipulation have been supplemented to provide statistical material for the school years up to 1975-76.
On June 21, 1974, after proper publishing of notice to prospective members of the class and other interested parties, the Court, noting that no party had requested intervention, ordered that the cause might continue as a class action.
On December 24, 1975, the parties to this action entered into a consent judgment and *1310 decree which the Court approved. (The consent decree is set out in full in Appendix B.) The consent decree was based on a denial by the Board of Education that plaintiffs' charges were true, and a recognition that there was racial imbalance in the school system despite the Board's efforts to integrate the system.
The Board agreed to take further affirmative action in order to overcome the effect of residential patterns and to alleviate racial imbalance in the City schools. The Board agreed to progressively increase the percentage of minority teachers in every school, so that, in 1976-77, 10%, in 1977-78, 20%, and in 1978-79, 30% of the teachers at each school would be of the race that was in the minority at that particular school. This was to be done by voluntary transfers if possible, but otherwise by mandatory assignment despite any contracts, tenure, or seniority agreements to the contrary. This goal has been substantially met even though all parties did not agree to the continuation of the program.
In addition, defendants agreed to strive to increase integration by their manner of providing classroom space, to study realignments of feeder schools, to consider elementary magnet schools and special subject high schools, both with city-wide enrollments, and to attempt to improve the curriculum, all in an effort to relieve the residence-based racial imbalance in the City schools.
On December 24, 1975, the Court ordered publication of the consent decree and notice was ordered to all interested parties that they might object to the consent judgment by filing a statement before Friday, January 16, 1976.
On January 16, 1976, objections to the consent decree were filed by the Missouri State Teachers Association, St. Louis District; the St. Louis Teachers Union, Local 420, American Federation of Teachers; and the St. Louis Teachers Association.
A group of black students and their parents and next friends, together with the National Association for the Advancement of Colored People, Caldwell, et al. (hereinafter NAACP), also filed their objections and applied to intervene as representatives of the class.
Both plaintiffs[1] and defendants objected to the intervention of the NAACP and moved to dismiss the objections and motion to intervene.
Liddell, et al., further argued that because of their intimate knowledge of the particulars of the St. Louis City Schools situation, they were better able to structure solutions on a local level than a bureaucratic national organization like the NAACP would be.
After a hearing on January 23, 1976, all objections and applications for intervention were denied by this Court. Only the NAACP appealed from that order.
On December 13, 1976, the U. S. Court of Appeals for the Eighth Circuit reversed the order of this Court and allowed the appellants' motion to intervene. Liddell v. Caldwell, 546 F.2d 768 (8th Cir. 1976). The only issue before the Eighth Circuit was the right of the NAACP to intervene. As the appeal was interlocutory, the Court of Appeals did not consider the merits of the consent decree.
On January 28, 1977, the appeals court denied the defendants' motion for a stay of mandate pending petition for certiorari, and said that the consent decree, although interlocutory as to remedy, still obliged the parties to go forward with implementation of a desegregation plan and to make "every effort to achieve the greatest possible degree of actual desegregation, taking into account *1311 the practicalities of the situation." Davis v. Board of School Comm'rs. of Mobile County, 402 U.S. 33, 37, 91 S.Ct. 1289, 1292, 28 L.Ed.2d 577 (1971).
On February 25, 1977, this Court granted leave to Caldwell, et al., or the NAACP, to intervene and made them parties to this cause, "adopting the original complaint as filed February 18, 1972, and the stipulation of fact, filed by the original parties herein on June 7, 1974, in the same manner and with like effect as if named as original parties to this cause."
By submission of reports on February 28 and March 10, 1977, the defendants filed their plan for desegregation, pursuant to the requirements of the consent decree. The measures proposed in these reports include (i) the establishment of fully integrated junior high schools, (ii) expansion of the magnet school program, including the establishment of a new magnet high school, (iii) expansion of the integrated enrollment in two alternative high schools, Metro and O'Fallon Technical, (iv) emphasis on permissive transfers to improve desegregation, (v) adjustment in transportation to improve desegregation, (vi) in-service training and other collateral services, (vii) an educational park, and (viii) a metropolitan remedy. A financial report, filed on March 15, 1977, set forth the estimated costs for the programs contemplated, and the projected cost allocation between the Board and the Department of Health, Education and Welfare (HEW).
On March 28, 1977, the United States Department of Justice was allowed to intervene as amicus curiae, having declined to intervene as a party. Subsequently two groups of parents and pupils representing white students in the St. Louis public schools, identified as the Involved Citizens Committee (and also as Puleo, et al.) and the Concerned Parents for Neighborhood Schools (Adams, et al.), and the City of St. Louis were allowed to appear as amici curiae.
In May, 1977, Liddell, et al., the NAACP, and the United States Department of Justice submitted their separate alternative plans for desegregation under the consent decree. The NAACP also moved to enforce its own desegregation plan by an injunction.
In its order of July 13, 1977, the Court noted that the only part of the Board's plan to which all parties agreed was the magnet school program. Therefore the defendants proceeded with that program. As it would be inconsistent with due process to direct that the contended portions of the plan be implemented immediately, without a hearing, the remainder of the plan could not be implemented in 1977. The Court ordered a July 25, 1977, hearing on the proposed plans. Therefore, the motions of intervening plaintiffs NAACP and of amicus curiae United States Department of Justice, requiring immediate implementation of their own plans, were denied, and the subsequent reversal of position and separate motions by intervening plaintiffs NAACP and the United States Department of Justice requesting immediate implementation of the Board's plan were denied so that an orderly hearing might be held. The defendants' motion to dismiss the alternate plans of Liddell, et al., the NAACP, and the United States was denied.
At that time, in the light of the recent Supreme Court cases, Milliken v. Bradley, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977); Dayton Board of Education v. Brinkman, 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977), and School District of Omaha v. U. S., 433 U.S. 667, 97 S.Ct. 2905, 53 L.Ed.2d 1039 (1977), it became necessary for this Court to determine whether, in fact, there had been any constitutional violation by the defendants. There was no determination of a constitutional violation made in the Stipulation of Facts or in the consent decree.
A trial to this Court was to determine the following: whether there has been any constitutional violation on the part of defendants, and, if so, what is its nature and extent. If a constitutional violation were found, the Court would consider implementing remedies, matching the extent and scope of any remedies found necessary to the extent and scope of any violation which may be found.
*1312 By order of July 14, 1977, the trial date was postponed to October 17, 1977, in order to permit the State defendants to prepare for trial.
Before commencement of the trial, the United States Department of Justice (hereinafter Department),[2] Puleo, et al., or the Involved Citizens Committee, Adams, et al., or the Concerned Parents for Neighborhood Schools, and the City of St. Louis[3] were allowed to intervene as parties plaintiff. The State of Missouri, the Missouri State Board of Education, and the State Commissioner of Education were made parties defendant.
This case was tried to the Court in thirteen trial weeks at five different settings between October 17, 1977, and May 26, 1978. During the 13 weeks of trial, 39 witnesses testified in person and one by deposition. About 1,200 exhibits were received in evidence. The trial proceedings covered 7,115 pages of transcript. The trial addressed both issues of liability and remedy.

II. FINDINGS OF FACT.

A. Stipulation of Facts.
The Stipulation of Facts was filed by the original parties, Liddell, et al., and the Board, on June 7, 1974, pursuant to a February 28, 1974, request by the Court. This request came after the Court had, by public notice, invited any interested parties to intervene in this class action.
The Stipulation of Facts consists of 50 pages of description and facts concerning the St. Louis public schools to which the original parties agreed and are bound.
Subsequent to the filing of the Stipulation of Facts, other parties have intervened as parties plaintiff.
When Caldwell, et al., (NAACP), sought to intervene in the class action, they did not attempt to "assert a right to relitigate or undo the factual stipulations of the parties." Liddell v. Caldwell, 546 F.2d 768, 770 (8th Cir. 1976). The Eighth Circuit described the Stipulation of Facts in the following manner: "the stipulation appears to fairly set forth the basic history and statistics of the St. Louis school system." Id. at 770.
The February 25, 1977, order of this Court granting the application for intervention of Caldwell, et al., (NAACP), specifically provided that the intervenors adopt the Stipulation of Facts "in the same manner and with like effect as if named as original parties." This Court also held in the order of July 13, 1977, that all parties are bound by the Stipulation of Facts.

B. The Board of Education.
The original defendants are the Board of Education of the City of St. Louis, which is a metropolitan school district, a body corporate, created and governed by the statutes of the State (hereinafter referred to as the Board), and the following persons who are sued in their respective official capacities at the time the suit was filed: the twelve members of the Board, the Acting Superintendent of Schools, and the five District Superintendents of the districts into which the school system of the City is administratively divided.
The Board has the supervision and government of the public schools and public school property within said district; and in its name the Board may sue and be sued; purchase, receive, hold and sell property, and do all things necessary to accomplish the purposes for which the school district is organized.
Under the laws of Missouri, all titles to property granted to the City of St. Louis by the United States or the State of Missouri for school purposes, and the title to all school lands and other property of every kind within the City of St. Louis are vested in the Board.
The laws of Missouri require the Board to organize annually by electing a president, *1313 vice-president and secretary from its members, and to appoint a superintendent of schools; and that should the superintendent of schools be unable to perform his duties as required by law, or if the office of superintendent becomes vacant, the Board shall appoint an acting superintendent to serve during the period of disability of the superintendent or the vacancy in the said office.
The laws of Missouri vest the Board with general and supervising control, government and management of the public schools and public school property in said City of St. Louis, and generally with all powers in the administration of the public school system in said City, inter alia, the following:
(a) to appoint the officers, agents and employees it deems necessary and proper and fix their compensation; (b) to make, amend and repeal rules and bylaws for the government, regulation and management of the public schools and school property in said City; (c) to examine, qualify and employ teachers; (d) to purchase and hold all property, real and personal, deemed by it necessary for the purpose of public education; (e) to build and construct improvements for such purposes, and sell the same; (f) to levy taxes authorized by law for school purposes; and (g) to provide for the gratuitous transportation of pupils to and from schools in cases where by reason of special circumstances pupils are required to attend schools at unusual distances from their residences.
Furthermore, as provided by statute, the Board is subject to rules promulgated by the State Board of Education on a number of subjects, including accreditation, classification and requirements for the schools of each class, and is supervised by the State Board in some respects.
Pursuant to the laws of the State of Missouri, the Board appointed a Superintendent of Schools, and during his leave of absence in the school year 1971-72, an Acting Superintendent of Schools was appointed for that year. These officials have statutory authority (subject to the approval of the Board of Education of the City of St. Louis, or under regulations made by the State Board of Education), inter alia, as follows:
(a) to appoint a treasurer;
(b) to appoint a commissioner of school buildings;
(c) to appoint associate and assistant superintendents;
(d) to prepare and administer the annual budget of the school system;
(e) to have general supervision of the school system, including its various departments and physical properties, course of instruction, discipline and conduct of schools, textbooks and studies; and
(f) to have general supervision of all school buildings, apparatus, equipment and school grounds and of their construction, installation, operation, repair, care and maintenance.
The boundaries of the School District of the City which is administered by the Board are coterminous with those of the City of St. Louis itself. These boundaries, which comprise 61.37 square miles, have remained the same since their establishment by the legislature in 1876. Compare ง 5271, R.S. Mo.1879 with ง 46.145, R.S.Mo.1969. The City of St. Louis is also a county but separate and distinct from St. Louis County which adjoins the City of St. Louis.

C. State of Missouri and the State Board of Education.
Prior to 1954, the Missouri Constitution provided separate schools for black and white pupils. Art. IX, ง 1(a), Mo.Constitution, 1945. Several state statutes served to implement that provision by providing for the distribution of separate school moneys (ง 161.020, R.S.Mo.), separate enumerations and the transfer of black pupils between districts (งง 163.130, 164.030, 165.117, 165.297, R.S.Mo.). The legislature acted promptly in response to Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). State funding for separate black and white schools was repealed at the next regular session of the General Assembly. Laws of 1955 at 520. *1314 The remaining statutes were repealed in 1957. Laws of 1957 at 452.
In 1961, laws were enacted prohibiting discrimination in housing (Chapter 213, R.S. Mo.), employment (Chapter 296, R.S.Mo.), and public accommodations (Chapter 314, R.S.Mo.). The latter chapter by its terms is applicable to schools. Enforcement of these laws was vested in the Missouri Commission on Human Rights. No other laws were enacted, nor were any laws amended which expressly or by implication required or permitted school districts to make distinctions between black and white pupils, or which encouraged districts to resist the removal of vestiges of the dual system within their districts.
The Missouri State Board of Education has constitutional and statutory authority to "supervise instruction" in the public schools of Missouri (Art. IX, ง 2(a), Mo.Constitution, 1945), and to otherwise effectuate the educational policies of the State. ง 161.092, R.S.Mo.1969 (as amended, Cum. Supp.1975). The State Board distributes state aid on an annual basis to local school districts pursuant to a formula taking into account, inter alia, numbers of pupils served and local tax effort. ง 163.031, R.S.Mo.1969 (as amended, Supp.1977).
State aid may be withheld only if a school district fails to: (a) operate its schools for a minimum number of days, (b) maintain adequate financial records, (c) levy a minimum property tax, or (d) compute average daily attendance as prescribed by law. ง 163.021, R.S.Mo.1969 (as amended, Cum.Supp.1975).
The State Board has statutory power to provide state aid in the transportation of students and to approve all school bus routes traveled by school buses. ง 163.161, R.S.Mo.1969 (as amended, Supp.1977).
St. Louis, as a "metropolitan district," is empowered to transport pupils to and from schools "where by reason of special circumstances pupils are required to attend schools at unusual distances from their residences." ง 162.621(8), R.S.Mo.1969.
All other districts are subject to statutory mileage criteria. ง 167.231, R.S.Mo.1969 (as amended, Supp.1977).
The determination of pupil assignments and transfers, the drawing of attendance zones and feeder patterns, the selection of sites for schools and additions, and the assignment of faculty are within the discretion of local school officials, and are not shown to be routinely reported to the State.
The State Board is responsible for approving applications from the St. Louis Board for aid under Title I of the Elementary and Secondary Education Act of 1965 and such aid is also subject to final approval by the Department of Health, Education and Welfare (HEW).
The evidence shows that the State of Missouri effectively removed all barriers at the state level to the desegregation of the schools. There is no showing that any actions of the State, the State Board of Education, or the Commissioner of Education of the State of Missouri had a segregative effect or in any way hindered desegregation.

D. Pre-Brown Conditions.

1. Dual school system.
Prior to the decision in Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), the public schools of the State of Missouri were segregated pursuant to state constitutional and statutory law. As of that time the public schools maintained and operated by the Board had a total enrollment of 90,327 pupils, comprising the following:

 17,216 High Schools 11,921 White 5,295 Black
 72,259 Elementary Schools 46,674 White 25,585 Black
 852 College 547 White 305 Black
 ______ ______ ______
 90,327 Total 59,142 White 31,185 Black

*1315 Over 30,000 children in St. Louis attended private and parochial schools, a relatively low percentage of that number being black.
Prior to 1954 the Board operated seven (7) high schools limited to white students. These schools were Beaumont, Central, Cleveland, McKinley, Roosevelt, Soldan, and Southwest high schools. There were two (2) high schools limited to black students. These schools were Sumner and Vashon. There were also two vocational or technical schools, one black and one white.
Under the dual school system white students were assigned to schools on the basis of proximity to their homes. Black children did not have neighborhood schools, but were instead bused to the black schools at the core of the City. Separate, overlapping attendance zone lines were maintained for black schools and white schools. This resulted in some extremely large attendance zones for black schools.

2. Discriminatory laws.
Segregation was eliminated in the following public facilities and community services in the indicated years. The Catholic schools were desegregated in 1947. Nondiscrimination was made the law in City employment in April, 1946. White teachers were employed in black segregated schools prior to 1955. The St. Louis area ball parks were desegregated and St. Louis University was integrated in 1944. Washington University was integrated in 1947. The St. Louis theaters were desegregated in 1951. The St. Louis recreational facilities were desegregated in 1950, and the public transit system was desegregated in 1953.
In 1918, an attempt was made to impose segregated housing on the City's population. Over the opposition of City officials, a segregated housing ordinance was passed by initiative petition. This ordinance was immediately struck down by the courts and was never enforced. Nevertheless, as of 1954, segregation in housing existed due to private discriminatory practices and actions and policies of the Federal Housing Administration.

3. Demographics.
A quick review of St. Louis demographics prior to 1954 reveals a tendency of certain groups of common race, national origin, religion, and economic means to settle in certain areas of the City. This tendency has resulted in some homogeneous residential patterns despite the heterogenity of the population of St. Louis as a whole. Although grouping in homogeneous residential patterns was evident prior to 1954, all groups remained highly mobile. Pockets of blacks were residing throughout St. Louis, although much of the black population lived in the area immediately north of the downtown area. The tremendous mobility of the St. Louis population was to be shown in demographic changes after 1954.
The population of St. Louis grew until 1950, when the population was 856,796. The racial composition in St. Louis was then 82.1% white and 17.9% black. In 1950, the white population in St. Louis had declined by 4,253 from 707,283 whites in 1940. White attendance in the St. Louis public schools had also declined as of 1950.

4. Board activities.
The St. Louis Board of Education anticipated the outcome of the Brown decision and in 1953 began to prepare for desegregation.
By the time the Brown decision has handed down a number of steps had been taken by the Board, including: interracial activities for principals, teachers and students; introduction of teaching materials portraying contributions of different ethnic groups to American life; comprehensive programs to improve the teaching of human relations in the schools; working with church groups, civil rights groups and other community organizations to prepare the community for desegregation and to obtain community support for desegregation; and arrangements to familiarize Board members, school officials and community leaders with the experience of a desegregated public school system. The pre-Brown activities of the Board also included the preparation of plans for the desegregation of the school system. The administrative staff of the Board began *1316 preparing a desegregation plan for implementation as soon as the Supreme Court acted.
This anticipatory work by the Board was praised at the time of Brown in that it made possible an early completion of the integration program for St. Louis. Irving Dilliard, chief editorial writer for the St. Louis Post-Dispatch, made the following comments on the Board's efforts in his editorial of May 19, 1954:
"Ready acceptance in St. Louis is indicated by the reception of the [Brown I] decision here. Much to its credit, the Board of Education has anticipated the result and has in hand plans for developing a single school system. It can be hoped that this program is already far enough along on paper that it can be completely worked out and put into effect next September. Three months is a substantial period. Accommodation of the ruling through the summer vacation season would be a splendid achievement for the second largest city in the country (after Baltimore) with a segregated school system."

E. 1954-56 Desegregation Plan.
On June 30, 1954, the Attorney General of the State of Missouri ruled that the provisions of the Constitution and laws of Missouri requiring segregation were superseded by Brown and were unenforceable. By that time, to wit, on June 22, 1954, the Board had already adopted a three step program for desegregation of the St. Louis public schools. The first step provided for desegregation at the junior college, teachers college level and in those classes which provided services on a city-wide basis. This first step was completed by September 1954.
The second step provided for desegregation of all high schools (except for the technical high schools) and also for desegregation of the adult education program. The third step provided for desegregation of the two existing technical high schools and all regular elementary schools. The plan was implemented over a two year period, from 1954 to 1956.[4]
The three point program eliminated race as a required criterion in determining eligibility to enroll in any public school of the system. After the adoption of this program, students were assigned to the schools in accordance with the following general principles to govern the integration process for students, which were adopted by the Board at the said meeting of June 22, 1954:
a. The areas to be served by each elementary and each secondary school will be established by new boundaries. In drawing these boundaries, the purpose will be to provide the best use of the facilities of a given school by the students living in the area of that school.
b. These boundaries will provide each school with a district which it will serve. Students must attend school in the district in which they live, with the following exceptions:
(1) The proper school authorities may transfer students from one district to another to relieve overcrowding.
(2) Students already enrolled in a school, but not resident in its new district may, but are not required, to continue at that school until they graduate. This privilege will be granted, however, only if the particular school is not overcrowded.
For the accomplishment of these objectives, IBM cards were prepared for city blocks showing the number of students without any consideration of race or color. All reference to race or color was eliminated in the records of the St. Louis Public School System from 1954 until 1962,[5] when the first racial count was taken pursuant to the recommendation *1317 of the U. S. Commission on Civil Rights.
The new attendance boundaries for elementary schools were drawn by a high level black administrator, James Armstrong Scott, who used the following procedure:
a. All principals of all elementary schools were required to send the grades and residence addresses of each of their students to a central office, where the information was reduced to IBM cards, which were then sorted by the city block on which each of the students resided.
b. Mr. Scott was then supplied with a separate sheet of paper for each city block, on which sheet was printed the number of public school students residing on that block and the grades which they attended. There was no other information on the sheet. The names, ages, race, and home addresses of the children were all deleted.
c. Attendance boundaries were then drawn for each school, using as the criteria only proximity to the school building and building school capacity, giving consideration for natural barriers such as major thoroughfares and distance.
Mr. Scott was instructed "to do the whole job" and to rely on the following factors alone:
"To draw the lines objectively by the use of IBM cards and to decide each district on the โ in terms of building capacity, that is if it's a five hundred school which would hold five hundred children. And on distance, so that the children would not have to go too far. And on the basis of safety, so that they wouldn't have to cross dangerous spots. And in the case of some, on the basis of transportation because even with the best districting, some children did have to ride to school."
(Scott deposition, pp. 8-9.)
Subsequent to the establishment of the new boundaries, there was a series of meetings and communications with parents, and the new boundaries were publicized in the newspapers in advance of their implementation. The new elementary boundaries were approved by the Board in its meeting of March 8, 1955.
One of the effects of the redistricting in 1954 was to bring about equalization of students in attendance at the various schools. As Scott testified:
"In some schools, especially toward the edge of the black area, there were schools of white children that had some empty rooms and they were redistricted to take down the numbers from the black schools. For years the black schools, the teachers had about forty-five children to a room; whereas, in most of the white schools there were about thirty-five children. But when we redistricted in 1954-55, we tried to have every school in the city, black or white, average the same number of pupils per room."
(Scott deposition, pp. 49-50.)
The high school boundaries were redrawn by Mr. Sellman, using the same method as Mr. Scott used. The new boundaries were publicized and interested groups and organizations, including the NAACP, the Urban League, PTA and other civic and religious groups were invited to inspect and comment on them. No complaints were received and the boundaries were approved by the Board on December 14, 1954.
The plan formulated by the Board, described above, succeeded in desegregating the previously dual school system.[6] The level of desegregation achieved through the plan was substantial and system-wide. Almost 60% of the black high school students chose to attend the previously all white school in their new district attendance area, with the result that six of the seven previously all white high schools had a racially mixed enrollment. At the elementary school level about two-thirds of the total enrollment were attending interracial schools.[7]
*1318 The Board's desegregation plan encompassed desegregation of the faculty, discussed infra, the administration, and the Board itself. Since April 18, 1955, there has been no time when the 12-member Board did not include at least one black member, two since the school year 1960-61, three since the school year 1962-63, and four since the school year 1970. There have been four black presidents elected by their colleagues on the Board.
Special committees were appointed by the Board to deal with desegregation policies and procedures. The first was a staff committee of three members, of which James A. Scott, a black assistant superintendent, was chairman from the establishment of the committee on November 14, 1961. The second was a continuing committee on integration, consisting of four members of the Board, which was created on September 10, 1963, and was first chaired by the Reverend John J. Hicks, one of the black Board members.
The Board's desegregation plan received widespread support in 1954 from civil rights supporters. Wylie Davis, in his study on St. Louis which was a Report to the Civil Rights Commission in 1962, praised the effectiveness of the Board's plan:
"The 1954-56 transitions, then, were solidly conceived and brilliantly carried off. They represented a signal breakthrough in human relations, and everywhere those who prize man's dignity were properly impressed."
As a result of the Board's 1954-56 desegregation plan, a unitary public school system was achieved in St. Louis.

F. Resegregative Factors.
After the 1954-56 desegregation plan was implemented, several forces, outlined below, which are beyond the Board's control, impeded further integration and caused resegregation in the St. Louis public schools.

1. Socio-demographic changes in St. Louis.
In its origin and for many decades thereafter the population of the City was predominantly white. The more recent decades, however, show a sizeable and consistent increase in the black population of the City, with a large loss of the white population and a significant loss of the total population. Since no issue is raised in this case as to any race or ethnic group other than black, and since the aggregate of all such other minority groups is negligible in itself, they are combined with "whites."
The census data show the extent of this transition over the years since 1940:

 Year Total Population Black % Black
 1940 816,048 108,765 13.3%
 1950 856,796 153,766 17.9%
 1960 750,026 214,377 28.6%
 1970 622,236 254,191 40.9%
 1977[*] 523,000 229,980 44.0%

During the period from 1950 to 1970 the "net out-migration"[8] of whites from the City amounted to over 400,000 while blacks showed an overall increase of over 100,000.
*1319 The exodus of whites and affluent blacks from the City to St. Louis County was caused and accelerated by a variety of mutually reinforcing factors; combination of widespread automobile ownership and building of expressways; abundance of land in the County which could be developed with modern homes, contrasted with the nonavailability of such land in the City and the age of the City's buildings which were found less desirable to satisfy the life-style of a post-war affluent society; and the pull of jobs in the County due to the very sizeable growth of employment opportunities provided by large manufacturers and businesses which became located in the County.
This movement from the City to St. Louis County is reflected in the following statistics of the United States census with regard to the racial composition of the County's population:

 Year Total Population White % Black
 1940 274,230 261,840 4.5%
 1950 406,349 389,336 4.1%
 1960 703,532 683,652 2.7%
 1970 951,353 902,002 4.8%

The white exodus to the suburbs in the 1950's and 1960's was accompanied, and partially caused or accelerated by the movement of the blacks from the inner-city area to the central west end and later to the northwest areas of the City and into the County. Factors in this black migration from the inner-city were the economic upgrading of former poverty and low income level families, and the impact of razing slum areas in preparation for new housing developments such as the Mill Creek area (declared blighted in 1953), J. J. Cochran (1953), Capt. N. O. Pruitt (1955), Wm. L. Igoe (1956), G. L. Vaughan (1957, 1963), J. M. Darst (1956), and A. M. Webbe Apartments (1961). The slum razing resulted in large-scale displacement of black residents of the inner-city, the majority of whom migrated to the west end.
Intra-city movement and dislocation of blacks was also produced by the clearance required for the development of the highway system, including Highways 55, 44, 70, and 40. These displacements resulted in a major intra-city migration of blacks from the traditional inner-city to the central west end and to the northwest areas of the City and into the County.
Prior to the 1960 census only 2% of the blacks in St. Louis lived west of Kingshighway. By April, 1963, over 25% of the black population lived west of Kingshighway.
The west end area of St. Louis (Union to Hodiamont and Delmar to Page) went from about 60% black in 1962 to almost 100% black today.
The black out-migration from the inner-city to the west end and northwest St. Louis has resulted in high population density in the receiving areas. In many instances the shifting of blight, as dwellings became unprofitable to the landlords and unlivable for the tenants, resulted in the downgrading and the eventual abandonment of neighborhoods, which caused a continuous search by blacks for a better neighborhood.
Another result was the depopulation of previously heavily occupied areas. During the westward, northward and northwestward expansion of the black population of the City between 1950 and 1970, fifty percent of the blacks moved out of the older black areas. This is reflected in the following statistical analysis by the 26 health districts into which the City has been divided since before 1950:

*1320
 Black Population of the St. Louis
 Health Districts as a % of the
 Health Districts City's Total Black Population 
 1950 1960 1970
 1. Carondelet 0.3% 0.2% 0.1%
 2. Gardenville - - -
 3. Southwest - - -
 4. Oakland - - -
 5. West End 0.3 7.3 9.9
 6. Sherman Park 2.4 20.0 20.6
 7. Northwest - 1.2 6.3
 8. Baden 0.1 - 0.3
 9. O'Fallon Park 0.1 - 3.3
 10. Fairgrounds 2.2 7.9 12.4
 11. Garfield 27.5 22.1 14.4
 12. Forest Park 5.5 7.0 6.5
 13. Fairmount 0.5 0.4 0.2
 14. Southampton - - -
 15. Cleveland 0.2 0.1 -
 16. Tower Grove - - -
 17. Compton - - -
 18. Ranken 5.9 2.0 1.7
 19. Lindell 4.0 3.4 3.5
 20. Yeatman 3.3 2.8 4.1
 21. Beaumont 30.4 17.7 8.2
 22. Mill Creek 9.0 3.2 2.9
 23. Soulard 0.8 0.5 1.0

*1321
 24. Cherokee - - -
 25. Downtown 6.7 3.8 2.5
 26. Hyde Park 0.8 0.2 1.0

The number of health districts with 10% or more black population (of all ages) increased from 8 in 1950 to 15 in 1970 and during the same period the number of health districts with more than 40% black population increased from 4 to 12. The percentages of blacks computed from the total population of each health district in 1950, 1960, and 1970 were as follows:

 Black Population by Health Districts
 as a Percentage of the Total
 Health Districts Health District Population 
 1950 1960 1970
 1. Carondelet 1.9% 1.3% 1.2%
 2. Gardenville - - -
 3. Southwest - - -
 4. Oakland .3 .4 .7
 5. West End 1.1 42.6 80.9
 6. Sherman Park 6.4 76.6 96.8
 7. Northwest - 8.2 48.4
 8. Baden 1.1 .7 5.4
 9. O'Fallon Park .8 .4 49.5
 10. Fairgrounds 9.3 48.4 90.3
 11. Garfield 77.2 96.9 98.9
 12. Forest Park 22.6 47.6 66.8
 13. Fairmount 4.8 5.0 4.8
 14. Southampton - - .1
 15. Cleveland .8 .7 .2

*1322
 16. Tower Grove - .1 -
 17. Compton .2 .1 9.4
 18. Ranken 32.9 22.9 30.4
 19. Lindell 19.0 30.4 45.8
 20. Yeatman 18.6 26.8 64.8
 21. Beaumont 92.0 96.5 90.4
 22. Mill Creek 45.0 44.3 74.4
 23. Soulard 2.0 2.4 10.0
 24. Cherokee - - -
 25. Downtown 55.0 61.8 60.1
 26. Hyde Park 3.6 2.0 15.1

In 1970 the bulk of the black population (of all ages) of St. Louis was concentrated in a comparatively small area of the City which included about 60% of 156 elementary school districts.
During the last few decades the proportion of black students enrolled in the City's public schools has consistently been greater than the proportion of the City's total black population. This is caused by a number of factors, including the fact that a higher proportion of black families than white is in the child-bearing age group; a higher proportion of white pupils than black attend private and parochial schools; and that elderly whites represent a large portion of the white population which remained in the City, whereas a large proportion of those who moved to the suburbs have been young and middle-age families with children.
In 1950 the black population was 17.9% of the total population of the City, while in the same year, black elementary school enrollment accounted for 30.8% of the total enrollment. By 1970 the City's black population was 40.9% of the total while black pupils made up 65.6% of the elementary school enrollment. In 1977 black enrollment in elementary schools was up to 72.7%, while the total black population of the City was estimated at 44%. The black student enrollment covers a wider geographical area than the overall black population.
Together with the massive shift in the black population to the central west end and the northwest areas of the City, there was a shift in the geographic concentration of school-age children. This relocation of school age children needs to be compared with the higher use of the public schools by black children than by white children and explains the tremendous overcrowding of public schools in the northwest portions of the City.
From 1953 to date, the racial composition of the pupils attending the public schools of the City, excluding Harris Teacher's College, has been as follows:

*1323
 School Year Black White Total %Black
 1953-54 30,880 58,595 89,475 34.5%
 1962-63 59,941 48,304 108,245 55.4%
 1963-64 63,675 47,762 111,437 57.1%
 1964-65 66,886 46,817 113,703 58.8%
 1965-66 69,888 45,834 115,722 60.4%
 1966-67 71,844 44,478 116,322 61.8%
 1967-68 73,433 43,238 116,671 62.9%
 1968-69 73,408 42,167 115,575 63.5%
 1969-70 73,128 40,246 113,374 64.5%
 1970-71 72,965 38,268 111,233 65.6%
 1971-72 73,221 35,459 108,680 67.4%
 1972-73 72,629 32,988 105,617 68.8%
 1973-74 68,624 30,226 98,850 69.4%
 1974-75 65,252 28,068 93,320 69.9%
 1975-76 61,672 25,938 87,610 70.4%
 1976-77 58,148 23,600 81,748 71.1%
 1977-78 55,984 21,017 77,001 72.7%
 1978-79 54,584 18,638 73,222 74.5%

2. Housing segregation.
The evidence of housing segregation in St. Louis is undisputed in the record. The Report of the U. S. Commission on Civil Rights, "Racial Isolation in the Public Schools," 1967, gives St. Louis as an example of "severe" residential segregation.
Prior to 1954 a pattern of racial housing segregation prevailed in the City and discriminatory restrictions against blacks were enforced by the courts and agencies of the State of Missouri. Dolan et al. v. Richardson et al., 181 S.W.2d 997 (Mo.App.St.L., 1944); Shelley v. Kraemer, 355 Mo. 814, 198 S.W.2d 679 (en Banc, 1946) rev'd, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1947); and Jones v. Alfred H. Mayer Co., 255 F.Supp. 115 (E.D.Mo.1966), aff'd, 379 F.2d 33 (8th Cir. 1967), rev'd, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968).
After 1954 certain discriminatory practices against blacks continued to exist in the City, such as:

*1324 (a) the failure of the City to enforce building codes and the strict adherence to use of brick in building,
(b) red-lining of areas by insurance companies and lenders,
(c) segregated policy of the Federal Housing Administration (FHA), and
(d) newspaper listing of separate for "colored" ads.
The fact that government policies and action have been a major force in developing and maintaining housing discrimination against blacks is undisputed in the record. The Department of Housing and Urban Development (HUD) is and for many years has been guilty of intentional housing segregation and has been so found by some federal courts. (Testimony of Dr. Gary Orfield, expert witness for the Department of Justice.)
In a 1975 article entitled "White Flight Research: Its Importance, Perplexities and Possible Policy Implications," Dr. Orfield states:
"White Flight as a Triumph of National Housing Policy. The phenomenon described as `white flight' by students of school desegregation is often seen, in another light, from another angle, as a true triumph of the basic tools of U. S. housing policy during the post-World War II period. Facilitating white suburbanization has been a basic goal, explicitly at first and implicitly to this day."
Dr. Morrison, an expert demographer, testified in a similar vein that federal policies on the interstate highway program, housing and FHA refusal of insurance on inner-city mortgages resulted in white movement to the suburbs and in housing segregation of blacks in the City.

3. Title I.
Following the enactment and implementation of the Elementary and Secondary Education Act of 1965, 20 U.S.C. ง 241a et seq. (hereinafter ESEA), a large number of schools were provided and have been operated by the Board with federal assistance. The purpose of this federal program is to "bring better education to millions of disadvantaged youth who need it most" "because of the strong correlation between educational under-achievement and poverty," as stated in the Senate Report (U.S.Code Congressional and Administrative News, 89th Congress, First Session, 1965, pp. 1446, 1450 and 1449). Federal funds were made available to the Board under Title I of the ESEA for students living in the areas (46 in 1972) of the City which have been declared eligible upon meeting the specified standards of economic disadvantaged conditions of its resident children (federally determined percentage of Aid to Dependent Children (ADC) recipients).
Federal Title I funds are disbursed each fiscal year by the Department of Health, Education and Welfare (hereinafter HEW) to the State of Missouri school authorities. This money is in turn allotted to the individual school district. The Title I programs for the St. Louis school district are developed by the Board and approved by State of Missouri officials and by HEW. Recipients of federal Title I funds are obliged to report to HEW officials respecting Title I projects and programs. The evidence shows that HEW officials have visited and viewed St. Louis Title I projects.
Title I funds are earmarked for services, including, where necessary, the construction of school facilities, for "the special educational needs of educationally deprived children in school attendance areas having high concentrations of children from low-income families." 20 U.S.C. ง 241e(a)(1)(A).
HEW regulations are designed to carry out the policy of Title I. These regulations require that school attendance areas be designated,[9] that certain areas be designated as project areas under Title I, and that the Title I services/project be carried out in the locations best suited to serve the needs of the children.
Most of the eligible areas under Title I criteria in St. Louis are and have been *1325 racially characterized by black predominance. Since the Title I program was started in 1965, the total number of elementary schools designated to receive Title I services ranged from 81 to 98 per school year, with an enrollment of between 86% and 97% black. These Title I schools constitute most of the schools in the system which have a major racial imbalance in their enrollment. In 1977-78, there were 82 elementary schools which received Title I services. 94.8% of the students enrolled in these Title I schools were black. Of the 90 virtually all black elementary schools in 1977-78, 73 were Title I schools.
The evidence shows that in St. Louis, where virtually all of the areas having high concentrations of children from low-income families are black, Title I requirements focusing on poverty and educational needs rather than purely educational needs, which the Board urged should be the main criterion, have led or contributed to the identifiability of a large number of schools as black and in furthering the concentration of black students therein.
The Board has operated Title I programs and built schools with Title I funds according to the following HEW regulation:
"ง 116.17 Project covered by an application.
(a) An application for a grant under Title I of the Act by a local education agency (other than a State agency directly responsible for providing free public education for handicapped children or for children in institutions for neglected or delinquent children) shall set forth a project for educationally deprived children residing in a project area composed of school attendance areas having high concentrations of children from low-income families . . which project shall have been designed specifically to meet special educational needs of those educationally deprived children. The project itself shall be carried out at locations where the needs of the educationally deprived children can best be served. It may involve the participation of educationally deprived children residing outside the project area if such a participation will not dilute the effectiveness of the project with respect to children residing in the project area."
45 C.F.R. ง 116.17 (1972).[10]
This regulation, in essence, required the Board, which needed federal Title I funds to implement remedial programs for educationally deprived children, to spend the Title I funds on children from eligible attendance areas (virtually all black). Although the project need not be carried out in the Title I designated area, the project still had to serve Title I children (virtually all black). Thus, if Title I children were assigned to non-Title I schools, the Title I programs would still have to have been taught separately. This situation would have had the same impact as intact busing. These requirements had the effect of excluding most white children from the Title I programs.
Although ง 116.17(a) allows the participation of educationally deprived children not from Title I areas to participate in Title I projects, this allowance is curtailed by the requirement that such participation will not dilute the effectiveness of the Title I project for Title I children. In St. Louis this dilution prohibition effectively excluded non-Title I white students from participating in Title I projects. An example of this prohibition was the Title I funding of two specialized high schools.
Both Work Study and Lincoln were planned as racially mixed specialized high schools, with voluntary attendance by the students. Both were funded under Title I, ESEA. Although the federal requirements limit eligibility of attendance to students living in an area which has been declared a Title I eligibility area, a 10% enrollment from other areas was first permitted in these schools but was later (1972) prohibited by the federal authorities.
Work Study was scheduled to open in 1969, but it was not completed until January 1970. Faculty and administration were racially mixed since the time when they were engaged in the preparation of the *1326 program in temporary facilities, and before the school was opened to the students. By the time the school opened the ratio of the student body was 92.6% black and 7.4% white.
The Lincoln high school was opened in 1966, after the Board acquired and renovated the educational building of Temple Israel for use as an opportunity school for students with special adjustment problems. The student body was composed of 266 black (94%) and 17 white (6%) students. By 1973 all students were black.
The dilution factor is especially important in light of the fact that Title I has not been fully funded by Congress and not all Title I eligible students can receive services. This makes it all the more necessary for the Board to concentrate its funds on the areas having the highest concentration of poverty students. These areas are mostly black.
The prohibition against diluting a Title I project has not been the only barrier to mixing Title I eligible students (primarily black) with other students. As has been stated above, it has been the policy of HEW to restrict the use of Title I funds to eligible students from eligible areas. When students have moved to a non-eligible area, they have no longer been eligible for Title I benefits. The regulations have not indicated (and have, indeed, suggested otherwise) that Title I students moved by a school district to a school in a non-Title I area (when no court ordered desegregation plan was in effect) would continue to be eligible for Title I services.[11]
The evidence in the record shows that the Board followed and had to follow the regulations set out by HEW to receive Title I funding, which the Board needed. There is no evidence of any segregative intent by the Board with respect to how Title I funds were used.

G. Resulting De Facto Resegregation.

1. Transitions in the schools.
As a result of the resegregative forces described above, with the resulting massive population movements โ out-migration of whites to the suburbs, intra-city migration of blacks โ many transitions occurred in the St. Louis public schools. These transitions illustrate the great mobility of both black and white populations. These changes were largely unforeseeable and/or beyond the control of the Board.
The major transition in St. Louis after the Brown decision was the change from a majority white system to a majority black school system. Another major change was the substantial increase in student population (mostly black) in the west and northwest areas of the City and a decrease in enrollment in the southern areas of the City. Much of the white migration from St. Louis was from the west and northwest areas of the City. This white population was rapidly replaced by a larger black population, causing a dense black population in the west and northwest areas of St. Louis.
The intra-city population changes noted above are reflected in the transition of a number of schools from well racially mixed student bodies to virtually all black enrollment (more than 90%). In the 1962-63 school year there were 30 regular elementary schools with black enrollment in the range from 10% to 80%. Of these, 14 reached a black enrollment of over 91% by the school year 1973-74. This transition is shown in the following tabulation:

 Percent Black Pupil Population
 1962 1963 1964 1965 1966 1967 1968 1969 1970 1971 1972 1973
 School - 63 - 64 - 65 - 66 - 67 - 68 - 69 - 70 - 71 - 72 - 73 - 74 
Blair 12.2% 13.2% 15.7% 16.8% 24.3% 32.6% 47.0% 67.7% 78.5% 85.8% 87.3% 91.7%
Hamilton 47.9 60.7 75.7 93.0 96.2 97.7 98.0 99.8 99.7 99.1 99.7 100.0
Harrison 46.6 75.2 90.7 96.3 97.2 96.0 99.1 100.0 100.0 100.0 100.0 100.0

*1327
Herzog 35.0 40.8 21.1 30.3 28.1 29.8 42.0 53.4 63.7 90.6 98.5 98.6
Howard 35.1 49.0 58.0 63.1 70.6 77.7 89.6 94.9 98.9 99.5 100.0 100.0
Howard Branch 58.1 72.4 81.7 83.9 88.2 93.1 91.6 97.9 98.8 99.4 98.6 98.5
Jackson 16.5 21.9 26.7 34.4 49.2 65.9 81.2 87.5 94.0 95.5 97.7 98.7
Lowell 31.1 19.6 26.1 28.1 35.0 41.1 51.4 63.3 71.3 79.5 90.7 95.3
Mark Twain 13.5 14.5 12.3 22.2 29.6 41.7 62.5 86.3 94.9 97.8 99.1 99.0
Marquette 70.9 79.2 84.2 89.8 90.6 97.7 98.5 98.8 98.9 99.1 99.4 99.2
Peabody 79.6 72.5 86.2 90.9 95.8 98.4 98.7 98.5 99.7 99.7 99.2 99.1
Rock Spring 55.7 56.6 40.1 51.7 58.0 63.3 63.5 76.3 85.0 94.0 89.8 93.3
Walbridge 39.2 42.7 13.6 33.4 29.5 17.7 27.4 45.1 71.1 88.0 97.4 98.7
Walnut Park 38.2 40.7 25.1 32.5 38.2 35.3 40.2 48.0 68.1 88.0 95.7 98.2

An analysis of the statistical data available during the period from 1953 to 1973 shows that of the 24 schools which reached a black pupil enrollment of approximately 50%, 22 increased that ratio to approximately 90% within the average period of 3.59 years, with a minimum of two years for seven schools and a maximum of eight years in the case of one school. Both schools which in 1972-73 had an enrollment still under the 90% level involved special attendance areas: (a) the Stix school's attendance zone is located in the area around the Hospital group, Kingshighway, the Washington University Medical School and related facilities which enhance the presence of a sizeable number of white families of child-bearing age; and (b) the other school, Waring, represents a unique situation, because of the adjoining controlled integrated neighborhood of Laclede Towne and its nature of a demonstration center for Harris Teacher's College with city-wide optional attendance.[12]
Of the 25 public schools of the City which reached a black enrollment of approximately 70%, within the average period of 2.04 years, ranging from one year for five schools to eight years in the case of one school, 24 out of these 25 schools reached the 90% level of black enrollment. The only exception as of 1972-73 was Waring, which was a specifically controlled situation, as previously stated.[13]
The record shows that the experience in St. Louis has been that stable integration in a particular school is generally achieved only when the percentage of blacks remains below 50%. When the percentage of blacks in an integrated situation reaches about 50%, what was an integrated enrollment becomes an all black or virtually all black enrollment.
The racial transitions in schools once the student enrollment reaches about 50% black is one major reason for the racial imbalance in the west and northwest area schools. Another reason is the dense concentration of blacks in those areas.
The impact upon the public school system of all of the massive population movements encompassing migration into and within the City and subsequent heavy concentration of blacks in the west and northwest portions of the City, compounded by the major migration of whites from those areas, resulted in staggering problems for the Board, particularly as to planning and capacity.
*1328 Great shifts in population caused some areas to lose much of the school population while other areas gained large numbers of students in a very short period of time. A striking example of this is set out in "Urban Decay in St. Louis" by the Institute for Urban and Regional Studies of Washington University (1972). This report showed that schools in the central section of the City lost up to 35% of their initial population in six months whereas the northwest area gained as much as 25% new students in the same amount of time.
Other examples of student transience are noted by the Board. Superintendent Kottmeyer advised the Board in 1960 that "between the closing of school in June and the opening of school in September one out of every five children in the elementary schools will be residing at a different address and attending a different school." (Board meeting, April 12, 1960.)
With this pervasive student transience, the Board was faced with the chore of constantly finding new places in schools for students. School enrollments in the west and northwest areas of the City increased beyond the capacity of existing facilities. The Board had the difficult task of planning for space for these students with the uncertainty of where further population shifts might place or dislocate these students.
The result of this problem was an imbalance in school utilization. In January, 1964, Community Resources issued its study "Elementary Education Facilities in St. Louis" which focused on this problem. The study states:
"We recognize that the problem is not one that has been created by any action of the school system. On the contrary it results from earlier difficulties, compounded by the gross and inadequately planned dislocation of the Negro population in St. Louis incident to the development of the Mill Creek program. Nevertheless, it is a problem which must be dealt with by the school system."
The eventual result of the massive population shifts and changing school enrollments was the resegregation of many schools that were previously integrated.
Resegregation was first noted in the St. Louis schools in 1962 when racial data was again taken [no racial data was recorded from 1954-1962]. In May, 1962, the Committee on Desegregation, chaired by James A. Scott, gave a progress report which noted the socio-demographic dynamics in St. Louis and added:
"[T]his process of neighborhood transformation most frequently culminates in what is popularly called de facto "re-segregation" of previously desegregated schools. . . . These "re-segregated" schools reflect in general the social problems as well as the racial imbalance of the communities they serve."
This same committee in 1963 noted that discriminatory housing practices impeded the progress of integration and contributed to resegregation in the schools.
Resegregation has continued until the present to the point that the following quote is applicable to St. Louis:
"Thus, while it is important to understand how the process of school and neighborhood resegregation proceeds, it is necessary to point out one inescapable fact: given constant density, a growing minority population that stays within the central city combined with a white population free to move out of the central city will inevitably produce an increasing number of segregated neighborhoods and segregated schools. As Arthur Stinchcombe, Mary McDill, and Dollie Walker note from studying this phenomenon in Baltimore, the city simply runs out of whites with whom blacks can integrate."
Robert Wegmann, The Future of Big City Schools (1977), p. 19.

2. Changing pattern in school enrollment (excluding Harris Teacher's College).
As was noted above, no racial data on students was taken from 1953-54 through 1961-62. When racial data was reinstituted in 1962-63, major changes in school enrollment were noted. During that period the *1329 St. Louis public schools lost 10,291 white students, whereas the total enrollment for the same period increased by 18,770.[14] In 1953-54, blacks accounted for 34.5% of the total enrollment of 89,475, while whites consisted of 65.5% of the total. By 1962-63, blacks had attained the majority in student population, then accounting for 55.4% of the total system of 108,245 students.
From 1962-63 to 1967-68 the student population increased to the all-time high of 116,671 students. During this period approximately 5,066 white students left the St. Louis schools. The black majority increased to 62.9% of the student population.
From 1967-68 to 1971-72, the year this law suit was filed, the student population decreased to 108,680. During this period white student loss was approximately 7,779 and the black majority increased to 67.4% of the students.
From 1971-72 to 1978-79 the student population decreased to 73,222. White loss was accelerated to 16,821 white students over this period. The black majority increased to 74.5%.

3. Racial imbalance in the St. Louis public schools.
The following data pertaining to the years 1972-73, the year this suit was filed, 1975-76, the year the consent decree was entered, and 1978-79 is a summary of the racial compositions of schools in the years indicated.
In 1972-73, the St. Louis City public schools enrolled 105,617 students of whom 72,629 or 68.8% were black. Of the 181 elementary and high schools[15] operating, 148 enrolled 90% or more pupils of one race. Of these 148, 105 had 90% or more black enrollment and 43 were 90% or more white. Furthermore, 52 schools were 100% black and 15 schools were 100% white.
In the 1975-76 school year, when the consent decree was approved, the system enrollment in elementary and high schools was 87,610 students of whom 61,672 or 70.4% were black. Out of the 164 elementary and high schools operating, 133 enrolled 90% or more pupils of one race. Of these, 98 schools were 90% or more black, and 35 were 90% or more white. Also, 58 schools were 100% black and 15 schools were 100% white.
In the present (1978-79) school year, the system enrollment is 73,222 students of whom 54,584 or 74.5% are black. Out of the 157 elementary and high schools operating, 103 enrolled 90% or more pupils of one race. Of these, 88 schools have 90% or more black enrollment, and 15 have 90% or more white enrollment. Also 48 schools are 100% black and 3 schools are 100% white.
In addition to this data, the charts in Appendix A(1-3) show the racial compositions as to each school in the district for the above years.
The evidence shows that although racial imbalance is still present in the St. Louis system, there has been a substantial reduction in the racial isolation of white children.

4. Schools referred to as vestiges.
A certain number of schools which had a one-race enrollment in 1953 are claimed to have maintained virtually the same racial composition ever since. The continuity in the racial characteristics at such schools cannot be established with certainty because of the gap in racial statistics in schools from 1954 to 1962. The number of schools to which this applies is about 34โ19 "black" schools and 15 "white" schools.
*1330 Of the 19[16] black schools, all have had some white students during the period from 1954 to 1979. The number of these students ranges from about 340 at Henry elementary school in 1961-62 to smaller numbers in other schools. All of these schools have also had some white faculty during the period in issue.
The evidence shows that in the areas of the City where the so-called black vestige schools are located, there have been rapid transmutations and inversions in the racial enrollment caused by the out-migration of whites and the intra-city migration of blacks who replaced those whites. These changes caused racial inversions in the "white" schools in the same area, resulting in virtually all black enrollment at those schools as well. Considering the demographics of the area of the City affecting both former "white" and "black" schools, there is no evidence that any of these 19 black schools are vestiges of a dual system. Rather, one can only conclude that these schools, along with other schools that changed from majority white to majority black and have remained majority black,[17] reflect the preponderance of black population in those areas of the City and the black majority in the school system since 1962.
In addition, all of the so-called black vestige schools have been Title I schools since the inception of that program in 1965. Title I schools are discussed in more detail elsewhere in this opinion.
Of the 15 so-called white vestige schools, all but one have enrolled black students during the period in question. All of these schools have had black faculty. These schools are not vestiges of prior state-imposed segregation.

H. Actions of the Board.

1. Adoption of the neighborhood school system.
Before 1954-55, the neighborhood school was the basis of assignment for all white students. Black children did not have neighborhood schools. With desegregation, the neighborhood school was adopted for all students and has been the basic principle in assigning children to elementary schools.
Under the neighborhood school concept, children in a given neighborhood are first to be seated in their neighborhood school. This concept was regarded by the Board as fostering a closer relationship between the home and the school, providing for the safety of children both in traveling to and from school and easier contact with the home in case of emergencies, and facilitating participation by children in extracurricular activities. Parents are also able to participate and more readily observe their children's activities.
The neighborhood school is the most common form of assigning students to schools throughout the United States. The concept has many educational values, noted above, as well as economic and administrative advantages. The advantages of the neighborhood school concept are widely, although not uniformly,[18] supported by educators and laymen alike.
In 1962, the Desegregation Committee of the Board, chaired by James A. Scott, reported that in a study of cities over 300,000 people there was near unanimous approval among parents, teachers, citizens, and educational authorities of the neighborhood school. The study stated that:

*1331 "[T]he elementary school should be a neighborhood institution and that everything possible should be done to provide every child adequate school facilities within walking distance of his home."
The original plaintiffs to this suit, Liddell, et al., also supported the neighborhood schools in 1971 for the following reasons:
"As concerned parents in the Beaumont/Summer School District, we firmly believe that busing of our children is in direct opposition to the neighborhood school concept; and that busing is harmful emotionally, socially, and educationally to black children.
. . . . .
The black families in north St. Louis are trying to stabilize their neighborhoods. . . . Our neighborhood schools are key factors in this stabilization."[19]
Letter of 1971 to the Board.
The size of a district served by a neighborhood school depends on the number of children residing in an area. In an area where relatively few children live, the geographical boundaries of a district served by an elementary school are apt to be large. The converse is also true โ where the population is dense, the school attendance districts will be smaller. It has been noted in a statistical report entitled "The Status of Integration in the St. Louis Public Schools during the 1967-1968 School Year," prepared by the Staff Committee on Integration of the Board, that:
"Analysis of these reports further indicates that the smaller the geographical unit from which a school receives its pupil population the more uni-racial its student personnel is likely to be."[20]
Some small school attendance districts in St. Louis are the result of dense population in some areas (predominantly black) of the City.
The record demonstrates that the neighborhood school concept has been applied neutrally by the Board as to black and white students since this policy was applied to both races under the unitary school system adopted in 1954-56.
The Board has departed from the neighborhood school concept in the following ways; busing for overcrowding and distance, student transfers, and attendance at city-wide, special, and technical schools. None of these have been used by the Board to depart significantly from the neighborhood school concept.
The neighborhood school policy has been of decisive importance[21] in a host of Board decisions concerning how and where students were and are educated, including decisions as to new school selection, construction, and school additions.

2. Student transfers.

a. Transfers concomitant to desegregation.
Desegregation in 1954-55 and the redrawing of attendance zone lines was accompanied by a student transfer policy (which had been in effect before desegregation)[22] which provided:
"Students already enrolled in a school, but not resident in its new district may, but are not required, to continue at that school until they graduate. This privilege will be granted, however, only if the particular school is not overcrowded."
This policy was designed to allow students to remain in the school of their origin in order to complete their graduating requirements rather than transfer schools. This policy applied only to students who had already attended the school in the previous *1332 district and lasted only until the student graduated.
Since no records of the race of students were kept from 1954 to 1962 it is impossible to conclude from the evidence how many students chose to exercise this option and what effect the policy had on desegregation.
Some evidence was offered to indicate that 40% of black high school students chose to remain in their formerly statutorily-designated all black schools and to graduate from those schools. This evidence indicates that 60% of the black high school students chose to attend the previously all white high schools. Had no option been available, it is impossible to know what greater percentage of black students would have been enrolled in interracial high schools.
There is no evidence as to the number of white high school, and white or black elementary students who opted to remain in their former schools to graduate.

b. Permissive transfers.
In 1963 the neighborhood school concept was questioned by some individuals and groups as rigid and not apt to facilitate integration in areas affected by segregative housing. The question was directly addressed by the Citizens Advisory Committee ([CAC] appointed by the Board in 1963 to study various aspects of the school system and to make recommendations to the Board)[23] which recommended adherence to the neighborhood school policy and also further recommended adding the open enrollment concept as another dimension to the basic neighborhood school concept. The Board adopted this recommendation which became known as permissive transfers.
Permissive transfers allow pupils to be enrolled in a different school from that of their neighborhood whenever space is available in the other school. Parents assumed the responsibility of transportation. When the transfer is granted, the pupil is allowed to continue his enrollment in the receiving school until graduation and is eligible to attend the high school of that district. This program, which was adopted on July 26, 1963, applied to a small number of children and has had a very limited effect in fostering further integration.
Policy changes made by the Board on June 14, 1976, were designed to further integration and to facilitate accessibility to schools by providing free transportation to the students.

c. Special transfers.
Transfers from neighborhood schools have also been allowed for such reasons as (1) curriculum not offered at their own school; (2) medical considerations; (3) an older brother or sister attending another school; or (4) employment of a parent in the receiving school's vicinity.
Charges of abuse have been aimed at the first two categories.
(1) Curriculum transfers โ During the period from 1955 to 1962, Soldan high school changed from 74% white to 90% black. German was not offered at Soldan, but was offered at Roosevelt, a southside predominantly white high school. Students wishing to study German could obtain a curriculum transfer to attend Roosevelt. Abuse of this "German transfer" allegedly allowed a substantial number of white students to escape the racially changing Soldan. The substantial number of transferees amounted to a little over four students per year in the years 1957-1961. The largest contingent, 29 transfers for German, occurred in 1962.[24] *1333 No subterfuge could be detected until 1962-63. German was offered as a course at Soldan in 1963-64 to end the subterfuge. The German incident illustrates the Board's desire not to see transfers abused for racial motivations.
(2) Medical transfers โ Charges of abuse concerning medical transfers have been raised in connection with the opening of the then majority white Northwest high school. The Board was aware that such abuses in medical transfers from majority black Beaumont high school to Northwest might take place. Attention was drawn to the matter at a Board meeting and the Board was warned that the requests for medical transfers might be forthcoming and that they would be denied.[25] There is no evidence that the abuses actually occurred. This incident demonstrates that the Board affirmatively guarded against racially motivated abuses of transfers.
There is no evidence that special transfers established any pattern of abused discretion or that they resulted in any significant degree of resegregation.

3. Boundaries and feeder patterns.
As was stated above, the boundaries that were drawn in 1954-55 to effectuate a unitary school system were neutral and nondiscriminatory.
In later years the Board made many boundary changes to meet increasing and/or shifting student populations. Changing school capacities such as those caused by completion of new buildings and additions in some areas of the City and by decreased enrollment and closed schools in others necessitated boundary adjustments.
The policy of the Board in drawing school boundaries was to ensure that every effort was made to secure maximum integration consistent with the following criteria; building capacity, distance, safety from the viewpoint of minimizing traffic hazards and hazardous topographical barriers, and, as to high schools, transportation facilities.
Boundary changes subsequent to the 1954-55 changes were drafted or reviewed by the integration committees of the Board. Some suggested boundary changes were not implemented due to disapproval by these committees.
Although boundary changes were made in accordance with the above stated integration goals, boundaries have had little effect in St. Louis, especially as to elementary schools, because of the City's demography and racial distribution.[26]
The evidence shows that boundaries have not been gerrymandered by the Board. Boundary changes were made in conformance with the Board's neighborhood school policy.
The issue as to high school boundaries is feeder patterns, or the manner in which elementary school students are assigned to attend the different high schools.
Various specific charges are made that the Board manipulated feeder patterns to achieve desired racial proportions in the high schools. Representative allegations are separately addressed here.

(a) Vashon high school.

In 1955 when dual boundaries were eliminated, the attendance area of the L'Overture and Attucks elementary schools (statutorily black schools under the dual statutory system and black afterwards) were assigned to feed into McKinley high school (statutorily white). The initial set of boundaries resulted in 1,437 whites and 211 blacks attending McKinley in January, 1955.
For the 1955-56 school year parts of the above areas were reassigned to Vashon high school (statutorily black), thus reducing by half the number of blacks going to integrated McKinley and instead going to unintegrated Vashon.
*1334 At the same time, however, attendance areas feeding into Vashon were reassigned to then integrated Central high school. These adjustments in feeder patterns did not materially affect integration.
In 1963-64 Vashon high school was moved from its original building, which became the new site for Harris Teacher's College,[27] to the former Hadley high school site. This move is charged to have had a segregative impact. Before the move, Vashon was 100% black; afterwards the school was 99.7%. Thus the move had little effect on integration.

(b) Soldan high school.

Between 1956-62 Soldan high school changed from a well-integrated school to a virtually all black school. Plaintiffs charge that manipulation of boundaries contributed to this phenomenal change. The record does not support this charge, but rather shows that the switch was caused by widespread migration of whites out of this area of the City and replacement by black residents.
Soldan became virtually all black (99.2%) in 1962. In 1965-66 (when Soldan was 99.4% black) the Board reassigned Stix elementary school (84.2% white) from Soldan to Southwest high school (99.6% white). A close examination of the evidence reveals that this switch had an integrative impact. Whereas the black percentage at Soldan remained constant, the percentage of black students at Southwest steadily increased, partly as a result of Stix (which became increasingly and finally majority black) students being assigned to feed Southwest. It is to be noted that when Stix became majority black it was not reassigned to Soldan.

(c) Beaumont and Central high schools.

In 1967-68 the Eliot elementary school (predominantly white) was transferred as a feeder school from Beaumont high school to Central high school. Eliot was originally assigned to feed Beaumont in 1964 when Beaumont was 61.0% black in an effort to protect the biracial enrollment of Beaumont. Eliot was assigned to Beaumont until the 1967-68 school year when the black percentage had increased to 96.2% despite the presence of Eliot students.
At the same time Central's black enrollment was increasing so that by 1967-68 there was a racial mix of 33.2% black and 66.8% white.
The feeder change had the effect of maintaining a racial mix at Central for some time when any effort at Beaumont was futile. Central became majority black in 1970-71 and is currently virtually all black.

4. Redistricting.
In the two decades from 1954 to 1974 the administrative structure of the public schools of the City has undergone substantial changes, directed to provide a higher degree of decentralization of authority and responsibility at the local administrative level. The system which has been in effect since the school year 1970-71 changed the administrative structure from a horizontal one of separate groups of elementary schools and of secondary schools to a vertical restructure. The system was reorganized into five administrative districts, each headed by a District Superintendent of whom three are black. One of the reasons for the administrative change was to afford new opportunities for improving desegregation through inter-district activities. The new districts were planned to include high schools with different racial compositions.
Each administrative district includes two academic high schools and an approximately equal number of regular elementary schools which become feeder schools for the high school in the geographical boundary in which they are located. These districts are identified by the names of their high schools. In the 1972-73 school year the districts were constituted as follows: Banneker: Central-Vashon District with 25 elementary schools and six branches; McKinley-Roosevelt District with 25 elementary schools and five branches; Cleveland-Southwest District with 28 elementary schools; Beaumont-Sumner District with 21 *1335 elementary schools and 11 branches, and Northwest-Soldan District with 20 elementary schools and 11 branches. In the course of the school year 1972-73 two branches were added to Beaumont and one to Soldan.

5. Transportation.
Busing has been used by the Board as a measure to relieve overcrowding. Students are transported from the overcrowded schools to schools with excess capacity located elsewhere in the district.
Due to the demographic conditions of the City, with heavy overcrowding in schools of predominantly black enrollment and vacant space available in schools with predominantly white enrollment, this busing has consisted mostly of black students going to predominantly white schools. In some instances white students were bused to schools which had a pupil enrollment of more than 90% black.
Busing has not been a favored measure for overcrowding due to opposition by parents of both races and because the value of the neighborhood school is lost. Busing has been shown to be educationally unsound, costly, and disruptive. Busing has therefore been used only when necessary to relieve overcrowding and to a lesser degree for distance problems.

a. Intact busing.
Busing was organized for some time prior to the 1954-56 desegregation plan in self-contained units, otherwise known as intact busing. This method of busing involved transporting entire classrooms of children to a receiving school to be taught as a separate class. The transported classroom was treated as part of the sending school, not of the receiving school. This method of busing was adopted for administrative convenience.[28] time scheduling, and educational reasons.
Implementation of the 1954-56 desegregation plan and its attendant redistricting relieved much of the overcrowding in both elementary and high schools, and thus in the years immediately following 1954 few pupils were transported. Due to the massive migration of people (mostly black) into the west end of the City, and the failures in 1960 and 1961 of voters to pass bond issues to construct new schools in overcrowded areas, overcrowding became a major problem in the early 1960's. These students (mostly black) were bused for the most part to otherwise virtually all white schools on the south side of St. Louis.
When busing once again became necessary the Board continued to use the pre-Brown method of intact busing. Intact busing was applied neutrally as to white and black student classes. White students were transported intact to white schools (as shown in 1963 at the Fremont elementary school. As was recognized in the 1962 Report to the Civil Rights Commission, intact busing was administered without segregative intent: "It may fairly be inferred that segregation in the St. Louis receiving schools has been an adventitious incident of unprejudiced motivations." (p. 274 of the Report.)
Complaints were raised in 1962 that intact busing resulted in the separation of the transported students from many of the activities of the local students. This separation was alleged to be segregative and discriminatory.
In 1963 the Board voted to terminate the practice, effective in 1964. This action was taken in accordance with the recommendations of the Citizens Advisory Committee and the two Integration Committees of the Board. The change in policy resolved a controversy which had arisen in 1963 between the Board and the NAACP over the segregative impact of the busing policy. The Board had filed a declaratory judgment action in this federal district court for a determination of the intact busing issue. The NAACP filed a countersuit in this same Court charging the Board with constitutional violations concerning intact busing, segregated boundaries and faculties, and other practices that allegedly fostered segregation. *1336 Eventually the two actions were consolidated.
In the fall of 1964 new schools financed with the funds of a March, 1962, bond issue became available for occupancy, thus relieving the need for extensive busing. The intact busing system was eliminated and was replaced by block busing.
In October, 1964, the Board and the NAACP moved the Court for dismissal of the consolidated suits. The motions were sustained as no justiciable issues were left to litigate. The NAACP recognized that the issues had been resolved in part; busing of blacks had been reduced to a minimum, intact busing was terminated, faculty integration was proceeding satisfactorily, and other issues had been met in part by the Board.
Busing was reorganized in 1964 into the block method. The city blocks from which the children are transported are regarded for practical purposes as part of the receiving schools. Transported pupils are fully integrated into all classes and activities of the receiving schools.
Busing based on the block method has been used since 1964 when busing has been necessary. The intact method has been disregarded for more than 14 years.[29]
The evidence shows that the Board's defunct intact busing policy had a disproportionate impact on black children, not because of any segregative intent of the Board, but because black children, being from the overcrowded areas, were bused more often than whites.

b. Busing 1964-78.
Despite new school construction in densely populated areas of St. Louis to offset overcrowding, busing has remained necessary for some students.
The charges leveled at the Board with respect to busing after 1964 are as follows: (1) the majority of students bused are black, (2) white students are bused to majority white schools, (3) black students are bused to majority black schools, and (4) black students who are bused to white schools are bused in small enough numbers so as not to disturb the predominantly white characteristic of the schools. The charges will be addressed separately. As a partial backdrop for this discussion the following information is set out.
In the school years 1972-73 and 1973-74, the statistics on the busing program of the Board show the following:

 School Bused for Bused for
 Year Distance Overcrowding Total 
 Black White Black White Black White
 1972-73 51 435 3908 832 3959 1267
 (10.5%) (89.5%) (82.4%) (17.6%) (75.8%) (24.2%)
 1973-74 42 441 3190 575 3232 1016
 ( 8.7%) (91.3%) (84.7%) (15.3%) (76.1%) (23.9%)

*1337 The black pupils bused for overcrowding in the school years 1972-73 and 1973-74 went to schools with pupil enrollment of the following composition:

 Receiving School Enrollment 1972 1973
 All black 700 (17.9%) 442 (13.9%)
 90 - 99% black 1972 (50.5%) 1429 (44.8%)
 Less than 90% black 1236 (31.6%) 1319 (41.3%)

Of the 832 white pupils bused for overcrowding in 1972, 48 went to 12 schools with pupil enrollment more than 90% black. Of the 575 white pupils bused for overcrowding in 1973, 27 went to six schools with pupil enrollment more than 90% black.
(1) Black students are more often bused for overcrowding because the schools in the areas of the City from which they are bused have the most serious and persistent overcrowding problem. (Whites are more often bused for distance than are blacks.) It is also to be noted that since 1962 black students have been in the majority in the St. Louis schools. In 1972 when the percentage of black students bused was 75.8%, blacks accounted for 68.8% of the school system.
(2) White students from majority white schools (virtually all are in south St. Louis) who were bused for overcrowding were generally sent to other south St. Louis schools with excess capacity. On close examination of busing routes, nothing was improper about where these students were assigned. White students bused for overcrowding have been bused at times by the Board to virtually all black (90-100%) schools.
The record also shows that schools toward the center of the City which had vacancies were often utilized to further integration. There is also no evidence (and no charge) that white students were bused past black schools with space to other white schools.[30] The converse is also true.
(3) Of the black students transported for overcrowding in 1974-75, 63.7% were assigned to schools having an enrollment 90-100% black. The figure for 1975-76 was 67%.
Black students were bused for overcrowding in 1974-75 to 15 predominantly white schools. The figure for 1975-76 was 13 schools.
Why more busing of black students to white schools did not take place is obvious from reviewing the map of busing routes for 1972-73. The great majority of black students bused are from far north St. Louis. Students that were bused to majority white or south St. Louis schools from that area underwent very long cross-town bus rides. Nothing improper can be inferred from busing students to closer schools.[31]
(4) As was noted above, the black students transported to predominantly white schools in South St. Louis were fully integrated into classes at those schools during this period. Transported students were kept in reasonable ratio to the number of local pupils. Plaintiffs charge that the Board operated an informal quota system which limited desegregative transportation *1338 of black students to white schools. The charge is without merit.
The policy of maintaining reasonable ratios of transported pupils to local students, which applied to both a receiving classroom and the receiving school, was based on the following reasons. A reasonable ratio standard would prevent any classroom from becoming overwhelmingly black, thus being susceptible to a charge of "intact" busing with token representation of white students. Transporting a large number of black students out of ratio to local white students would serve only to create majority black schools in south St. Louis. Finally, a great number of transported students in a school neither lends to the overall stability of a school nor to viable desegregation.[32]

6. School construction.
The intra-city black migration, and resulting severe overcrowding noted above, were met by the Board not only with the short-range solution of extensive busing, but also with the use of rented premises and portable classroom units. Seventy-seven portable units were in operation in 1961, of which 67 housed entirely or predominantly black pupils. The other 10 portables were used in schools with integrated or predominantly white enrollment. In 1972, 17 schools, with predominantly black enrollment, used 95 portable classrooms on their premises. Furthermore, nonclassroom facilities in several schools with predominantly black enrollment were converted to classroom use, with the effect of increasing the black population of those schools.
Renting of facilities in congested areas was resorted to when feasible. Parents of children in areas where rented space was used favored this method of relief to overcrowding which retained the advantages of neighborhood schools.
For long-term relief of severe overcrowding, the Board resorted to permanent school construction in those areas where, as a result of the northwest and westward intra-city migration of the black population, the crowded conditions of the neighborhood exceeded the capacity of the existing schools. In turn, the new constructions and additions to existing schools in those neighborhoods resulted in small attendance zones.
The permanent constructions and additions made by the Board were authorized through a series of bond issues. The 1955 bond issue of $16,395,000 provided funds for 12 elementary schools, additions to O'Fallon and Southwest high schools, and seven school site expansions. The 1962 bond issue, totaling $23,180,000, provided funds for the construction of the new Northwest high school, additions to Southwest and McKinley high schools, 12 new elementary schools, and additions to others.
Both these bond levies for new school constructions or additions were explained to the voters and consistently received the affirmative vote of the predominantly black wards, including those where these improvements were to be located, to a higher degree than that of the City as a whole: in 1955 they ranged from 93% to 97% as compared with a city-wide vote of 83%; in 1962 the range was 79% to 89% as compared with a city-wide vote of 74%.
In a number of instances, in addition to O'Fallon, new constructions, additions and adaptations of existing buildings for school use were planned by the Board as racially mixed situations:
(A) Northwest high school was planned in 1963 with an estimated percentage of black enrollment of 30%, and a projection of an ultimate increase to 40%. It was opened in 1964 with a student body of 344 black (26.4%) and 957 white (73.6%). It was expanded in 1968 with 12 additional classrooms. At that time the black enrollment was 42%. The increase in black enrollment was thereafter accelerated as follows: 1970, 62.3%; 1971, 78.6%; 1972, 90.4%; 1973, 97.0%; 1978, 98.7%.
*1339 (B) Twelve additional classrooms were constructed in the Central high school in 1968; at that time this school had a 41.6% black enrollment. It became 85.4% black in 1973-74. In 1978-79 the enrollment is 90.9% black.
(C) In 1961 a six classroom addition was built at the Scullin elementary school, which at that time had a racially mixed pupil enrollment. It became 99.1% black in 1966-67.
(D) The Peabody elementary school was planned to serve that integrated housing project in 1956. This racially mixed situation was reflected both as to student body and staff when it opened in September 1956. The first available statistics for 1962 show 746 black (79.6%) and 191 white (20.4%) pupils, and a faculty of 17 black and 10 white. By 1965 the black student body was 90.9% and has been over 99% since 1970.
(E-F) Both Work Study and Lincoln were planned as racially mixed specialized high schools on voluntary attendance by the students. Both were funded under Title I, ESEA.[33] Although the federal requirements limit eligibility of attendance to students living in an area which has been declared a Title I eligibility area, a 10% enrollment from other areas was first permitted but was later prohibited by the federal authorities.
Work Study was scheduled to open in 1969, but it was not completed until January 1970. Faculty and administration were racially mixed since the time when they were engaged in the preparation of the program in temporary facilities and before the school was opened to the students. By the time the school opened the ratio of the student body was 92.6% black and 7.4% white.
The Lincoln high school was opened in 1966, after the Board acquired and renovated the educational building of Temple Israel for use as an opportunity school for students with special adjustment problems. The student body was composed of 266 black (94%) and 17 white (6%) students. By 1973 all students were black.
(G) An example of planning a school in a racially mixed situation which could not be carried out is the projected Carver-Blumeyer elementary school, which was intended to service the integrated Blumeyer housing project. A two year effort by the Board failed because the selection of one site was blocked by a lawsuit, and the Housing Authority did not provide funding and the Board was unable to find other sources for the financing of the second site which was considered.
(H) Originally successful was the elementary school known as Howard Branch which was built in 1958. In 1962 the enrollment consisted of 201 black (58.1%) and 145 white (41.9%). By 1967 it was 93.1% black and has remained over 98% black since 1970.
(I) Metro was established as a specialized high school in 1972 by converting and adapting an existing building. Through special assignment of students furnished by the Board with bus passes, the small enrollment has been successfully controlled with 56 black and 56 white students in 1972 and 74 (52.1%) black and 68 (47.9%) white students in 1973. Metro has maintained a balanced enrollment. In 1978-79 the program enrolled 156 students, of whom 53.8% are black.
The above paragraphs demonstrate that the Board consistently selected, when possible, school sites to promote integration. The evidence also shows that many of the Board's attempts to maintain integrated schools fell to demographic changes in the City. These changes were not foreseeable by and were beyond the control of the Board.
Much of the new school construction took place in areas of the City with a predominantly black population. Although the Board knew that these areas were predominantly black,[34] the Board also knew that *1340 existing schools in this area were grievously overcrowded and were grossly inadequate in number to serve the community.
Charges of intentional containment in connection with the Board's construction policy are without merit.[35] The Stipulation of Facts reveals several attempts by the Board to locate integrated schools in fringe areas and areas which were likely to be and which were for a while integrated. These efforts did not enjoy prolonged success due to factors beyond the Board's control. The construction of new schools in areas of dense population, where the children were, was in conformance with the Board's neighborhood school policy which the Court finds on an examination of the entire record was supported by the majority of parents, administrators, citizens, and teachers, both black and white.[36] The construction avoided prolonged, extensive, and expensive busing which black parents consistently sought to avoid.[37] The record as a whole supports the Board's construction policy.[38]
The sites chosen for new school construction by the Board do not reflect any segregative intent. There is no evidence in the record that reveals that sites[39] other than those selected would have significantly furthered integration.[40] Sites were selected in response to pressing education and human needs of the time without regard to race.[41]

*1341 7. School closings.

From 1955 to 1968 the number of students consistently increased, especially in the heavily black areas of central west and northwest St. Louis. This increase necessitated the building of schools in areas with severe overcrowding. After an all-time high student enrollment in 1967-68, student enrollment has consistently declined.
After 1967-68, new school construction slowed considerably and schools started to close because of declining enrollment. From 1970 to 1978 approximately 30 schools have been closed. Schools were closed by the Board for the sole reason of declining enrollment. The Board has never closed schools (nor is it charged) for racial reasons.
When schools were closed, the Board reassigned students in accordance with the neighborhood school policy so that students would be as close to home as possible. This meant assignment when possible to a contiguous school. When a branch school was closed, students were assigned to the main school in that district when possible. When space in a contiguous school was not available, there were efforts made by the Board to locate space in noncontiguous schools that would enhance integration.[42] Of the seven schools closed at the end of 1976-77, student reassignments were made with efforts toward integration.
When students from schools 90-100% black that were closed have been reassigned to other 90-100% black schools, this was done so that students could continue to receive Title I services. Both the closed and receiving schools were Title I schools or magnet schools.

8. Schools with city-wide enrollment.[43]
The Board operates a number of specialized schools which enroll students on a city-wide basis, thus achieving the maximum possible degree of integration. Examples are: (a) Harris Teacher's College, which has been established and operated as the only local facility for the academic preparation of teachers; in the school year 1972-73 it had an enrollment of 1,069, of whom 561 (52%) were black; (b) the technical high school (O'Fallon) which in 1972-73 had an enrollment of 3,308 students, of whom about 68% were estimated to be black; (c) the 13 special elementary schools, which in 1972-73 had an aggregate enrollment of 944 of which 78.3% were black; (d) three special centers for "gifted pupils" with an aggregate 19.6% black percentage of the total enrollment in the school year 1973-74; and (e) the Waring elementary school, which was reorganized in 1965 as a demonstration school interlinked with Harris Teacher's College, has an open enrollment for students from any area of the City. Students graduating from Waring have the option of attending any high school of their choice. In the school year 1972-73 Waring had a 76.1% black enrollment, inclusive of transported pupils.
Schools with city-wide enrollment are not affected by neighborhood populations. Even this type of student enrollment has not been able to keep balanced racial enrollments. O'Fallon and Waring, which for several years had good records of integrated enrollment, have in recent times become virtually all black schools; O'Fallon, ninth and tenth grades, with 94.3% black students in 1978-79 and Waring with 89.1% black *1342 students in 1976-77, the last year before Waring became a magnet school.
Other schools which have been maintained and operated by the Board include the following with their respective 1972-73 enrollment and racial composition:
(1) Six "specialized high schools," in which enrollment is open at the election of qualified students. These schools offer specialized programs only and before 1974 did not offer a full high school curriculum. Beginning in the school year 1974-75, students were eligible to receive regular credits and a diploma from their specialized high school. The specialized high schools are as follows: (a) O'Fallon, discussed infra; (b) Metro, a pilot school without walls where students are offered educational experiences in the community outside the school premises for part of the day; (c)-(d) Martin Luther King and Delmar for mentally retarded; and (e)-(f) two specialized high schools for students in poverty areas under Title I ESEA: Work Study for students who are identified as dropout-prone, to provide them with combined on the job training and accredited academic courses sufficient to qualify for graduation, and Lincoln for students with academic and behavior adjustment problems.
These specialized high schools had the following enrollment and racial composition in 1972-73:[44]

 PUPILS 
 Total % Black
 Metro 112 50.0
 (O'Fallon [*][*] )
 Delmar 360 99.7
 King 916 98.7
 Lincoln 142 97.9
 Work Study 213 98.6
 ______ ____
 Totals: 1,743 95.7
(2) Thirteen special elementary schools (with separate administrators in charge) designed and operated for pupils with special needs because of physical or mental handicaps or other problems.[45] These schools with their respective racial enrollment as of 1972-73 consist of the following:

 PUPILS 
 Total % Black
 Children's Study School
 for children taken from
 their home under Court
 Order 25 56.0
 City Hospital for hospitalized
 pupils 8 87.5
 Continued Education for
 pregnant girls 256 98.4

*1343
 Gallaudet for children with
 hearing and speech defects 90 76.7
 Glennon Memorial Hospital
 for hospitalized pupils 15 33.3
 Griscom for delinquent children,
 temporary detention 66 75.8
 Michael for orthopedically
 handicapped children 118 61.9
 Missouri Hills for delinquent
 children 83 84.3
 Phillips Hospital for
 hospitalized pupils 17 94.1
 St. Louis Children's Hospital
 for hospitalized pupils 14 85.7
 Special #1 for mentally
 retarded pupils 82 8.5
 Special #48 for mentally
 retarded pupils 99 100.0
 Special #80 for mentally
 retarded pupils 71 91.5
 ___ ______
 Totals: 944 78.3

(3) Eighty-two special schools for the mentally retarded, which are housed in rooms located in 82 regular elementary school buildings and are administered by those administrators. These schools had in 1973-74 an aggregate enrollment of 2,699 pupils, of whom 2,087 were black (77.3%) and 612 were white (22.7%).[46]
(4) Three special centers for "gifted pupils" in the Busch, Mallinckrodt and Wade Schools, located in south St. Louis. In the school year 1973-74, these centers had an aggregate enrollment of 584 children, of whom 155 (19.6%) were black.[47] Mallinckrodt and Wade are now operated as magnet schools.

a. The Technical high schools.
Before desegregation in 1954-56, there were two technical high schools, Hadley for white students and Washington for black students. In September 1955, all technical ninth graders, both black and white, were sent to Hadley. Desegregation of the upper three grades was accomplished in September, 1956, upon the completion of a new technical high school, O'Fallon. Two new technical high school districts were drawn for the City. O'Fallon was designated to serve a much larger area than Hadley.[48]
In 1962 Hadley was 95% black whereas O'Fallon was about 33% black. In 1963-64, pursuant to a recommendation of the Citizens *1344 Advisory Committee, O'Fallon became the only technical high school for St. Louis. The Hadley school became O'Fallon Branch. Enrollment at O'Fallon and O'Fallon Branch was city-wide. Students had free choice to attend either location. After the consolidation of the technical schools, O'Fallon Branch (formerly Hadley) continued to be overwhelmingly black. O'Fallon eventually became majority black.
Starting in 1968-69, O'Fallon and O'Fallon Branch were used for half day vocational programs only and racial data was kept in the regular high schools which vocational students attended during the other half of the day. In 1977-78, racial statistics became available for full-time O'Fallon ninth graders. Of 946 ninth graders, 91.3% were black. In 1978-79, with statistics available for full-time O'Fallon ninth and tenth graders, of 1,559 students, 94.3% are black.
During the time when O'Fallon and Hadley were operated as two separate districts, some courses were offered at Hadley (Dry Cleaning and Pressing, Shoe Repair, Cafeteria Tea Room Service, Auto Repair) that were not offered at O'Fallon. Likewise, certain courses were offered at O'Fallon (Aero-Mechanics, Advanced Machine Shop, Pre-Engineering, Practical Nursing) that were not offered at Hadley. The different course offerings were designed to obtain maximum use of personnel, to avoid duplication of expensive equipment for the training of students with advanced standing, and to bring together those students with high mechanical and technical aptitudes regardless of race. O'Fallon was the site chosen for the more "advanced" courses because it had the necessary room available and Hadley did not. At this time students desiring to take a course not offered at their technical school could enroll in the other school.[49] Later, O'Fallon and O'Fallon Branch were one district with open enrollment.
No discrimination or segregative intent has been demonstrated with respect to the technical schools.[50]

9. Staff.

a. Faculty.
Since 1954, when the Board's desegregation plan was implemented, the Board's integration policy regarding its teaching staff has been governed by the following general principles:
1. As always, the tenure rights of certificated (teaching) employees will be preserved.
2. Whenever possible, * * * teaching * * * employees will retain their present assignments. They will be transferred only to meet the needs of the service.[51]
3. When vacancies occur, employees will be assigned to fill them on the basis of the competence and adaptability of an employee for a particular assignment.
4. Teachers will be appointed from a single rated list compiled from examination *1345 scores, without regard to race or color.
5. Promotions will continue to be made on the basis of merit.
This policy, which was formally reasserted in a July 9, 1963, statement of the Board, has been qualified by the efforts of the Board to improve the racial balance in the instructional staff of the schools.
Various educational programs were developed by the Board to prepare teachers for integrated student bodies through pre-service educational courses, in-service programs as apprentices in schools of a predominantly different racial composition, as well as seminars, workshops and special courses for teachers and administrators given at Washington and St. Louis Universities. Harris Teacher's College has provided a number of courses in the problems of desegregation, human relations and black history, and through its demonstration school โ Waring elementary school โ has offered to prospective teachers a laboratory for quality education in a controlled racially mixed facility.
In the face of a severe teacher shortage in the 1950's and 1960's, particularly among black teachers, the Board actively and affirmatively sought out and hired black teachers.[52] In more recent years an increasing shortage of black teachers has been encountered at the high school level. This shortage is due in part to increased competition in employment opportunities with industry, government, and other school districts and colleges. Teachers appointed in the 1972-73 school year received their training in 30 different states.
In the decade from 1962 to 1972 the following changes occurred in the racial composition of the classroom teaching staff of the St. Louis public schools:

 Year White Black Total
 1962 1,804 (53.7%) 1,555 (46.3%) 3,359
 1970 1,798 (46.6%) 2,060 (53.4%) 3,858
 1971 1,823 (45.7%) 2,164 (54.3%) 3,987
 1972 1,837 (46.4%) 2,128 (53.6%) 3,965
 1973 1,638 (44.4%) 2,052 (55.6%) 3,690

To improve the racial balance of the teaching staff in the schools, the administration has endeavored to assign new teachers to schools having a pupil enrollment predominantly of the race other than that of the teacher, and encouraging transfers on a voluntary basis and through persuasion in the case of teachers with tenure. No compulsory transfer of teachers to achieve racial mixing was ordered by the Board.[53] Teachers' seniority has traditionally been protected against involuntary transfers, which have remained limited to cases of decrease of teacher services in a school, and of unsatisfactory ratings. The evidence shows that the Board's failure to implement *1346 mandatory teacher transfers was done in good faith without any segregative intent.
In fact, the reluctance on the part of some principals to have on their faculty personnel of the other race, and similar resistance on the part of some teachers and certain sections of the community have limited the degree of racial mixing of school faculties.[54] In spite of the efforts of the Board to improve the racial balance of the teaching staff in the schools of the system, in a large number of instances the faculty and local administrators in the regular elementary schools follow the racial pattern of the neighborhood where the school is located.
In a number of schools, however, the racial composition of the faculty did not mirror that of the students. The following examples apply to 1962-63:

 School % Black Students % Black Faculty
 Soldan 99.2 65.5
 Beaumont 50.0 9.6
 Ashland 91.5 33.3
 Dozier 98.3 53.3
 Ford Branch 99.7 33.3
 Herzog 35.0 18.2
 Howard 35.1 16.7
 Laclede 97.1 50.0
 Long[*] 21.4 30.8
 Marquette 70.9 24.0
 Scullin 92.3 38.1
 Walbridge[*] 39.2 12.5
 Walnut Park[*] 38.2 15.0

*1347 Where the evidence in the record demonstrates that faculty composition reflects or reflected the racial composition of the student body, there is and was minimal or no influence on the racial composition of the school. Where schools underwent drastic changes in racial composition, the change in faculty composition followed rather than preceded student changes. Racial identifiability of schools is not now and was not in the past a result of the Board's failure to mandatorily achieve more racially balanced faculty.[55]
Racial identifiability of schools in St. Louis is and has been the result of the City's demographics. The following finding from Brinkman v. Gilligan, 446 F.Supp. 1232, 1239 (S.D.Ohio, 1977), rev'd 583 F.2d 243 (6th Cir. 1978), cert. granted sub nom. Dayton Board of Education v. Brinkman, ___ U.S. ___, 99 S.Ct. 831, 59 L.Ed.2d 31 (1979), is applicable to St. Louis:
"Many of plaintiffs' witnesses asserted that the placing of black teachers in all-black schools had the effect of identifying that school as being black, thus impacting black children into black schools. . .
"The Court believes the evidence to be to the contrary. In every specific instance brought to the Court's attention in which black faculty were assigned to black schools, the school was already identifiable as being black because of the racial population of the students."
Between 1962 and 1972, the Board reduced the number of regular elementary schools without black faculty from 50 to 30, and of the regular elementary schools without white faculty from 47 to 27. The number of high schools with one race faculty was decreased from 3 to 0.
In 1973 the regular elementary schools with all white faculty were reduced from 30 to 26. In the course of this school year there was a further reduction to 25.
The Board's efforts culminated in the adoption of the Balanced Staff Policy statement of the Board of July 10, 1973. With consideration for the factors of competency, sex, experience, and age, this policy states that the basic and guiding principle of the St. Louis public schools is "to maximize racial representation among its staff members at all levels and in all job classifications." A three year schedule of implementation was projected by the Board.
During the years of implementation of the Balanced Staff Policy from 1973 to 1975, when the consent decree was entered, 139 teachers were transferred, 186 new teachers were assigned, and 45 administrators were transferred, for a total of 370, all to further racial balancing in accordance with the Board's policy. After the Balanced Staff Policy was adopted, applicants for teaching positions have not been employed unless they accepted an assignment to a school which was predominantly the other race.
Since 1975, when the consent decree was signed, the Board's policy in assigning teachers has been governed by paragraph 5 of that decree. Under paragraph 5, 10% in 1976-77, 20% in 1977-78, and in 1978-79, 30% of the teachers at each school would be of the race that was in the minority at that particular school.
The process of compliance with paragraph 5 in the school years 1976-77 and 1977-78 has been achieved, notwithstanding some resistance from part of the staff to the mandatory transfers which were necessary to implement the decree. Implementation in 1978-79 is in the process of being carried out. The mandatory assignment of staff under the consent decree has been effective in eradicating racial imbalance in faculty representation at all schools. The actions taken pursuant to the consent decree have fully remedied any past deficiency in staff assignments.

b. Non-certificated personnel.
Policies similar to those for teachers have governed the employment and promotion of *1348 non-certificated personnel since 1954. On October 13, 1961, the hiring of non-certificated employees of the Board was placed under a centralized Merit System administered by the Superintendent of Instruction (later named Superintendent of Schools). In 1953 the percentage of black noncertificated employees was 16.7%. That percentage rose to 31.5% in 1963 and 61% in 1973.
Considering the aggregate of all employees, the Board has employed black personnel in a greater percentage than that of the adult black population in St. Louis.

c. Administrators.
Between 1962 and 1972 the Board increased black representation among its administrators from 33.2% to 59.6%. In 1976, 60.4% of the administrators were black.
In the decade from 1962 to 1972, more blacks than whites have been placed in high administrative positions with the Board, with the result that the number of blacks in those positions has increased from 5 (16.1%) in 1962 to 15 (44.1%) in 1972, compared with 26 (83.9%) whites in 1962 and 19 (55.9%) in 1972. Among the high positions occupied by blacks in 1972 were those of Deputy Superintendent (who was Acting Superintendent in 1971-72), Assistant to the Superintendent, Acting Director of Personnel (who was promoted to Director in 1973), Fiscal Control Officer, and Director of the Division of Curriculum Services.
As a result of the Balanced Staff Policy of July 10, 1973, 27 administrators were transferred to positions or locations which improved the racial mixture in each of those situations. Included were the assignments of a black district superintendent to the McKinley-Roosevelt district which is a district with a number of elementary schools having a completely white enrollment, and a white superintendent to the Northwest-Soldan district, which has a predominantly black attendance. At the level of elementary school principals, several assignments were made to provide representation of personnel of the race different from that of the majority of the staff and student body of those schools. In 1976 three of the five district superintendents were black.

d. Pupil-teacher ratio.
The average pupil-teacher ratio has been progressively reduced over the years by the Board: from 36 pupils in the regular elementary schools in 1955 to 31 in 1971 and thereafter, to 27 in the academic high schools. These are averages and there are variations from school to school. During the year 1972-73 the average pupil-teacher ratio in the regular elementary schools having a black enrollment of between 90% and 100% was 30.2:1, while the ratio in the regular elementary schools with the opposite white enrollment was 31.2:1. Schools having less than 90% one race enrollment showed a pupil-teacher ratio of 30.4:1.
Comparable analysis and figures for the academic high schools in 1972-73 are as follows: the pupil-teacher average ratio was 25.8:1 in the academic high schools having an enrollment of between 90% and 100% black students, 26.7:1 for the academic high schools with comparable white enrollment and 23.4:1 in the high schools with less than 90% of either race.
A lower pupil-teacher ratio is found in the eight elementary schools of rooms of 15 and in each of the special elementary schools, where the ratio is 20 pupils per teacher, and 35 pupils in the instances where there are two teachers in the room. In the aggregate, the pupil population of these schools is predominantly black.
The pupil-teacher ratio in the six specialized high schools (exclusive of O'Fallon, whose students were counted in their academic high school) based on the averages for the first semester 1972-73 shows the following.

*1349
 Average
 Schools Having Average Number of
 90% - 100% Daily Number of Pupils Per
 Black Students Enrollment Teachers Teacher 
 Delmar 350 10 35.0
 King 965 36 26.8
 Lincoln 169 20 8.5
 Work Study 223 18 12.4
 _____ __ ____
 Totals: 1,707 84 20.3
 Schools Having
 Less Than
 90% One Race 
 Metro 112 7 16.0
 Average for All
 Specialized High
 Schools 1,819 91 20.0

10. Curriculum and facilities.

a. Curriculum.
Over the years, after studies of, and upon the recommendations of its Committees on Integration, the Board has taken steps to (a) eliminate from the materials used in its schools pictures and expressions which were objectionable in terms of adverse racial implications, (b) promote black studies as an integrated aspect of the total curriculum for all children, and (c) provide special courses of black studies as part of the elective offerings in the academic high schools.
In the regular elementary schools, the instructional curriculum is the same for each school throughout the City, with the following exceptions: (a) the three gifted student centers have had their own programs, and (b) special remedial reading courses are provided in various schools. In the school year 1972-73 these programs were given in 71 schools by a total of 95 teams of reading specialists, comprising 166 teachers, to about 12,300 children. They were allocated among the five administrative districts, each of which is provided with a reading clinic for the training of remedial reading teachers, and direct clinic services to the most difficult cases in the district, as follows:

 Administrative District Number of Teachers
 Banneker: Central-Vashon
 (black enrollment 87.7%) 47
 Beaumont-Sumner
 (black enrollment 99.8%) 46
 Northwest-Soldan
 (black enrollment 96.5%) 41
 McKinley-Roosevelt
 (black enrollment 32.4%) 28
 Cleveland-Southwest
 (black enrollment 6.4%) 4

*1350 The curriculum in the high schools is established on a city-wide basis, but in the academic high schools there is a further flexibility in the curriculum of courses offered, with both variations and cyclic offerings and some elective privileges being granted to the students. In addition, students are allowed to transfer to the high school which offers the desired course. The offering of elective courses in a given high school is contingent upon the following factors: (a) student request, (b) faculty assessment of student needs, and (c) availability of teachers. Experimental programs are started in individual high schools before being extended city-wide. Examples are a course in black humanities which was piloted in Beaumont and Southwest, and a course in music which was initiated at Sumner, all before being offered in other high schools. Furthermore, special programs may be developed within the general scope of the curriculum upon local initiative of faculty and students, with the approval of the administration. Elective courses may be dropped in a high school whenever there is diminution of student interest therein, at the discretion of the local faculty and principal.
Extracurricular activities provide integrated situations in such areas as (a) vocal and instrumental music groups (glee clubs, choirs, bands, kinder concerts) which are guided by professional music supervisors and teachers of the Board, Division of Vocal and Instrumental Music; (b) athletic activities which are planned and directed by the Board's Division of Physical Education with ball games and other intra-school and city-wide competitions; and (c) cultural programs, such as city-wide participation in Citizenship Education Clearing House Projects, seminars, clubs, art competitions, exchange programs with private schools, etc.

b. Facilities.
Facilities and opportunities for sport activities such as swimming pools and athletic fields are comparable among schools of predominantly white and predominantly black enrollment. At the elementary level, gym and other facilities are better and more modern in the 35 recently constructed schools with predominantly black attendance than in the older schools with prevailing white enrollment. The athletic equipment which is furnished by the Board is allocated on an equal basis of need to all schools under the supervision of interracial committees of coaches and representatives of the various departmental units involved.
The buildings housing schools of predominantly white and predominantly black enrollment respectively are of comparable quality and characteristics, except that more recent constructions are found in the schools having a predominantly black attendance. Of the 39 school buildings constructed by the Board during the last 20 years, 35 (89.7%) house predominantly black students; 2 (5.1%) house predominantly white students, and 2 (5.1%) have an integrated student body of less than 90% of one race. All of the 18 school buildings constructed within the last 10 years have a predominantly black enrollment. The average age of schools with predominantly white enrollment is higher than that of the schools with predominantly black attendance.
The maintenance of all school buildings is planned and carried out on a uniform city-wide basis which includes a continuing program of exterior painting of every school on a five year cycle and painting of the interior on an eight year cycle. Maintenance and repairs are carried out as needed throughout the school year and the custodial service is assigned to each school on the basis of its size.
The budget of the St. Louis public schools is established on a system-wide basis with funds allocated for programs and staff throughout the system and not by school. Administrative districts do not have separate budgets, except for a small sum ($2,500 in the school year 1972-73) which is allocated to each of the five district superintendents for miscellaneous and unanticipated expenditures. An exception was made in 1972-73 for the superintendent of the Central-Vashon district, to whom the sum of $16,000 was allocated in connection with the *1351 special Banneker Project (a predominantly black area).
The Martin Luther King specialized high school for the mentally retarded is located in the former McBride Catholic high school which was purchased and remodeled by the Board in 1971. In the school year 1972-73, among its physical facilities were a small home economics room, a small library with limited equipment, a small industrial arts room with few supplies, a music room (which was formerly a shop room) with limited equipment and poor ventilation. Beginning in the summer of 1973, improvements were carried out by the Board, consisting of a new home economics room with a commercial kitchen (used in connection with a commercial education program) and improvements of the industrial arts room. Part of the cost was paid with federal funds and, in addition, about $19,000 was paid by Board funds.
Work Study was established in 1970 as a Title I ESEA specialized high school for drop out prone students. It has good facilities for well rounded, well equipped programs for the subjects taught, inclusive of the academic subjects required for graduation.
Lincoln was established in 1966 as a Title I ESEA specialized high school for students with serious academic or behavioral difficulties, with the goal of helping work out their problems and returning to their academic high school. It has facilities for the usual secondary program, except as limited by its purpose, which requires emphasis on counseling.

c. Retentions and withdrawals.
The Civil Rights Report of 1972 shows that 523 secondary students were "retained" in their grade for that year. The federal form to be used to compile this report defines the term "retained" for its purposes as follows:
Report in each column the number of pupils who were not promoted at the end of the last school term. Report only those pupils who were assigned to the same grade this school term as the last. Do not report those pupils who were promoted but are repeating a particular subject."
Of these "retained" students, in 1972-73, 506, or 97%, were black. There were no retentions at the predominantly white high schools of Cleveland, Roosevelt, and Southwest. Thirty were found in the two racially mixed high schools, Central and McKinley. The rest were found at the predominantly black high schools, Beaumont, Lincoln, Soldan, and Sumner. The rate at Beaumont was about 11% while the rate at Lincoln was 52%. Summer school programs are offered by the Board to enable students to make up credits as needed.
The following tabulation shows the dropout rate by each high school, with its racial student composition, in the school year 1972-73:

 Percent of End of Number End of Percent
 Black Term of Term + of
 Enrollment School Membership Dropouts Dropouts Dropouts
 100.0 Beaumont 2,738 331 3,069 10.79
 73.1 Central 1,189 329 1,518 21.67
 0.5 Cleveland 2,497 235 2,732 8.60
 62.9 McKinley 1,134 265 1,399 18.94
 90.4 Northwest 2,058 184 2,242 8.21
 7.2 Roosevelt 2,414 522 2,936 17.78
 100.0 Soldan 2,953 498 3,451 14.43
 8.1 Southwest 2,428 195 2,623 7.43
 100.0 Sumner 2,379 275 2,654 10.36

*1352
 99.9 Vashon 1,885 544 2,429 22.40
 98.6 Work Study 173 27 200 13.50
 98.7 King 835 126 961 13.11
 97.9 Lincoln 223 86 309 27.83
 99.7 Delmar 235 76 311 24.43
 ______ _____ ______ _____
 City-Wide 23,141 3,693 26,834 13.76
 FORMULA: DROPOUT 3,693
 -------------------------------- = % ------ = 13.76
 DROPOUT + END OF TERM MEMBERSHIP 26,834

The term "dropout" as used in the Board's records includes the following categories:
 Moved/Not attending school
 Pregnancy/Not attending school
 Suspension-Not reassigned
 Entered armed service
 Entered verified employment
 Needed at home
 Lack of interest
 Non-attendance
 Marriage
 Physical health
 Reason unknown
The withdrawals of high school students by school in the school year 1972-73 is set forth in the following tabulation. Since no statistical record of withdrawals by race is maintained by the Board, no reference to race is possible, other than with regard to the enrollment in each high school:

 Percent of
 Black
 Enrollment School Withdrawals
 100.0 Beaumont 190
 73.1 Central 140
 0.5 Cleveland 170
 62.9 McKinley 158
 90.4 Northwest 173
 7.2 Roosevelt 208
 100.0 Soldan 169
 8.1 Southwest 172
 100.0 Sumner 124
 99.9 Vashon 186
 98.6 Work Study 12
 98.7 King 26
 97.9 Lincoln 83
 99.7 Delmar 15
 _____
 City-wide 1,826

The term "withdrawals" as used in the Board's records includes the following categories:
Transfer private/parochial
Moved/attending school
Return to elementary school
Missouri Hills-Griscom
Assigned tutorial school
Metro high school
Assigned continuation school

*1353 Conduct tending to demoralize
Psychological/psychiatric diagnosis/treatment
Suspension/reassigned St. Louis public schools
Death
No return/reason unknown
There is no evidence of segregative action by the Board concerning curriculum, facilities, or withdrawals. The evidence indicates that students of both races have been accorded equal treatment.

11. Magnet schools.
In 1976-77, the Board began its operation of the magnet schools under the consent decree. Seven magnet schools at the elementary level and two magnet high schools were planned, organized, funded through HEW, and made operational by the opening of the 1976-77 school year. All of the magnet schools have city-wide enrollment, with the goal of 50% black and 50% white student attendance.
In 1977-78, the magnet school program was expanded by adding a new Business and Office magnet high school (Lincoln) and by increased enrollment. In 1978-79, all magnet school programs have continued with an enrollment of 1,011 in the high schools, of whom 64.8% are black, and 2,840 in the elementary schools, of whom 67.9% are black.

a. Admissions to the magnet schools.
The policy of the Board in 1976-77 with respect to admissions to magnet schools of white nonpublic school children was propounded to conform to the Office of Civil Rights (hereinafter OCR) requirements.
The policy was as follows. When a student who had never before attended a St. Louis public school (i. e., students transferring in from county public schools and students attending private or parochial schools) applied for and was accepted into a magnet school, OCR recorded that transaction as a transfer of that student from the neighborhood school to the magnet school.
Magnet school admission guidelines state that a student may not be admitted to a magnet school if that student's transfer from the neighborhood school would result in increased racial isolation of that neighborhood school.
On July 5, 1977, the Office of Education (hereinafter OE) informed the Board that it was ineligible for funding under the Emergency School Aid Act, 20 U.S.C. 1601, et seq., (hereinafter ESAA) partly because of an OE finding that the 1976-77 magnet school program did not result in a reduction of racial isolation in the schools. One of the reasons for the OE finding was that white non-public students admitted to magnet schools were treated as transfers from neighborhood schools. The Board, seeking to revoke the OE finding, stated that this treatment of formerly nonpublic students resulted in a significant distortion of the actual increases in racial isolation in the neighborhood schools feeding the magnet schools. Many of these nonpublic students were white and so their admission to the magnet schools made it appear that they were being allowed to flee predominantly black feeder schools when in fact that was not true. It is unwarranted to assume that children who did not previously attend the public school system would suddenly enroll in the neighborhood school. To the contrary, most of those involved attended parochial and private schools exclusively in the past and would continue to attend nonpublic schools but for the attractive magnet school program.
The overall effect of the above policy was to discourage white students from entering or re-entering the public school system at a time when white students were desperately needed to integrate more schools.
The OE finding of a failure to reduce racial isolation in the magnet school program was revoked and on August 10, 1977, *1354 St. Louis school officials worked out a mutually acceptable addendum to the school district's ESAA plan for 1977-78 with OCR officials. Nonpublic school students requesting admission to the magnet school program were considered according to the following guidelines:
1. Magnet schools must be no less than 50% nor more than 70% black.
2. A transfer to a magnet school must not increase racial isolation at the feeder neighborhood school. This requires that the release of a nonminority (white) student from a racially isolated sending school (majority black school) shall take place only after there is a prior release of twice the number of minority students otherwise required.
3. In filling available seats in the magnet schools, public school children will be considered and processed first. Only after all public school applicants have been placed in magnet schools, within the limits of the above numerical formulae, will applicants from nonpublic schools be considered.
4. Applicants from nonpublic schools will not be treated as applying from the neighborhood school of their residence. Applicants from nonpublic schools will be allowed into magnet schools on a ratio of one white nonpublic school student for every five black students. The five black students need not necessarily be from the public school in the neighborhood of the white nonpublic school child's residence nor must they necessarily be admitted to the same magnet school as that attended by the white nonpublic school child.
Plaintiffs Adams, et al., assert that there was no reasonable basis for insisting that white and parochial students be restricted in admissions to the magnet schools. The discriminatory policy likely has had the effect of contributing to resegregation in the magnet schools. The Court agrees that the real need in the schools of St. Louis is to encourage more white students to enter the public schools so that there may be a stable plan of integration developed. Any policy which inhibits such a plan is patently wrong. The policy with respect to admission of white nonpublic school students has been abandoned in the school year 1978-79 and the request to declare this practice unconstitutional is denied since the question is now moot.

III. CONCLUSIONS OF LAW.
The Court has jurisdiction of this action pursuant to 28 U.S.C. งง 1343(3) and (4), 28 U.S.C. ง 2201, 42 U.S.C. งง 1983, 1988 and 2000d, and the Fourteenth Amendment to the Constitution of the United States.

A. Governing Constitutional Principles.
Section 1 of the Fourteenth Amendment to the United States Constitution provides in part that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." The issue in this case is whether the defendants here have denied to the plaintiffs the equal protection of the laws, thereby violating plaintiffs' constitutional rights.
At the time of Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896), the Supreme Court of the United States interpreted the Equal Protection Clause as allowing black citizens to be accorded separate but equal treatment under the law. The "separate but equal" doctrine of Plessy, which dealt with railway transportation, was extended to apply to public schools. Cuming v. County Board of Education, 175 U.S. 528, 20 S.Ct. 197, 44 L.Ed. 262 (1899). Thereafter, state laws mandating separate school systems for black and white students were upheld under the "separate but equal" doctrine.
This construction of the Equal Protection Clause was reversed in Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (Brown I), where the Supreme Court held:
"We conclude that in the field of public education the doctrine of "separate but equal" has no place. Separate educational facilities are inherently unequal. Therefore, we hold that the plaintiffs and *1355 others similarly situated for whom the actions have been brought are, by reason of the segregation complained of, deprived of the equal protection of the laws guaranteed by the Fourteenth Amendment."
Brown I, supra, at 495, 74 S.Ct. at 692.
The reason for abolishing the "separate but equal" doctrine was that the decision to separate children because of their race in itself implies a difference and inequality in the races. The law cannot countenance such implication in state action.
Brown I was followed by Brown v. Board of Education 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) (Brown II) which imposed a duty on the states to abolish segregated schools and to provide racially nondiscriminatory schools. Under Brown I and Brown II, the dismantling of dual school systems became a constitutional objective.
Primary responsibility for eliminating segregated schools was directed to school authorities. Where school authorities defaulted or unduly delayed in their duty to implement the new constitutional principles, the district courts were authorized to review the school authorities' actions and to evaluate possible solutions to the problem. The Court in Brown II delineated the wide range of considerations which courts were to review:
". . . the courts may consider problems related to administration, arising from the physical condition of the school plant, the school transportation system, personnel, revision of school districts and attendance areas into compact units to achieve a system of determining admission to the public schools on a nonracial basis . . .."
Brown II, supra, at 300-01, 75 S.Ct. at 756.
Where school authorities failed to apply the new principles, courts were to do so in their place under these guidelines:
"In fashioning and effectuating the decrees, the courts will be guided by equitable principles. Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs. These cases call for the exercise of these traditional attributes of equity power. . . . Courts of equity may properly take into account the public interest in the elimination of such obstacles in a systematic and effective manner. But it should go without saying that the vitality of these constitutional principles cannot be allowed to yield simply because of disagreement with them."
Brown II, supra, at 300, 75 S.Ct. at 756.
Following the Brown decisions, the focus of school desegregation law was directed to school systems in southern states that refused to dismantle pre-Brown statutorily designated dual schools. Federal courts were consistently called upon to fashion remedies where local school authorities had sought to avoid desegregation.
In Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), involving New Kent County, Virginia, there was no residential segregation, but there were segregated schools for ten years after Brown. The Supreme Court determined in Green that:
"[T]he Board, by separately busing Negro children across the entire county to the `Negro' school, and the white children to the `white' school, is deliberately maintaining a segregated system which would vanish with non-racial geographic zoning."
Green, supra, 391 U.S. at 442, n. 6, 88 S.Ct. at 1696.
The busing described above was done pursuant to the "freedom of choice plan" adopted in New Kent County whereby students could choose to attend a particular school or else automatically be reassigned to whatever school they previously attended. This plan resulted in minimal desegregation, with 85% of blacks choosing to attend the former black school and only 15% of blacks choosing to attend the primarily white school.
The student assignment plans in New Kent County were rejected in Green as being constitutionally deficient. The plan was found to be racially discriminatory in that it did not achieve a unitary school *1356 system. As the Supreme Court noted: "The transition to a unitary, nonracial system of public education was and is the ultimate end to be brought about . .." Green, supra, 391 U.S. at 436, 88 S.Ct. at 1693. The Court further stated:
"School boards such as the respondent then operating state-compelled dual systems were nevertheless clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch."
Green, supra, 391 U.S. at 437-38, 88 S.Ct. at 1694.
As later defined in Alexander v. Holmes County Board of Education, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969), a unitary school system was one "within which no person is to be effectively excluded from any school because of race or color." Alexander, supra, 396 U.S. at 20, 90 S.Ct. at 30.
The Supreme Court in Green also restated the function of the district court in evaluating a school board's actions with regard to desegregation:
"The obligation of the district courts, as it always has been, is to assess the effectiveness of a proposed plan in achieving desegregation. There is no universal answer to complex problems of desegregation; there is obviously no one plan that will do the job in every case. The matter must be assessed in light of the circumstances present and the options available in each instance. It is incumbent upon the school board to establish that its proposed plan promises meaningful and immediate progress toward disestablishing state-imposed segregation. It is incumbent upon the district court to weigh that claim in light of the facts at hand and in light of any alternatives which may be shown as feasible and more promising in their effectiveness. Where the Court finds the board to be acting in good faith and the proposed plan to have real prospects for dismantling the state-imposed dual system `at the earliest practicable date,' then the plan may be said to provide effective relief."
Green, supra, 391 U.S. at 439, 88 S.Ct. at 1695.
Whereas the Green case scrutinized racial imbalance in schools in the context of a rural setting where no residential segregation existed,[56] the Supreme Court later considered the urban Charlotte-Mecklenburg system in North Carolina, where residential segregation and resulting racial imbalance were obstructing efforts to achieve unitary schools. Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).
The Supreme Court in Swann recognized that many changes had taken place (especially in metropolitan areas) in the patterns and the structure of communities, and the growth and shifts in student populations. These changes had a "marked impact on school planning, sometimes neutralizing or negating remedial action before it was fully implemented." Swann, supra, 402 U.S. at 14, 91 S.Ct. at 1275. These problems and changes had been aggravated in several school systems by the failure of school authorities, many using subterfuge and dilatory tactics, to desegregate the schools. In light of the above context, the Supreme Court felt it necessary to define in "more precise terms than heretofore the scope of the duty of school authorities and district courts in implementing Brown I and the mandate to eliminate dual systems and establish unitary systems at once." Swann, supra, 402 U.S. at 6, 91 S.Ct. at 1271.
The Swann case dealt with a pre-Brown state-imposed segregated school system that never achieved a unitary system after Brown. For such a system, the goal of Brown was still to be achieved. "The objective today remains to eliminate from the public schools all vestiges of state-imposed segregation." Swann, supra, 402 U.S. at 15, 91 S.Ct. at 1275.
In determining whether or not a school system was constitutionally desegregated, the following factors serve as the most important *1357 indicia; student assignment, faculty, staff, transportation, extracurricular activities, and facilities. The Court stated that:
"Independent of student assignment, where it is possible to identify a `white school' or a `Negro school' simply by reference to the racial composition of teachers and staff, the quality of school buildings and equipment, or the organization of sports activities, a prima facie case of violation of substantive constitutional rights under the Equal Protection Clause is shown.
When a system has been dual in these respects, the first remedial responsibility of school authorities is to eliminate invidious racial distinctions."
Swann, supra, 402 U.S. at 18, 91 S.Ct. at 1277.
Swann held that where dual systems persisted, plans based on racially neutral criteria were not sufficient if they did not in fact remedy the situation created by the violative conduct, that is, if the dual school system was not dismantled.
The Swann decision, in addition to presenting specifics on what constituted maintaining a dual system in violation of the Constitution, also set out specific guidelines on the remedial authority of the courts.
"In seeking to define even in broad and general terms how far this remedial power extends it is important to remember that judicial powers may be exercised only on the basis of a constitutional violation. Remedial judicial authority does not put judges automatically in the shoes of school authorities whose powers are plenary. Judicial authority enters only when local authority defaults.
. . . . .
As with any equity case, the nature of the violation determines the scope of the remedy."
Swann, supra, 402 U.S. at 16, 91 S.Ct. at 1276.
In addition to the limitation on district courts to remedy only the condition that offends the Constitution, the Supreme Court stated that in dismantling a dual school system there could be no requirement of a particular racial balance in each school, grade, or classroom. Swann, supra, 402 U.S. at 24, 91 S.Ct. 1267. Accord, Spencer v. Kugler, 404 U.S. 1027, 92 S.Ct. 707, 30 L.Ed.2d 723 (1972).
The Swann decision spoke of judicial authority to remedy violations by school authorities. The case expressly left unanswered the extent to which a school desegregation decree may be used to remedy other types of state action not attributable to school authorities:
"We do not reach in this case the question whether a showing that school segregation is a consequence of other types of state action, without any discriminatory action by the school authorities, is a constitutional violation requiring remedial action by a school desegregation decree."
Swann, supra, 402 U.S. at 23, 91 S.Ct. at 1279.
In Keyes v. School District No. 1, Denver, Colo., 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973), the Supreme Court had occasion to examine school segregation in a new context:
"This is not a case, however, where a statutory dual system has ever existed. Nevertheless, where plaintiffs prove that the school authorities have carried out a systematic program of segregation affecting a substantial portion of the students, schools, teachers, and facilities within the school system, it is only common sense to conclude that there exists a predicate for a finding of the existence of a dual school system."
Keyes, supra, 413 U.S. at 201, 93 S.Ct. at 2694.
The Keyes holding underlines the importance of determining intent in a finding of unlawful segregation:
". . . we hold that a finding of intentionally segregative school board actions in a meaningful portion of a school system, as in this case, creates a presumption that other segregated schooling within the system is not adventitious. It establishes, in other words, a prima facie case of unlawful segregative design on *1358 the part of school authorities, and shifts to those authorities the burden of proving that other segregated schools within the system are not also the result of intentionally segregative actions. This is true even if it is determined that different areas of the school district should be viewed independently of each other because, even in that situation, there is high probability that where school authorities have effectuated an intentionally segregative policy in a meaningful portion of the school system, similar impermissible considerations have motivated their actions in other areas of the system. We emphasize that the differentiating factor between de jure segregation and so-called de facto segregation to which we referred in Swann is purpose or intent to segregate."
Keyes, supra, 413 U.S. at 208, 93 S.Ct. at 2697.
Once the burden of proof has shifted to school authorities, the Court noted the following on rebuttal proof:
"In discharging that burden, it is not enough, of course, that the school authorities rely upon some allegedly logical, racially neutral explanation for their actions. Their burden is to adduce proof sufficient to support a finding that segregative intent was not among the factors that motivated their actions. . . . If the actions of school authorities were to any degree motivated by segregative intent and the segregation resulting from those actions continues to exist, the fact of remoteness in time certainly does not make those actions any less `intentional.'
"This is not to say, however, that the prima facie case may not be met by evidence supporting a finding that a lesser degree of segregated schooling in the core city area would not have resulted even if the Board had not acted as it did. In Swann, we suggested that at some point in time the relationship between past segregative acts and present segregation may become so attenuated as to be incapable of supporting a finding of de jure segregation warranting judicial intervention. 402 U.S., at 31-32, [91 S.Ct. 1267 at 1283-1284]. See also Hobson v. Hansen, 269 F.Supp. 401, 495 (D.C.1967), aff'd sub nom. Smuck v. Hobson, 132 U.S.App.D.C. 372, 408 F.2d 175 (1969)."
Keyes, supra, 413 U.S. at 210-11, 93 S.Ct. at 2698.
Applicable Supreme Court decisions subsequent to Keyes have concentrated and elaborated on the issues of intent, burden of proof, and remedy and the interplay among these issues.
In Milliken v. Bradley, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974) (Milliken I), the Court noted that significant racial imbalance in schools within an autonomous school district operates simply to shift the burden of proof to the school authorities to show that school assignments are not discriminatory. This shift in the burden of proof is "a very different matter from equating racial imbalance with a constitutional violation calling for a remedy."[57]Milliken I, supra, 418 U.S. at 741, n. 19, 94 S.Ct. at 3125. Accord, Keyes, supra, 413 U.S. at 208, 93 S.Ct. 2686; Swann, supra, 402 U.S. at 26, 91 S.Ct. 1267.
Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976),[58] reaffirms the necessity of establishing intentional discriminatory action and purpose as a prerequisite to a finding of constitutional violation:
"That there are both predominantly black and predominantly white schools in a community is not alone violative of the Equal Protection Clause. The essential element of de jure segregation is `a current condition of segregation resulting from intentional state action.' Keyes v. School Dist. No. 1, 413 U.S. 189, 205, [93 S.Ct. 2686, 2696, 37 L.Ed.2d 548] (1973)." *1359 Davis, supra, 426 U.S. at 240, 96 S.Ct. at 2048. The Court also reasserted the principle that official action will not be held unconstitutional solely because it results in a racially disproportionate impact. "Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution." Id. at 242, 96 S.Ct. at 2049. Accord, Village of Arlington Heights v. Metropolitan Housing Corp., 429 U.S. 252, 264-65, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).[59]
Arlington Heights, supra, states that even in light of disproportionate impact, there must be proof that discriminatory purpose was a motivating factor in the decisions of officials. Where there is proof that an official decision was motivated in part by a racially discriminatory purpose, the burden shifts to the officials to show "that the same decision would have resulted even had the impermissible purpose not been considered." Arlington Heights, supra, 429 U.S. at 270-71, n. 21, 97 S.Ct. at 566.
In Dayton Board of Education v. Brinkman, 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977), the Supreme Court addressed the issue of remedy and the need to tailor the remedy commensurate to the specific constitutional violations. The Court ruled:
"The duty of both the District Court and the Court of Appeals in a case such as this, where mandatory segregation by law of the races in the schools has long since ceased, is to first determine whether there was any action in the conduct of the business of the school board which was intended to, and did in fact, discriminate against minority pupils, teachers, or staff. . . . If such violations are found, the District Court in the first instance, subject to review by the Court of Appeals, must determine how much incremental segregative effect these violations had on the racial distribution of the Dayton school population as presently constituted, when that distribution is compared to what it would have been in the absence of such constitutional violations. The remedy must be designed to redress that difference, and only if there has been a systemwide impact may there be a systemwide remedy."
Dayton, supra, 433 U.S. at 420, 97 S.Ct. at 2775, citing Keyes, supra, 413 U.S. at 213, 93 S.Ct. 2686.
Subsequent to the Dayton decision, the Supreme Court vacated the ruling in United States v. School District of Omaha, 541 F.2d 708 (8th Cir. 1976), cert. granted, 433 U.S. 667, 97 S.Ct. 2905, 53 L.Ed.2d 1039 (1977). The remedy mandated in Omaha was an extensive plan involving the system-wide transportation of pupils. The remedy was based on a previous finding of a systemwide violation.[60] The Court remanded the case for reconsideration in the light of Arlington Heights, supra, and Dayton, supra.[61]
An open question now under review by the Supreme Court as of the date of this writing is the extent that legal presumptions and inferences, such as those employed in Omaha, may be used to extrapolate from evidence of discrete and isolated constitutional violations, the existence of a *1360 system-wide violation, necessitating a system-wide remedy.[62]
A threshold decision which must be met in this case is whether or not the St. Louis system falls within the ruling of Dayton Board of Education v. Brinkman. This determination first requires a decision as to whether or not the Board's desegregation plan in 1954-56 was effective in achieving a unitary school system.

B. Effectiveness of the 1954-56 Desegregation Plan.
After the decision in Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), the Board of Education of St. Louis had an affirmative duty to dismantle the dual school system. The Board's desegregation plan, which was fully implemented in 1954-56, was effective in disestablishing the dual school system and in achieving a unitary system. The Board completely eliminated race as a requirement or a bar to attend any school in the system. Alexander v. Holmes County Board of Education, 396 U.S. 19, 20, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969). Students were reassigned to schools on a completely racially neutral basis. The boundaries were redrawn with data that was free of any reference, however subtle, to race. The plan was not only neutral, but it was effective as well. Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). About two-thirds of all students were attending interracial schools after desegregation. The Board's plan resulted in the "meaningful and immediate progress toward disestablishing state-imposed segregation" as required by Green, supra.
There is no evidence that the Board used any subterfuge or dilatory tactics in achieving the mandate of Brown. The Board acted immediately and decisively to create a unitary school system.
The basis of the unitary school system which the Board adopted after Brown was the neighborhood school. Prior to Brown, the neighborhood school policy was used to assign white children to schools whereas black children were bused elsewhere. After Brown, all children were assigned to their neighborhood schools.
The neighborhood school is not itself suspect as racially discriminatory. Adoption of the neighborhood school policy as to all children pursuant to the desegregation plan resulted in some remaining one race schools. These remaining one race schools must come under close judicial scrutiny to assure that their racial composition is not the result of present or past discriminatory action by school authorities:
"Where the school authority's proposed plan for conversion from a dual to a unitary system contemplates the continued existence of some schools that are all or predominately of one race, they have the burden of showing that such school assignments are genuinely nondiscriminatory."
Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 26, 91 S.Ct. 1267, 1281, 28 L.Ed.2d 554 (1971).
The cause for some remaining one race or virtually one race schools in St. Louis was the adoption of the neighborhood school. There is no credible evidence which indicates that the racially imbalanced schools were the result of gerrymandering, escapist transfers, or any other discriminatory acts by the Board.
The Board's decision to adopt the neighborhood school was not discriminatory. The Board did not merely rely upon some *1361 "allegedly logical, racially neutral explanation for their actions." Keyes v. School District No. 1, Denver, Colo., 413 U.S. 189, 210, 93 S.Ct. 2686, 2698, 37 L.Ed.2d 548 (1973). In light of tremendous support by educators, citizens, government policy,[63] and parents, both black and white, of neighborhood schools, the Board has demonstrated that "segregative intent was not among the factors that motivated their actions." Id. The Board's good faith is highlighted by the fact that they published the new school boundaries far in advance of their implementation and invited comments on them from the public and from civic groups representing diverse points of view. No indications were received in 1954 that the boundaries or the neighborhood school basis of assignment were discriminatory. Therefore, so long as neighborhood school attendance zones are not gerrymandered, or pupil assignments otherwise abused so as to foster segregation, the use of neighborhood schools is allowed for the sake of its unique benefits, even though there may be a resulting residentially based racial imbalance in the schools.
Adoption of neighborhood schools comports with guidelines set out in Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) (Brown II), where the Court suggested:
"revision of school districts and attendance areas into compact units to achieve a system of determining admission to the public schools on a nonracial basis . .."
Id. at 300-01, 75 S.Ct. at 756.
The Supreme Court clarified this reference to "compact units" in Swann where the Court advised that revision into compact units must also be effective in achieving desegregation. Swann, supra, 402 U.S. at 27, n. 10, 91 S.Ct. 1267.
Neighborhood schools also meet the definition of achieving a unitary system as set out in Section 2000c(b) of Title IV of the Civil Rights Act of 1964:
"`Desegregation' means the assignment of students to public schools and within such schools without regard to their race, color, religion, or national origin, but `desegregation' shall not mean the assignment of students to public schools in order to overcome racial imbalance."
Swann, supra, 402 U.S. at 17, 91 S.Ct. [1267] at 1276.
Adoption of neighborhood schools in St. Louis did not have the foreseeable consequence of bringing about or maintaining segregation. Omaha, supra, 521 F.2d at 535-36. The demographic history of St. Louis reveals the high mobility of all ethnic groups before Brown. The massive changes in the racial makeup of the City in the late 1950's and 1960's were not foreseeable by the Board.
In sum, this Court finds that the Board's actions with respect to desegregation were taken in good faith and were as effective as practically possible. Davis v. Board of School Comm'rs of Mobile County, 402 U.S. 33, 37, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971). The duty to desegregate was, therefore, discharged by the Board. The affirmative duty of the Board to abolish the dual school system being discharged, and racial discrimination through official action being eliminated, the City of St. Louis came to the point described by the Supreme Court in Swann:
"At some point, these school authorities and others like them should have achieved full compliance with this Court's decision in Brown I. The systems would then be `unitary' in the sense required by our decision in Green and Alexander.

"It does not follow that the communities served by such systems will remain demographically stable, for in a growing, mobile society, few will do so. Neither school authorities nor district courts are constitutionally required to make year-by-year adjustments of the racial composition of student bodies once the affirmative duty to desegregate has been accomplished *1362 and racial discrimination through official action is eliminated from the system. This does not mean that federal courts are without power to deal with future problems; but in the absence of a showing that either the school authorities or some other agency of the State has deliberately attempted to fix or alter demographic patterns to affect the racial composition of the schools, further intervention by a district court should not be necessary."
Swann, supra, 402 U.S. at 31-32, 91 S.Ct. at 1283-1284.

C. Burden of Proof.
This Court concludes that the principles stated in Dayton Board of Education v. Brinkman, 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977), and its progeny are applicable to this case. In order to find constitutional violations it will be necessary for plaintiffs to establish that the Board's actions or inactions were intended to, and did in fact, discriminate against minority pupils, teachers, or staff. If such violations are found, this Court must determine the incremental segregative effect that these violations had on the racial distribution of the St. Louis school population as presently constituted, when that distribution is compared to what it would have been in the absence of such constitutional violations. Dayton, supra, 433 U.S. at 420, 97 S.Ct. 2766.
The burden of proving intentional discriminatory action by the Board and that these actions in fact had a segregative effect and that segregation would not have existed in absence of such action rests with the plaintiffs and plaintiff-intervenors. Dayton, supra, 433 U.S. at 420, 97 S.Ct. 2766. The burden will at times shift to the defendants where a prima facie case of discrimination exists. Swann, supra, 402 U.S. at 26, 91 S.Ct. 1267. See United States v. School District of Omaha, 521 F.2d 530, 534-35 (8th Cir. 1975). The defendants then have the burden to show the nonexistence of discriminatory purpose as a factor that motivated their actions or failures to act or that their discriminatory acts did not have a racial impact or exacerbate segregation. Washington v. Davis, 426 U.S. 229, 243, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). See Keyes, supra, 413 U.S. at 210, 93 S.Ct. 2686; Omaha, supra, 521 F.2d at 536.

D. Racial Imbalance in the St. Louis Schools.
After St. Louis converted to a unitary school system, dramatic changes occurred in the demography of the City. These changes are fully discussed in the Findings of Fact, supra. These changes were caused by a variety of factors, including actions of federal authorities and housing discrimination. The result was the massive migration of whites from the City and an equally massive intra-city migration of blacks. The population movements as a whole are reflected in the changes of the racial composition of the public school enrollment from 66% white in 1953 to 45.13% white in 1962 and finally 25.5% white in 1978. The movements resulted in substantial racial changes in certain areas of the City, specifically in the west end and northwest St. Louis. These racial changes in turn affected the racial composition of schools in those areas, resulting in a number of racially imbalanced schools. None of these changes and their effect were foreseeable by the Board.
The relationship over a substantial period of time between racially changing residential areas and racially changing schools is complex, but causally related. A school system which assigns pupils to schools under the neighborhood school policy will naturally be affected by this relationship. In St. Louis, the primary cause of racial imbalance and resegregation in schools is the interaction of the neighborhood school policy with residential segregation which has resulted due to factors unforeseeable by and beyond the influence or control of the Board.
The existence of substantial racial imbalance in a unitary school system, especially one which has previously been segregated by law, creates a prima facie case of unlawful discrimination. Swann, supra, 402 U.S. at 26, 91 S.Ct. [1267] at 1281. The burden of proof is on the Board to show *1363 that the racial imbalance is not the result of "present or past discriminatory action on their part." Id. This shift in the burden of proof, however, does not equal racial imbalance with a constitutional violation. Milliken v. Bradley, 418 U.S. 717, 741, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974) (Milliken I). Although the burden of proof is on the Board to show that racial imbalance in school assignments is not part of prior state-enforced segregation, the existence of the imbalance in St. Louis is not traceable to prior mandatory segregation.
As is noted above, the primary reason for racial imbalance in the St. Louis public schools is adherence to the neighborhood school policy where resegregation was taking place due to factors not attributable to the Board.
Population changes so overwhelmed the actions of the Board, that the Board's actions or omissions to act may not be said to have had the foreseeable effect of causing or maintaining the racial imbalance in the schools. These changes would have taken place despite any efforts of the Board to prevent them, and were not, in fact, hastened by the effects of any actions or inactions of the Board. The overwhelming, inexorable cause of the racial imbalance in the schools is the aggregate movement of individuals in response to economic forces. This Court has found (fully described in Findings of Fact) that resegregation was not the result of gerrymandering boundaries, manipulating feeder patterns, optional attendance zones, abuse of transfers, busing, teacher assignments, curriculum, or any other acts of the Board. The neighborhood school policy has been operated since 1954-56 on a neutral basis, free of manipulation. There is no credible evidence that the Board deviated from the neighborhood school policy when necessary to prevent meaningful desegregation. Attention must also be directed to numerous efforts on the part of the Board to build integrated schools and maintain integrated programs. That many of these programs eventually failed, although in many instances integration was maintained for several years before resegregation negated those efforts, is not evidence of intentional segregation by the Board. Rather, the Board has evidenced its good faith in integrative efforts. In recent years the Board has succeeded in reducing racial isolation in schools, especially with respect to white students. The Board has met its rebuttal burden of proof in demonstrating that its operation of the neighborhood school policy was racially neutral.
The Board's burden of proof in demonstrating that race was not a factor in adhering to the neighborhood school policy where resegregation was taking place must be scrutinized under governing case law.
As a matter of general principle, assigning school children to schools in their neighborhood does not offend the Constitution. Milliken I, supra, 418 U.S. at 737-41, 94 S.Ct. 3112. This is especially true where the neighborhood school policy is maintained free of manipulation. Keyes, supra, 413 U.S. at 245-46, 93 S.Ct. 2686.
Likewise, racial imbalance in schools is not in itself violative of the Constitution. Washington v. Davis, supra, 426 U.S. at 240, 96 S.Ct. 2040. Accord, Swann, supra, 402 U.S. at 24, 91 S.Ct. 1267. As the Supreme Court stated in Dayton (which this Court has held applies in this case):
"It is clear from the findings of the District Court that [this city] is a racially mixed community, and that many of its schools are either predominantly white or predominantly black. This fact without more, of course, does not offend the Constitution."
Dayton, supra, 433 U.S. at 417, 97 S.Ct. at 2774. The constitutional right of plaintiffs is to attend a unitary school system in that district. Milliken I, supra, 418 U.S. at 746, 94 S.Ct. 3112. Constitutional rights do not extend to attending schools with a particular racial balance.
"If we were to read the holding of the District Court to require, as a matter of substantive constitutional right, any particular degree of racial balance or mixing, that approach would be disapproved and we would be obliged to reverse. The constitutional command to desegregate *1364 schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole."
Swann, supra, 402 U.S. at 24, 91 S.Ct. at 1280. Other language from Swann makes it clear that "`desegregation' shall not mean the assignment of students to public schools in order to overcome racial imbalance." Id. at 17, 91 S.Ct. at 1276.
The Board has successfully demonstrated that racially segregative purpose was not a factor in the operation of the neighborhood schools.[64] The Board has met its rebuttal burden of proof that its student assignment policy was racially nondiscriminatory. That the neighborhood school policy came to have a disproportionate impact on the racial balance of schools, and especially black schools, does not mean that it was racially discriminatory, absent segregative purpose. Village of Arlington Heights v. Metropolitan Housing Corp., 429 U.S. 252, 264-65, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). Accord, Washington v. Davis, supra, 426 U.S. at 240, 96 S.Ct. 2040; Swann, supra, 402 U.S. at 23, 91 S.Ct. 2686.
The following language from Swann applies to the problem of de facto racial imbalance in the St. Louis schools:
"We are concerned in these cases with the elimination of the discrimination inherent in the dual school systems, not with myriad factors of human existence which can cause discrimination in a multitude of ways on racial, religious, or ethnic grounds. The target of the cases from Brown I to the present was the dual school system. The elimination of racial discrimination in public schools is a large task and one that should not be retarded by efforts to achieve broader purposes lying beyond the jurisdiction of school authorities. One vehicle can carry only a limited amount of baggage. . . .
"Our objective in dealing with the issues presented by these cases is to see that school authorities exclude no pupil of a racial minority from any school, directly or indirectly, on account of race; it does not and cannot embrace all the problems of racial prejudice, even when those problems contribute to disproportionate racial concentrations in some schools."
Swann, supra, 402 U.S. at 22-23, 91 S.Ct. at 1279.
This Court specifically concludes that the plaintiffs have failed to meet their burden of proof that there has been any intentional segregation of students caused by the actions or inactions of the Board. This Court also concludes that no actions or inactions of the Board had the foreseeable consequence of bringing about or maintaining segregation. This Court further finds that if any action of the Board resulted in segregation, the Board has successfully met its burden that the act was not done with segregative intent.

IV. POSITIONS AND PLANS OF THE PARTIES.
The intervening plaintiff NAACP takes the position that there has been a constitutional violation based on the present imbalance within the schools. Their expert has suggested a plan (the Stolee plan) which requires massive busing of pupils within the *1365 City of St. Louis. The Court is of the opinion that such a plan is not feasible and would not be a stable plan of integration. The plan, in essence, divides the children on a numerical percentage by race in each school. Based on past experience in other cities where massive busing has been employed, including Atlanta, Boston, Richmond, Detroit, and others, the end result has been to lead to more segregation.
The plan (the Colton plan) suggested by the original plaintiffs, which is also premised on their position that a constitutional violation exists, makes a four-tiered assignment of pupils which will result in black pupils seeing some white pupils even though they may not be in the same classes or grades. This does not appear to be practical to this Court.
The intervening plaintiffs Adams and the City of St. Louis take the position that there has been no constitutional violation and, accordingly, this Court is without power or authority to order any desegregation within the City. This position is untenable. The entry of a consent decree by the Court, and the voluntary actions taken thereunder to reduce racial isolation, is a proper form of resolving a desegregation suit. McDaniel v. Barresi, 402 U.S. 39, 91 S.Ct. 1287, 28 L.Ed.2d 582 (1971).
The defendant Board takes the position that they are bound by the consent decree in which they agreed to desegregate wherever possible and where practical. This Court is of the opinion that regardless of whether or not there has been a constitutional violation by the Board, and this Court has found that there is no constitutional violation by the Board or by the State of Missouri, all parties are bound by the consent degree and that the Board in that consent decree agreed to desegregate the schools wherever it is possible. The State of Missouri is willing to aid the Board in these efforts by giving technical assistance and financial aid.
The expert for the United States testified that in his opinion a practical, stable plan of integration could not be achieved within the city of St. Louis because of the ratio of 75% black to 25% white students and that to make any effort to place the schools in the same ratio would result in a short period of time in total black schools for the City of St. Louis. He also suggested that the Board should consider soliciting voluntary assistance from the adjoining schools in St. Louis County whereby white students may be bused into the City for the purpose of fostering integration. This Court has no objection to such an effort but is of the opinion that the only way it can be achieved is to offer such quality education within the City of St. Louis that cannot be duplicated in the County. This can be done by a continuation of the magnet school program which could attract white students from the County and from the private and parochial schools within the City which will improve the balance between black and white students.
All parties have expressed a willingness to lend their expertise and their assistance to the Board in working out a practical solution to the problem within the City. With this in mind, the Court will direct the defendant Board to solicit the assistance of all the parties, and of such citizens' groups which have offered their assistance and have volunteered to help, and to come back to the Court within a period of 90 days from the date when the judgment in this cause becomes final to supplement their plan previously filed under the consent decree.
In drawing up a plan for further integration of the schools, the Board must keep in mind the realities of the situation, the cost and monies available to the Board, and such assistance as it may receive in the future from the federal government, including funds under Title I ESEA, and from the state government in the various programs which those governments have sponsored. Since no constitutional violation has been found, the criteria shall be quality education, which includes integration of the races, where practical and feasible.
*1366 The original plaintiffs and other intervening parties have requested the Court to allow attorneys' fees and costs. The Court is of the opinion that none of the parties are entitled to attorneys' fees and that each party shall bear its own costs.

APPENDIX A(1)

 Racial Composition of the Enrollment in the
 St. Louis Elementary and Secondary Schools
 by District
 Year 1972-73
BANNEKER:
 CENTRAL-VASHON DISTRICT
 Black White Total % Black
 CENTRAL HIGH SCHOOL 1,147 422 1,569 73.1
 Ames 78 560 638 12.2
 Blair 541 79 620 87.3
 Bryan Hill 674 72 706 95.5
 Clay 51 777 828 6.2
 Eliot 632 77 709 89.1
 Howard 411 0 411 100.0
 Howard Br. 141 2 143 98.6
 Irving 673 44 717 93.7
 Irving Br. 308 31 339 90.9
 Jackson 507 12 519 97.7
 Lowell 410 42 452 90.7
 Webster 314 189 503 62.4
 _____ _____ ______ ______
 TOTAL CENTRAL H.S. 5,887 2,267 8,154 72.2
 VASHON HIGH SCHOOL 2,635 2 2,637 99.9
 Banneker 422 2 424 99.5
 Blewett 737 1 738 99.9
 Carr 192 0 192 100.0
 Carr Lane 448 0 448 100.0
 Carver 515 3 518 99.4
 Cole 420 0 420 100.0
 Cole Br. 205 1 206 99.5
 Columbia 803 0 803 100.0
 Curtis 194 0 194 100.0
 Curtis Br. 80 0 80 100.0
 Divoll 374 0 374 100.0
 Divoll Br. 120 0 120 100.0
 Dunbar 601 3 604 99.5
 Dunbar Br. 216 1 217 99.5
 Franklin 341 0 341 100.0
 Henry 664 0 664 100.0
 Jefferson 651 0 651 100.0
 Marquette 478 3 481 99.4
 Pruitt 230 0 230 100.0
 ______ _____ ______ ______
 TOTAL VASHON H.S. 10,326 16 10,342 99.8
 ______ _____ ______ ______
TOTAL BANNEKER:
CENTRAL-VASHON DISTRICT 16,213 2,283 18,496 87.7

*1367
McKINLEY-ROOSEVELT DISTRICT
 Black White Total % Black
 McKINLEY HIGH SCHOOL 924 544 1,468 62.9
 Charless 1 339 340 0.3
 Chouteau 433 0 433 100.0
 Clinton 444 55 499 89.0
 Clinton Br. 287 47 334 85.9
 Fremont 6 770 776 0.8
 Hodgen 727 48 775 93.8
 Humboldt 138 344 482 28.6
 Lafayette 27 391 418 6.5
 L'Ouverture 664 0 664 100.0
 Madison 201 71 272 73.9
 Peabody 857 7 864 99.2
 Sigel 10 619 629 1.6
 Waring 290 91 381 76.1
 _____ _____ ______ ____
 TOTAL McKINLEY H.S. 5,009 3,326 8,335 60.1
 ROOSEVELT HIGH SCHOOL 214 2,748 2,962 7.2
 Adams 165 397 562 29.4
 Fanning 1 790 791 0.9
 Froebel 0 618 618 0
 Garfield 0 618 618 0
 Grant 0 622 622 0
 Mann 0 640 640 0
 Mann Br. 0 50 50 0
 Monroe 0 479 479 0
 Mullanphy 39 717 756 5.2
 Rock Spring 176 20 196 89.8
 Shenandoah 10 523 533 1.9
 Shepard 7 626 633 1.1
 Sherman 15 626 641 2.3
 Sherman Br. #1 6 95 101 5.9
 Sherman Br. #2 7 138 145 4.8
 Sherman Br. #3 10 107 117 8.5
 Wyman 690 111 801 86.1
 _____ _____ ______ ____
 TOTAL ROOSEVELT H.S. 1,340 9,925 11,265 11.9
TOTAL McKINLEY-ROOSEVELT
 DISTRICT 6,349 13,251 19,600 32.4

*1368
CLEVELAND-SOUTHWEST DISTRICT
 Black White Total % Black
 CLEVELAND HIGH SCHOOL 14 2,815 2,829 0.5
 Blow 4 407 411 1.0
 Carondelet 0 238 238 0
 Gardenville 3 458 461 0.7
 Long 0 555 555 0
 Lyon 0 328 328 0
 Maddox 14 292 306 4.6
 Meramec 0 419 419 0
 Mt. Pleasant 0 369 369 0
 Oak Hill 0 480 480 0
 Scruggs 14 701 715 2.0
 Windsor 0 433 433 0
 Woerner 22 581 603 3.6
 Woodward 23 616 639 3.6
 __ _____ ______ _____
 TOTAL CLEVELAND H.S. 94 8,692 8,786 1.1
 SOUTHWEST HIGH SCHOOL 220 2,494 2,714 8.1
 Buder 20 520 540 3.7
 Busch 9 374 383 2.3
 Dewey 67 520 587 11.4
 Gratiot 51 182 233 21.9
 Kennard 0 391 391 0
 Lindenwood 0 331 331 0
 Longfellow 52 227 279 18.6
 Mallinckrodt 78 234 312 25.0
 Mason 46 403 449 10.2
 Nottingham 2 277 279 0.7
 Roe 7 561 568 1.2
 Shaw 3 503 506 0.6
 Stix 295 101 396 74.5
 Wade 124 313 437 28.4
 Wilkinson 55 194 249 22.1
 _____ _____ _____ _____
 TOTAL SOUTHWEST H.S. 1,029 7,625 8,654 11.9
 _____ _____ _____ _____
TOTAL CLEVELAND-SOUTHWEST
 DISTRICT 1,123 16,317 17,440 6.4

*1369
BEAUMONT-SUMNER DISTRICT
 Black White Total % Black
 BEAUMONT HIGH SCHOOL 3,201 0 3,201 100.0
 Ashland 1,219 0 1,219 100.0
 Ashland Br. 218 0 218 100.0
 Bates 608 2 610 99.7
 Benton 498 0 498 100.0
 Farragut 971 1 972 99.9
 Farragut Br. #1 37 1 38 97.4
 Farragut Br. #2 11 0 11 100.0
 Gundlach 1,042 0 1,042 100.0
 Harrison 629 0 629 100.0
 Langston 994 0 994 100.0
 Langston Br. 107 0 107 100.0
 Lexington 543 17 560 97.0
 Williams 684 1 685 99.9
 Williams Br. #1 225 0 225 100.0
 Williams Br. #2 163 0 163 100.0
 Yeatman 965 4 969 99.6
 ______ __ ______ _____
 TOTAL BEAUMONT H.S. 12,115 26 12,141 99.8
 SUMNER HIGH SCHOOL 2,644 0 2,644 100.0
 Cote Brilliante 922 0 922 100.0
 Cupples 901 3 904 99.9
 Euclid 515 0 515 100.0
 Euclid Br. #1 52 0 52 100.0
 Euclid Br. #2 85 0 85 100.0
 Field 579 7 586 98.8
 Field Br. 216 0 216 100.0
 Hickey 814 0 814 100.0
 Marshall 474 1 475 99.8
 Marshall Br. 183 0 183 100.0
 Riddick 647 0 647 100.0
 Simmons 783 1 784 99.9
 Simmons Br. 202 0 202 100.0
 Stevens 730 0 730 100.0
 Turner Middle 539 0 539 100.0
 Washington 731 0 731 100.0
 ______ __ ______ _____
 TOTAL SUMNER H.S. 11,017 12 11,029 99.9
 ______ __ ______ _____
TOTAL BEAUMONT-SUMNER
 DISTRICT 23,132 38 23,170 99.8

*1370
NORTHWEST-SOLDAN DISTRICT
 Black White Total % Black
 NORTHWEST HIGH SCHOOL 2,070 219 2,289 90.4
 Baden 205 476 681 30.1
 Dessalines 291 11 302 96.4
 Herzog 453 9 462 98.1
 Herzog Br. 126 4 130 96.9
 Mark Twain 691 6 697 99.1
 Scullin 905 1 906 99.9
 Walbridge 981 26 1,007 97.4
 Walnut Park 831 37 868 95.7
 _____ ___ _____ _____
 TOTAL NORTHWEST H.S. 6,553 789 7,342 89.3
 SOLDAN HIGH SCHOOL 3,751 0 3,751 100.0
 Arlington 634 1 635 99.8
 Clark 877 3 880 99.7
 Clark Br. #1 288 3 291 99.0
 Clark Br. #2 94 0 94 100.0
 Cook 832 7 839 99.2
 Cook Br. 111 0 111 100.0
 Dozier 466 4 470 99.1
 Emerson 661 0 661 100.0
 Emerson Br. 177 1 178 99.4
 Enright Middle 1,225 3 1,228 99.8
 Ford 831 0 831 100.0
 Ford Br. 246 0 246 100.0
 Hamilton 1,005 3 1,008 99.7
 Hamilton Br. #1 203 0 203 100.0
 Hamilton Br. #2 98 2 100 98.0
 Hamilton Br. #3 119 0 119 100.0
 Hempstead 907 0 907 100.0
 Hempstead Br. 99 0 99 100.0
 Laclede 911 1 912 99.9
 Mitchell 854 0 854 100.0
 Mitchell Br. 350 1 351 99.7
 Stowe 1,106 1 1,107 99.9
 Wheatley 259 0 259 100.0
 ______ ___ ______ _____
 TOTAL SOLDAN H.S. 16,104 30 16,134 99.8
 ______ ___ ______ _____
TOTAL NORTHWEST-SOLDAN
 DISTRICT 22,657 819 23,476 96.5

*1371
 (A) Specialized High Schools.
 PUPILS 
 Black White Total % Black
 Metro 56 56 112 50.0
(O'Fallon [*][*][*][*])
 Delmar 359 1 360 99.7
 King 904 12 916 98.7
 Lincoln 139 3 142 97.9
 Work Study 210 3 213 98.6
 _____ ___ _____ _____
 Totals 1,668 75 1,743 95.7

 (B) Special Elementary Schools.
 PUPILS 
 Black White Total % Black
Children's Study School
 for children taken from
 their home under
 Court Order 14 11 25 56.0
City Hospital for hospitalized
 pupils 7 1 8 87.5
Continued Education for
 pregnant girls 252 4 256 98.4
Gallaudet for children with
 hearing and speech defects 69 21 90 76.7
Glennon Memorial Hospital
 for hospitalized pupils 5 10 15 33.3
Griscom for delinquent
 children, temporary
 detention 50 16 66 75.8
Michael for orthopedically
 handicapped children 73 45 118 61.9
Missouri Hills for delinquent
 children 70 13 83 84.3
Phillips Hospital for
 hospitalized pupils 16 1 17 94.1
St. Louis Children's Hospital
 for hospitalized pupils 12 2 14 85.7
Special #1 for mentally
 retarded pupils 7 75 82 8.5
Special #48 for mentally
 retarded pupils 99 0 99 100.0
Special #80 for mentally
 retarded pupils 65 6 71 91.5
 ___ ___ ___ _____
 Totals 739 205 944 78.3

*1372 APPENDIX A(2)

 Racial Composition of the Enrollment in the
 St. Louis Elementary and Secondary Schools
 by District
 Year 1975-76
BANNEKER:
 CENTRAL-VASHON DISTRICT
 Black White Total % Black
 CENTRAL HIGH SCHOOL 1,787 163 1,950 91.6
 Ames 86 393 479 18.0
 Blair 365 44 409 89.2
 Bryan Hill 550 0 550 100.0
 Clay 122 552 674 18.1
 Eliot 475 13 488 97.3
 Howard 294 0 294 100.0
 Howard Br. 128 3 131 97.7
 Irving 559 17 576 97.0
 Jackson 364 8 372 97.8
 Lowell 363 13 376 96.5
 Webster 478 66 544 87.9
 ______ _____ _____ _____
 TOTAL CENTRAL H.S. 5,571 1,272 6,843 81.4
 VASHON HIGH SCHOOL 1,960 0 1,960 100.0
 Banneker 290 0 290 100.0
 Blewett 514 1 515 99.8
 Carr 296 3 299 99.0
 Carr Lane 361 0 361 100.0
 Carver 446 3 449 99.3
 Cole 418 0 418 100.0
 Columbia 621 0 621 100.0
 Dunbar 502 0 502 100.0
 Dunbar Br. 141 0 141 100.0
 Franklin 341 0 341 100.0
 Henry 521 0 521 100.0
 Jefferson 584 0 584 100.0
 Marquette 314 3 317 99.1
 ______ _____ ______ ______
 TOTAL VASHON H.S. 7,309 10 7,319 99.9
TOTAL BANNEKER:
 CENTRAL-VASHON DISTRICT 12,880 1,282 14,162 90.9

*1373
McKINLEY-ROOSEVELT DISTRICT
 Black White Total % Black
 McKINLEY HIGH SCHOOL 1,040 435 1,475 70.5
 Charless 0 302 302 0.0
 Chouteau 302 1 303 99.7
 Clinton 378 26 404 93.6
 Clinton Br. 157 2 159 98.7
 Fremont 9 627 636 1.4
 Hodgen 510 14 524 97.3
 Humboldt 83 213 296 28.0
 Lafayette 5 279 284 1.8
 L'Ouverture 506 1 507 99.8
 Madison 160 26 186 85.0
 Peabody 764 2 766 99.7
 Sigel 41 437 478 8.6
 Waring 277 55 332 83.4
 ______ ______ ______ ______
 TOTAL McKINLEY H.S. 4,232 2,420 6,652 63.6
 ROOSEVELT HIGH SCHOOL 380 2,395 2,775 13.7
 Adams 264 194 458 57.6
 Fanning 4 667 671 0.6
 Froebel 0 597 597 0.0
 Garfield 0 578 578 0.0
 Grant 1 592 593 0.2
 Mann 0 648 648 0.0
 Monroe 0 380 380 0.0
 Mullanphy 307 436 743 41.3
 Rock Spring 204 6 210 97.1
 Shenandoah 38 515 553 6.9
 Shepard 14 517 531 2.6
 Sherman 80 528 608 13.2
 Sherman Br. 1 12 75 87 13.8
 Sherman Br. 2 19 194 213 8.9
 Wyman 714 36 750 95.2
 ______ ______ ______ ______
 TOTAL ROOSEVELT H.S. 2,037 8,358 10,395 19.6
TOTAL McKINLEY-ROOSEVELT
 DISTRICT 6,269 10,778 17,047 36.8

*1374
CLEVELAND-SOUTHWEST DISTRICT
 Black White Total % Black
 CLEVELAND HIGH SCHOOL 25 2,623 2,648 0.9
 Blow Middle 33 360 393 8.4
 Gardenville 1 387 388 0.3
 Long 0 502 502 0.0
 Lyon 3 441 444 0.7
 Maddox 9 282 291 3.1
 Meramec 0 373 373 0.0
 Mt. Pleasant 0 304 304 0.0
 Oak Hill 0 375 375 0.0
 Scruggs 47 607 654 7.2
 Windsor 0 403 403 0.0
 Woerner 17 383 400 4.2
 Woodward 70 491 561 12.5
 ______ ______ ______ _____
 TOTAL CLEVELAND H.S. 205 7,531 7,736 2.6
 SOUTHWEST HIGH SCHOOL 403 2,098 2,501 16.1
 Buder 37 427 464 8.0
 Busch 7 367 374 1.9
 Dewey 40 466 506 7.9
 Kennard 0 261 261 0.0
 Lindenwood 0 273 273 0.0
 Longfellow 43 139 182 23.6
 Mallinckrodt 62 172 234 26.5
 Mason 31 317 348 8.9
 Nottingham 0 193 193 0.0
 Roe 0 487 487 0.0
 Shaw 0 224 224 0.0
 Stix 297 37 334 88.9
 Wade 155 200 355 43.7
 Wilkinson 38 157 195 19.5
 _____ ______ ______ _____
 TOTAL SOUTHWEST H.S. 1,113 5,818 6,931 16.1
TOTAL CLEVELAND-SOUTHWEST
 DISTRICT 1,318 13,349 14,667 9.0

*1375
BEAUMONT-SUMNER DISTRICT
 Black White Total % Black
 BEAUMONT HIGH SCHOOL 3,178 0 3,178 100.0
 Ashland 960 0 960 100.0
 Ashland Br. 176 0 176 100.0
 Bates 405 1 406 99.8
 Benton 373 0 373 100.0
 Farragut 701 0 701 100.0
 Gundlach 813 2 815 99.8
 Harrison 576 0 576 100.0
 Langston 860 4 864 99.5
 Lexington 418 2 420 99.5
 Williams 502 0 502 100.0
 Williams Br. 1 163 0 163 100.0
 Williams Br. 2 132 0 132 100.0
 Yeatman 966 0 966 100.0
 ______ __ ______ _____
 TOTAL BEAUMONT H.S. 10,223 9 10,232 99.9
 SUMNER HIGH SCHOOL 2,504 0 2,504 100.0
 Cote Brilliante 426 0 426 100.0
 Cupples 762 2 764 99.7
 Euclid 370 0 370 100.0
 Euclid Br. 62 0 62 100.0
 Field 500 3 503 99.4
 Field Br. 164 1 165 99.4
 Hickey 669 0 669 100.0
 Marshall 415 1 416 99.8
 Marshall Br. 88 0 88 100.0
 Riddick 442 0 442 100.0
 Simmons 677 0 677 100.0
 Stevens 512 0 512 100.0
 Turner Middle 632 0 632 100.0
 Washington 628 0 628 100.0
 ______ __ _____ _____
 TOTAL SUMNER H.S. 8,851 7 8,858 99.9
TOTAL BEAUMONT-SUMNER
 DISTRICT 19,074 16 19,090 99.9

*1376
NORTHWEST-SOLDAN DISTRICT
 Black White Total % Black
 NORTHWEST HIGH SCHOOL 2,671 24 2,695 99.1
 Baden 459 224 683 67.2
 Herzog 450 0 450 100.0
 Herzog Br. 114 0 114 100.0
 Mark Twain 786 3 789 99.6
 Mark Twain Br. 376 2 378 99.5
 Scullin 841 1 842 99.9
 Walbridge 992 4 996 99.6
 Walnut Park 841 5 846 99.4
 Walnut Park Br. 274 1 275 99.6
 ______ ___ ______ _____
 TOTAL NORTHWEST H.S. 7,804 264 8,068 96.7
 SOLDAN HIGH SCHOOL 2,131 0 2,131 100.0
 Enright 9th Gr. 789 0 789 100.0
 Arlington 567 0 567 100.0
 Clark 703 0 703 100.0
 Clark Br. 1 243 0 243 100.0
 Clark Br. 2 120 0 120 100.0
 Clark 7/8 237 0 237 100.0
 Cook 623 1 624 99.8
 Cook Br. 121 0 121 100.0
 Dozier 378 0 378 100.0
 Emerson 679 0 679 100.0
 Ford 593 0 593 100.0
 Ford Br. 203 0 203 100.0
 Hamilton 875 6 881 99.3
 Hamilton Br. 1 159 0 159 100.0
 Hamilton Br. 2 120 0 120 100.0
 Hamilton Br. 3 226 7 233 97.0
 Hempstead 853 1 854 99.9
 Hempstead Br. 89 0 89 100.0
 Laclede 711 0 711 100.0
 Mitchell 773 0 773 100.0
 Mitchell Br. 247 0 247 100.0
 Stowe 930 1 931 99.9
 ______ ___ ______ ______
 TOTAL SOLDAN H.S. 12,370 16 12,386 99.9
TOTAL NORTHWEST-SOLDAN
 DISTRICT 20,174 280 20,454 98.6

*1377
 RACIAL COMPOSITION OF THE ENROLLMENT IN:
(A) Specialized High Schools
 Black White Total % Black
 Metro 81 57 138 58.7
 (O'Fallon [*][*][*][*] )
 Delmar 184 0 184 100.0
 King 582 4 586 99.3
 Lincoln 229 0 229 100.0
 Work Study 226 2 228 99.1
 _____ ___ _____ _____
 Totals 1,302 63 1,365 95.4

(B) Special Elementary Schools (Twelve)[*]
 Black White Total % Black
Children's Study School
 for children taken from their
 home under Court Order 13 7 20 65.0
City Hospital for hospitalized
 pupils 5 5 10 50.0
Continued Education for
 pregnant girls 238 0 238 100.0
Gallaudet for children with
 hearing and speech defects 72 22 94 76.6
Glennon Memorial Hospital
 for hospitalized pupils 1 7 8 12.5
Griscom for delinquent
 children, temporary detention 84 24 108 77.8
Michael for orthopedically
 handicapped children 81 43 124 65.3
Missouri Hills for delinquent
 children 44 6 50 88.0
Phillips Hospital for hospitalized
 pupils 16 0 16 100.0
St. Louis Children's Hospital
 for hospitalized pupils 12 2 14 85.7
Special #1 for mentally
 retarded pupils 4 54 58 6.9
Special #48 for mentally
 retarded pupils 85 0 85 100.0
 ___ ___ ___ _____
 Totals 655 170 825 79.4

*1378 APPENDIX A(3)

 Racial Composition of the Enrollment in the
 St. Louis Elementary and Secondary Schools
 by District
 Year 1978-79
 Black White Total
 54,584 (74.5%) 18,638 (25.5%) 73,222
 Racial Composition of the Enrollment in the
 St. Louis Elementary and Secondary Schools
 by District
 Year 1978-79
 9-29-78
BANNEKER:
 CENTRAL-VASHON DISTRICT[*]
 Black White Total % Black
 CENTRAL HIGH SCHOOL 1,315 131 1,446 90.9
 Blair 285 37 322 88.5
 Bryan Hill 598 0 598 100.0
 Clay 228 295 523 43.6
 Eliot 519 8 527 98.5
 Howard 161 6 167 96.4
 Howard Branch 132 0 132 100.0
 Irving 587 22 609 96.4
 Jackson 299 12 311 96.1
 Lowell 358 18 376 95.2
 Webster 353 56 409 86.3
 ______ ___ ______ _____
 TOTAL CENTRAL
 SUB-DISTRICT 4,835 585 5,420 89.2

*1379
 Black White Total % Black
 VASHON HIGH SCHOOL 1,301 1 1,302 99.9
 Banneker 257 1 258 96.6
 Carr Lane 234 0 234 100.0
 Carver 320 1 321 99.7
 Cole 372 0 372 100.0
 Columbia 519 0 519 100.0
 Dunbar 461 1 462 99.8
 Franklin 439 1 440 99.8
 Henry 493 26 519 95.0
 Jefferson 556 0 556 100.0
 Marquette 299 21 320 93.4
 Blewett Junior High:
 Secondary 413 3 416 99.3
 Elementary 261 1 262 99.6
 ______ ___ ______ _____
 TOTAL VASHON SUB-DISTRICT 5,925 56 5,981 99.1
 ______ ___ ______ _____
TOTAL BANNEKER:
 CENTRAL-VASHON DISTRICT 10,760 641 11,401 94.4
BEAUMONT-SUMNER DISTRICT
 Black White Total % Black
 BEAUMONT HIGH SCHOOL 2,166 0 2,166 100.0
 Ashland 740 1 741 99.9
 Ashland Branch 124 1 125 99.2
 Bates 313 0 313 100.0
 Benton 327 0 327 100.0
 Farragut 586 0 586 100.0
 Gundlach 667 0 667 100.0
 Harrison 482 0 482 100.0
 Langston 649 0 649 100.0
 Lexington 386 5 391 98.7
 Williams 453 0 453 100.0
 Williams Br. 1 163 0 163 100.0
 Yeatman 848 0 848 100.0
 ______ ___ ______ _____
 TOTAL BEAUMONT
 SUB-DISTRICT 7,904 7 7,911 99.9

*1380
 Black White Total % Black
 SUMNER HIGH SCHOOL 2,006 1 2,007 99.9
 Cote Brilliante 356 0 356 100.0
 Cupples 653 1 654 99.8
 Euclid 342 0 342 100.0
 Field 286 0 286 100.0
 Hickey 550 0 550 100.0
 Marshall ) 458 0 458 100.0
 Marshall Branch )
 Riddick 318 0 318 100.0
 Simmons 578 0 578 100.0
 Stevens 408 0 408 100.0
 Turner Middle 580 1 581 99.8
 Washington 485 0 485 100.0
 ______ __ ______ _____
 TOTAL SUMNER
 SUB-DISTRICT 7,020 3 7,023 99.9
 ______ __ ______ _____
TOTAL BEAUMONT-SUMNER
 DISTRICT 14,924 10 14,934 99.9
CLEVELAND-SOUTHWEST DISTRICT
 Black White Total % Black
 CLEVELAND HIGH SCHOOL 81 1,968 2,049 4.0
 Blow 35 306 341 10.3
 Gardenville 43 227 270 15.9
 Long 61 339 400 15.3
 Lyon 1 318 319 0.3
 Maddox 3 193 196 1.5
 Meramec 1 320 321 0.3
 Mt. Pleasant 2 216 218 0.9
 Oak Hill 24 313 337 7.1
 Scruggs 51 407 458 11.1
 Windsor 0 290 290 0.0
 Woerner 87 151 238 36.6
 Woodward 137 345 482 28.4
 _____ _____ _____ _____
 TOTAL CLEVELAND
 SUB-DISTRICT 526 5,393 5,919 8.9

*1381
 Black White Total % Black
SOUTHWEST HIGH SCHOOL 591 1,438 2,029 29.1
 Buder 72 251 323 22.3
 Busch 53 224 277 19.1
 Dewey 192 279 471 40.8
 Kennard 43 261 304 14.1
 Lindenwood 72 146 218 33.0
 Longfellow 62 78 140 44.3
 Mason 49 239 288 17.0
 Nottingham 53 110 163 32.5
 Roe 85 291 376 22.6
 Wilkinson 76 58 134 56.7
 _____ ______ ______ _____
 TOTAL SOUTHWEST
 SUB-DISTRICT[*] 1,348 3,375 4,723 28.5
 ______ ______ ______ _____
TOTAL CLEVELAND-SOUTHWEST
 DISTRICT 1,874 8,768 10,642 17.6

McKINLEY-ROOSEVELT DISTRICT[*]
 Black White Total % Black
 McKINLEY HIGH SCHOOL 820 313 1,133 72.4
 Charless 0 213 213 0.0
 Chouteau 207 1 208 99.5
 Clinton 420 22 442 95.0
 Fremont 9 452 461 2.0
 Hodgen 280 20 300 93.3
 Lafayette 138 215 353 39.1
 L'Ouverture 336 6 342 98.2
 Peabody 682 0 682 100.0
 Sigel 66 330 396 16.7
 ______ ______ ______ _____
 TOTAL McKINLEY
 SUB-DISTRICT 2,958 1,572 4,530 65.3

*1382
 Black White Total % Black
ROOSEVELT HIGH SCHOOL 740 1,472 2,212 33.5
 Adams 339 194 533 63.6
 Fanning 7 574 581 1.2
 Froebel 6 518 524 1.1
 Garfield 47 433 480 9.8
 Grant 4 487 491 0.8
 Mann 2 514 516 0.4
 Monroe 55 309 364 15.1
 Mullanphy 674 174 848 79.5
 Shenandoah 41 339 380 10.8
 Shepard 77 422 499 15.4
 Sherman ) 153 320 473 32.3
 Sherman Branch 1)
 Wyman 595 26 621 95.8
 ______ ______ ______ _____
 TOTAL ROOSEVELT
 SUB-DISTRICT 2,740 5,782 8,522 32.1
 ______ ______ ______ _____
TOTAL McKINLEY-ROOSEVELT
 DISTRICT 5,698 7,354 13,052 43.7
NORTHWEST-SOLDAN DISTRICT
 Black White Total % Black
NORTHWEST HIGH SCHOOL 1,650 21 1,671 98.7
 Baden 551 110 661 83.4
 Herzog ) 508 0 508 100.0
 Herzog Branch)
 Mark Twain 565 1 566 99.8
 Mark Twain Branch 315 0 315 100.0
 Scullin 636 0 636 100.0
 Walbridge 729 4 733 99.5
 Walnut Park 622 0 622 100.0
 Walnut Park Branch 253 0 253 100.0
 _____ ___ _____ _____
 TOTAL NORTHWEST
 SUB-DISTRICT 5,829 136 5,965 97.7

*1383
 Black White Total % Black
SOLDAN HIGH SCHOOL 1,524 1 1,525 99.9
 Arlington 447 0 447 100.0
 Clark 373 0 373 100.0
 Clark Branch 1 218 0 218 100.0
 Clark Branch 2 173 0 173 100.0
 Clark 7/8 190 0 190 100.0
 Cook 574 1 575 99.8
 Cook Branch 187 0 187 100.0
 Emerson 512 0 512 100.0
 Ford 524 0 524 100.0
 Hamilton 463 0 463 100.0
 Hamilton Br. 2 218 0 218 100.0
 Hamilton Br. 3 207 5 212 97.6
 Hempstead 720 2 722 99.7
 Hempstead Branch 132 0 132 100.0
 Laclede 575 1 576 99.8
 Mitchell 712 1 713 99.9
 Mitchell Branch 214 0 214 100.0
 Stowe 712 0 712 100.0
 Enright 9th Gr. Center
 Secondary 538 1 539 99.8
 Elementary 201 0 201 100.0
 ______ ___ ______ _____
 TOTAL SOLDAN
 SUB-DISTRICT 9,414 12 9,426 99.9
 ______ ___ ______ _____
TOTAL NORTHWEST-SOLDAN
 DISTRICT 15,243 148 15,391 99.0
 RACIAL COMPOSITION OF ENROLLMENT
 IN MAGNET SCHOOL LOCATIONS[*]
 YEAR 1978-79
 Black White Total % Black
SECONDARY
 Math and Science H.S.
 (DeAndreis) 246 129 375 65.6
 Visual and Performing Arts
 (Humboldt) 300 174 474 63.3
 Business and Office H.S.
 (Lincoln) 109 53 162 67.3
 _____ ___ _____ _____
 SECONDARY TOTALS 655 356 1,011 64.8

*1384
 Black White Total % Black
ELEMENTARY
 Academy of Basic
 Instruction (Waring) 354 31 385 91.9
 Academy of Basic
 Instruction (Mallinckrodt) 215 121 336 64.0
 Action Learning and
 Career Ed. (Madison) 160 87 247 67.8
 Computer Managed Learning:
 P.L.A.N. (Ames) 366 177 543 67.4
 Individually Guided
 Education (Wade) 247 191 438 56.4
 Investigative Learning Center
 (Stix) 340 146 486 70.0
 Visual and Performing Arts
 Center (Shaw) 245 209 454 54.0
 _____ _____ _____ ______
 ELEMENTARY TOTALS 1,927 962 2,889 66.7
 _____ _____ _____ ______
 GRAND TOTALS 2,582 1,318 3,900 66.2
 RACIAL COMPOSITION OF ENROLLMENT
 IN MAGNET SCHOOL PROGRAMS[*]
 YEAR 1978-79
 Black White Total % Black
SECONDARY
 Math and Science H.S.
 (DeAndreis) 246 129 375 65.6
 Visual and Performing
 Arts H.S. (Humboldt) 300 174 474 63.3
 Business and Office H.S.
 (Lincoln) 109 53 162 67.3
 _____ _____ _____ ______
 SECONDARY TOTALS 655 356 1,011 64.8

*1385
 Black White Total % Black
ELEMENTARY
 Academy of Basic
 Instruction (Waring) 354 31 385 91.9
 Academy of Basic
 Instruction (Mallinckrodt) 215 121 336 64.0
 Action Learning and Career
 Ed. (Madison) 160 87 247 67.8
 Computer Managed Learning:
 P.L.A.N. (Ames) 366 177 543 67.4
 Individually Guided
 Education (Wade) 247 191 438 56.4
 Investigative Learning
 Center (Stix) 340 146 486 70.0
 Visual and Performing Arts
 Center (Shaw) 245 160 405 60.5
 _____ _____ _____ _____
 ELEMENTARY TOTALS 1,927 913 2,840 67.9
 _____ _____ _____ _____
 GRAND TOTALS 2,582 1,269 3,851 67.0
 RACIAL COMPOSITION OF ENROLLMENTS
 IN SPECIALIZED HIGH SCHOOLS AND SPECIAL
 ELEMENTARY SCHOOLS
 YEAR 1978-79
 (A) SPECIALIZED HIGH SCHOOLS[*]
 Black White Total % Black
 Metro 84 72 156 53.8
 [*]O'Fallon 9th & 10th Gr. 1,559 95 1,654 94.3
 Delmar 133 0 133 100.0
 King 428 3 431 99.3
 Work Study 200 0 200 100.0
 Pruitt Alternative
 Secondary 269 8 277 97.1
 Elementary 30 3 33 90.9
 Rock Spring
 Secondary 198 16 214 92.5
 Elementary 13 7 20 65.0
 _____ _____ _____ _____
 SPECIALIZED
 HIGH SCHOOL TOTALS 2,914 204 3,118 93.5

*1386
 (B) SPECIAL ELEMENTARY SCHOOLS[**]
 Black White Total % Black
 Children's Study 11 6 17 64.7
 City Hospital 2 2 4 50.0
 Continued Education 179 1 180 99.4
 Gallaudet 70 34 104 67.3
 Glennon Memorial Hospital 3 6 9 33.3
 Griscom 68 28 96 70.8
 Lutheran Hospital 0 8 8 0.0
 Michael 86 38 124 69.4
 Missouri Hills 47 15 62 75.8
 Phillips Hospital 8 0 8 100.0
 St. Louis Children's
 Hospital 13 2 15 86.7
 Smith 12 55 67 17.9
 Rhoda 90 0 90 100.0
 ___ ___ ___ _____
 SPECIAL ELEMENTARY
 SCHOOL TOTALS 589 195 784 75.1

*1387
 APPENDIX B
 IN THE UNITED STATES DISTRICT COURT
 FOR THE EASTERN DISTRICT OF MISSOURI
 EASTERN DIVISION
CRATON LIDDELL, A MINOR )
BY MINNIE LIDDELL )
HIS MOTHER AND NEXT FRIEND )
 and )
MINNIE LIDDELL )
 )
JOANNA GOLDSBY, A MINOR )
BY BARBARA GOLDSBY )
HER MOTHER AND NEXT FRIEND )
 and )
BARBARA GOLDSBY )
 )
DEBORAH YARBER, A MINOR )
BY SAMUEL YARBER )
HER FATHER AND NEXT FRIEND )
 and )
SAMUEL YARBER )
 )
NATHALIE MOORE, A MINOR )
BY LOUISE MOORE )
HER MOTHER AND NEXT FRIEND )
 and )
LOUISE MOORE )
 ) Cause No. 72C 100(1)
RACHELLE LE GRAND, A MINOR )
BY LOIS LE GRAND )
HER MOTHER AND NEXT FRIEND )
 and )
LOIS LE GRAND )
 )
on behalf of themselves and )
all other school age children )
and their parents residing )
in the metropolitan school )
district of the City of )
St. Louis, Missouri )
 )
 Plaintiffs )
 )
 vs. )
 )
 )
THE BOARD OF EDUCATION OF )
THE CITY OF ST. LOUIS, )
STATE OF MISSOURI )
 )
 and )
 )
DANIEL L. SCHLAFLY )
FREDERICK E. BUSSE )
REV. JAMES L. CUMMINGS )
MALCOLM W. MARTIN )
GORDON L. BENSON )
MRS. ANITA L. BOND )
 )

*1388
MRS. JOYCE BOWEN )
HENRY M. GRICH, JR. )
MRS. ERMA J. LAWRENCE )
REV. DONALD E. MAYER )
LAWRENCE MOSER )
CHARLES HARRIS )
 )
individually in their official )
capacities as members )
of the Board of Education of )
the City of St. Louis, )
State of Missouri )
 )
 and )
 )
ROBERT E. WENTZ )
 )
in his official capacity as )
Superintendent of Schools )
of the City of St. Louis )
 )
 and )
 )
JULIUS C. DIX )
BENJAMIN M. PRICE )
ROBERT W. BERNTHAL )
DAVID J. MAHAN )
CHARLES BRASFIELD )
 )
individually in their official )
capacities as District )
Superintendents of the Board )
of Education of the City of )
St. Louis, State of Missouri )
 )
 Defendants )

CONSENT JUDGMENT AND DECREE
On this 24th day of December, 1975, the parties hereto having appeared by counsel, and having consented, in the interest of the settlement of this litigation, as well as in the interest of saving the time, burden and expense of further hearings, subject to the approval of the Court, to the making and entering of this Judgment, as per memorandum filed herein under the date hereof, it is hereby
ORDERED, ADJUDGED AND DECREED that:
1. This Court has jurisdiction of the subject matter of this class action and of the parties hereto.
2. This Judgment and Decree is made and entered upon the Stipulation of Facts as amended and supplemented and upon the consent of the parties.
3. Nothing herein contained shall be deemed to be an admission on the part of *1389 defendants that the charges contained in plaintiffs' Complaint, as amended, are true. However, notwithstanding the actions taken by the Board subsequent to Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, as of this date hereof, segregation is present, as a matter of fact, in the Public School System of the City of St. Louis, in the particulars itemized in said Stipulation of Facts.
4. Defendants, their agents, officers, employees and successors, and all those in active concert and participation with them shall be enjoined and prohibited from discriminating on the basis of race or color in the operation of the School District of the City of St. Louis, and shall be required to take affirmative action to secure unto plaintiffs their right to attend racially nonsegregated and nondiscriminatory schools, and defendants will afford unto plaintiffs equal opportunities for an education in a nonsegregated and nondiscriminatory school district, and shall be required to take the affirmative action hereinafter set forth.
5. With regard to the personnel of the St. Louis public schools, the defendants are directed and ordered to take the following measures which are necessary or proper in order to reduce racial segregation:
a) Effective before the beginning of the 1976-1977 school year, defendants shall have planned, developed and carried out a program through volunteers and, if necessary, through mandatory appointments and assignments, to provide a minimum of two regular classroom teachers and no less than 10% of the minority teachers and other staff of either race in each school of the system.
b) The minimum percentages provided for in the preceding paragraph shall be increased by defendants to no less than 20% of the minority teachers and other staff of either race in each school of the system before the beginning of the 1977-1978 school year, and to 30% of the teachers and other staff before the beginning of the 1978-1979 school year.
6. The measures required to be taken by the Board under the provisions of paragraph 5 hereof shall be taken notwithstanding any already signed and approved contract; and the tenure or seniority of teachers or other certificated personnel shall not be used to excuse or justify any lack of compliance with the provisions hereof.
7. Employees of the Board, whether certificated or not, shall not be discriminated against as to hiring, rehiring, promotion, dismissal, suspension or assignment on the ground of race or color, all subject to the procedural provisions of Title VII of the Civil Rights Act of 1964, as amended.
8. To the extent which is consistent with the proper operation of the school system as a whole, defendants shall locate any new schools, lease new classroom facilities or substantially expand existing schools with the objective of eradicating the effects of past and present segregation in the public schools of the City of St. Louis.
9. Before the beginning of the 1977-1978 school year, defendants shall make a study of realignments of all elementary feeder schools to the academic high schools for the purpose of reducing racial isolation and segregation at the said high schools, and shall submit a report thereon to the Court, on or before January 15, 1977, with implementation to begin September, 1977.
10. The defendants are hereby ordered to make a study and report to the Court on or before May 1, 1976 as to whether or not the following items will assist in eliminating or reducing segregation:
a) Establishing elementary magnet schools with specialized curriculum, having an open enrollment by application.
b) Establishing high schools for the study of the visual and performing arts, for the study of mathematics and physical and natural sciences, and other subject areas, such *1390 schools having open enrollment by city-wide application.
c) Recognizing that the above measures are basically experimental in nature, a study of the feasibility of curriculum improvements or other changes that should be instituted in the system as a whole shall be undertaken for the purpose of increasing the quality of education throughout the system, all within the context of reducing racial isolation in the schools and with the goal of desegregating the school system. A report shall be made to the Court by May 1, 1976, with implementation beginning with the school year 1976-1977.
11. Defendants are required to file with the Court, within sixty days from the opening day of the 1976-1977 school year a report setting forth the following information:
a) Tabulation by race of the enrollment in each school of the district.
b) List of each student, by name and address, who applied for transfer stating whether the application was granted, or, if not, the reason for the denial.
c) Tabulation of teachers by race for each school, listing the assigned grade or grades, and the vacancies which have been filled by the hiring of teachers from outside the system at each of the schools.
12. Defendants shall simultaneously mail copies of all reports filed with the Court to counsel for the plaintiffs. Plaintiffs' counsel shall be advised as to actions undertaken by the defendants in compliance with this Judgment.
13. Costs shall be taxed against the defendant Board of Education of the City of St. Louis and a reasonable attorneys' fee and expenses will be allowed against it and in favor of counsel for the plaintiffs.
14. Jurisdiction is retained for the purpose of enabling any of the parties to this Judgment to apply to this Court at any time for such further orders and directives as may be necessary or appropriate for the construction or carrying out of this Judgment.
Dated this 24th day of December, 1975.
 /s/ James H. Meredith 
 U. S. District Judge

JUDGMENT
A memorandum dated this day is hereby incorporated into and made a part of this judgment.
IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the Board of Education of the City of St. Louis shall within 90 days from the date this becomes a final judgment supplement its plan filed under the consent decree by filing a plan with such changes as the Board deems appropriate under this decision. In formulating such a plan, the Board will consult with and receive the input of all parties to this litigation and such citizen groups as are available and have offered to assist in the implementation of a plan.
The Court has specifically found that there has been no intentional segregation of students by the actions or inactions of the Board and that there has been no constitutional violation by the defendants. In light of this finding the Court directs that the formulation of any plan under the consent decree have as its goal quality education which includes integration of the races where practical and feasible.
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the requests of the original plaintiffs and all other intervening plaintiffs who have requested the Court to allow them attorneys' fees and costs be and the same are denied. No attorneys' fees are allowed and each party shall bear its own costs.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the request of intervening plaintiffs Adams, et al., to declare unconstitutional the policies of the Department of Housing, Education and Welfare (HEW) concerning the magnet school program is denied for the reason that the question is moot.
NOTES
[1] Plaintiff Minnie Liddell attested that on February 12, 1972, she had written, on behalf of the Concerned Parents of North St. Louis, to the president of the St. Louis Chapter of the NAACP soliciting its support and aid in this lawsuit, and that "We were turned down cold." In addition, plaintiff Barbara Goldsby attested that she was a member of the committee which met with officials of the NAACP on February 25, 1972, to ask for its aid in this desegregation suit, and that the officials of the NAACP had refused to help plaintiffs and had said, "`That the schools were integrated and that they (NAACP) had a good working relationship with the Board.'"
[2] Plaintiff-intervenors United States Department of Justice and Caldwell, et al. (NAACP), together with the original plaintiffs, Liddell, et al., are referred to throughout this opinion, except where noted, as plaintiffs.
[3] The group of parties plaintiff consisting of Adams, et al., Puleo, et al., and the City of St. Louis contest the validity of the consent decree. They will be referred to as plaintiffs for a discussion of that section only.
[4] The transition from the dual system to a unitary one was done by steps so that all details, such as boundary revision, transfers of books and materials, etc., could be done properly. An advantage to the transition by steps was better supervision in that more attention could be devoted to the particular schools being integrated at that time.
[5] Since race was no longer a factor in determining eligibility to enroll in any St. Louis public school, any reference to race was excluded from the records of the school system.
[6] In the introduction to "Civil Rights U.S.A.", 1962, a Report to the Civil Rights Commission, it was noted: "[A]lthough the St. Louis public school system was organized on a racially segregated basis in 1954, it desegregated all its schools completely in the school years 1954-55 and 1955-56."
[7] The Desegregation Report of September, 1956, prepared by Mr. Scott, noted that the above figures should be adjusted upward since

". . . a somewhat larger number of white and Negro pupils enrolled in the same schools than was initially estimated." Exactly what that number was is not known as school records were no longer kept by race.
[8] The term "net out-migration" is defined as the difference between the number of persons moving into a given area and the number of persons moving out of that area, less natural increase, in a given period of time.
[9] HEW has defined "attendance area" as:

". . . in relation to a particular school, the geographic area in which the children who are normally served by that school reside."
45 C.F.R. ง 116.1(b) (1974).
[10] More recent regulations do not attempt to liberalize these requirements.
[11] There is one limited exception which was approved in November, 1978. Students transferred in midyear would continue to remain eligible for the remainder of that year. 20 U.S.C. ง 2733 (1978), P.L. 95-561.
[12] In 1978-79, Stix and Waring are both magnet schools with 70.0% and 91.9% black students respectively.
[13] Waring, now a magnet school, has a 91.9% black student enrollment in 1978-79.
[14] Before desegregation beginning in 1954, the St. Louis school system had already begun to lose white students. Until 1967-68, the system lost white students and gained in black students. After 1968, the system lost both black and white students. The percentage gains in black students has consistently risen since desegregation.
[15] This tabulation does not reflect the racial composition as of 1972-73 and 1975-76 of the technical high school O'Fallon, which is a specialized high school with a wholly integrated student body. The reason is that they were in attendance at that school only for a half day and they were counted in the racial count of the respective academic high school where they attended for the other half day. Hence there was at least a half day of integration for the students of those high schools which is not reflected in the preceding tabulation. The above figures also do not reflect Harris Teacher's College enrollment.
[16] The Department and the NAACP list 25 schools as vestiges. Six of these schools have been closed.
[17] All of the 20 schools (except Baden) which before Brown were all white and are located west of Grand and north of Lindell are now over 99% black. Of the 19 schools which were all black before Brown, 11 are located in the area west of Grand and north of Lindell. Of the remaining eight pre-Brown black schools, seven are located north of Lindell but east of Grand. Of the 10 pre-Brown white schools in this area eight are now between 87% and 100% black. Of the other two schools, one is a magnet school. The other represents the only exception.
[18] The 1962 Report to the Civil Rights Commission criticizes the Board for adhering to the neighborhood school where resegregation was taking place. This study recommended a liberalization of the policy to enhance integration.
[19] It should be noted that this opposition to busing, done to relieve overcrowding, comes seven years after the termination of intact busing.
[20] Creating larger units in areas of dense black population, thereby requiring larger schools which would be largely black, has been criticized in other school desegregation cases.
[21] Policies of the United States government with respect to the allocation and use of Title I funds have in the past confirmed and reinforced the neighborhood school policy. See further discussion of Title I, supra.
[22] This policy was in effect before desegregation to allow any student to complete attendance at his school without regard to a change in residence by that student.
[23] Plaintiffs have pointed several times to the failure of the Board to adopt recommendations of the CAC. Failure to adopt certain recommendations of the CAC is not evidence of segregative intent. Complaints have also been aired by plaintiffs when the Board did adopt recommendations of the CAC. (The Department charges that adoption of the permissive transfer recommendation had a clearly foreseeable segregative impact.) Adoption of CAC recommendations is also not evidence of segregative intent.
[24] The 1962 Report to the Civil Rights Commission noted that it is not easy to detect a transferee's motives in an application for a curriculum transfer. The solution suggested by the report, to standardize high school curriculum, was met in this instance by the Board when the abuse was detected.
[25] The Board did not adopt a formal position on abuses of medical transfers even though there existed a formal policy to prevent abuses in athletic transfers. The reason for the difference is that the restrictions on athletic transfers were placed by the High School League and not by the Board. Further, the handling of athletic restrictions is not similar or pertinent to preventing students from giving misrepresentations on transfer applications.
[26] The expert witness for the NAACP, Dr. Michael Stolee, testified that in preparing the desegregation plan submitted by the NAACP, boundary changes played a very minor role.
[27] The move was necessary to keep Harris' accreditation. Harris was converted to Enright middle school which opened virtually all black.
[28] The need for administrative convenience must not be taken lightly in a pre-computer age.
[29] Plaintiffs charge that while black students from north St. Louis were being bused intact, 50 white students from the Christian Home Orphanage were being bused and received into the regular classrooms. These students were too few in number to be transported as whole classes, there being only 50 students in various grades. Plaintiffs also charge that the transportation of these 50 pupils violated the neighborhood school policy in that Benton, a majority black elementary school, was the neighborhood school for the Orphanage. This alleged departure from this policy was an exercise by the orphans to continue in the same school before the redistricting in 1954-55. Benton was also extremely overcrowded at the time in question. Busing of these institution children is much easier than busing children from individual homes. Attendance by the orphans in schools other than Benton until 1964 was allowed for good cause shown to the Board by the Orphanage. When the Board terminated busing these children, they withdrew from the public school system. It is thus apparent that busing these children had no impact on the racial composition of Benton.
[30] The charge as to the Froebel elementary school is unfounded. In that situation the enrollment projection at Froebel (100% white) indicated overcrowding and students were scheduled to be bused to the Madison elementary school (63.2% black). Busing was ordered to end a few weeks into the school year when actual enrollment showed no overcrowding.
[31] The Department lists as an example of segregative black-to-black transportation that the Board took no action to modify the transportation out of the Yeatman elementary school (99.8% black) as requested by the Concerned Parents of North St. Louis. (Yeatman is one of the schools which plaintiff charges should not have been built in this area. Now the issue is what to do with overcrowding at that school.) The evidence shows that the Board previously considered and investigated plaintiff's suggestions and found that busing to Bates elementary school (100% black) was the only viable solution. The Department has set forth no other solution either. The charge is inconclusive.
[32] The Department, in support of its charge that "reasonable ratios" limited the number of black transportees to southside schools, points to the alteration of some classroom assignments at the Buder elementary school in 1965 in accordance with the ratio "policy." The changes, which were minimal, did not affect the number of black students attending that school.
[33] The impact of the Title I program is discussed more fully, supra.
[34] The Department and the NAACP suggest that because of contact with housing authorities and commissions the Board exerted influence over them in furthering segregative housing. There is no shred of evidence to support this contention. The desire of the Board to know where people, thus students, regardless of race, were going to be located so that proper projections could be made for facilities is not evidence of influence over housing authorities or of segregative intent.
[35] The Department charges that the Board refused to end intact busing in 1963-64 until black students could be relocated in the new segregated schools. The Board planned the extensive school construction in 1960 before any complaints about intact busing were aired.
[36] Black wards consistently voted for school bonds in higher percentages than did other wards.

Mrs. Liddell's statement in 1971 about the neighborhood schools being a key factor in stabilizing north St. Louis neighborhoods dispels the unsupported charge of the Department that school construction had a disruptive effect on the neighborhoods in north St. Louis.
[37] The plaintiffs' proposition that overcrowding be relieved in the 1960's and 1970's by busing rather than by construction is not supported by any factual analysis or figures to support the feasibility of any such program. A decision not to bus thousands of children is perfectly reasonable and is not evidence of segregative intent.
[38] Plaintiffs contest that many people did not support the Board's construction policy. Plaintiffs (Department) refer several times to minutes of Board meetings where various Board members expressed concern over building new schools. Some dissent and expression of various views is to be expected from any democratic group. Examination of various aspects of a policy must be reviewed before decisions are made. It must be noted that members expressing concern saw that the new schools were needed and voted for them along with black members of the Board.

The Community Resources Report of March 3, 1964, relied on by the Department and the NAACP to show disapproval of the new construction and to show that the Board rejected integrative alternatives presented to them, is inapplicable. The Report does not wholly disapprove of the Board's construction, but rather objects to the construction of supplementary units at five locations. The report does not allege any segregative intent or effect. The report was presented to the Board's continuing Committee on Integration on March 5, 1964, after the Board had already signed contracts for these units and work had already started.
[39] The charge that the sites selected by the Board locked black students into segregative schools is not supported by the evidence. Blacks continued to be highly mobile, moving from one area of the City to another. As a result, some schools, such as those in the central area, have major vacancies and some are no longer used as regular elementary schools, notwithstanding the fact that they were originally placed there to relieve overcrowding.
[40] The Department complains about the site selected for Northwest high school, suggesting instead a site that was in an area which the Department described as having the highest percentage of black residents in the Northwest attendance zone. It is estimated that this site would have opened heavily black. Northwest, at the site selected by the Board, opened with a white majority and was able to sustain for many years a good racial mix before becoming virtually all black.
[41] The NAACP and the Department charge that the Board built five schools in 1967-68 with Title I funds in areas of high black concentration with the result of isolating black children in segregated schools. These schools were placed in areas where overcrowding was the most severe. In addition, in order to qualify for funds, the schools had to be built in poverty areas, which happen to be black in St. Louis.

The NAACP and the Department further charge that by building these schools, the Board contravened the federal regulation which forbids spending funds which would result in "cultural" or "linguistic" isolation. 45 C.F.R. ง 116.21(f). The NAACP states that this regulation was in effect in 1967 when the building program was taking place. The regulation was not in effect at that time, but rather was enacted in late 1968, after the building program was finished. The Board, therefore, could not have violated this regulation. The evidence shows that the Board in good faith followed HEW regulations, which had the effect of increasing, rather than reducing racial isolation in the St. Louis schools. The Title I program is discussed in more detail, supra.
[42] The Department alleges as an example of segregative assignment in noncontiguous schools, the closing of Carr elementary school and reassignment to noncontiguous Franklin elementary school. Franklin and Carr, however, are contiguous.
[43] This discussion does not include the Board's operation of the magnet schools under the consent decree. Magnet schools are discussed, infra.
[44] Data on the racial composition in special elementary and high schools for 1975-76 and 1978-79 is contained in Appendix A(2) and (3).
[45] The problems which induce enrollment in these special classes are beyond the control of the Board.
[46] The fact that there are more black than white students assigned to classes for the mentally retarded is (contrary to the charge of the NAACP) beyond the control of the Board.
[47] The 1962 Report to the Civil Rights Commission states: "There is not a shred of evidence that ability group has been used in St. Louis with segregative intent centered on race." (p. 289.) The report continues: "gifted children in St. Louis not only get a suitably challenging academic offering but a highly favorable racial consolidation as well." (p. 290.) Nothing in the record subsequent to 1962 indicates that the Board discriminated in administering the special programs.
[48] The 1956 technical high school boundaries are charged to be discriminatory by the NAACP and the Department. The Hadley boundaries were allegedly drawn to serve only black students. The evidence shows that the Hadley district included attendance zones of many schools which were all white before 1954 and which retained a white majority in 1962-63. The Hadley boundaries also encompassed the entire Central high school district which was 9.2% black in 1962-63.
[49] With all courses being open to both black and white students throughout St. Louis, a factor in the late 1950's and early 1960's which limited black enrollment in classes taught at O'Fallon was the exclusion of blacks from certain labor unions. Because of this, few blacks were able to enter the apprenticeship training program. The Board worked to increase membership in the apprenticeship program. Their efforts were eventually successful.
[50] A program called "Operation Steno" was suggested to the Board by a black assistant district superintendent. This program was designed as a remedial program to help black students gain jobs as secretaries and stenographers. Objections were raised to the program as being segregative and the project was abandoned.
[51] The purpose of this policy was to provide stability in the schools during the changeover phase of large numbers of students. The interpretation by plaintiffs that this policy froze teacher assignments into segregated faculties and that transfers of teachers were discouraged is erroneous. In 1954-55, 25 black teachers were assigned to teach in six previously all white high schools which became integrated. These transfers affected 14% of the black high school teachers. With regard to the elementary schools, two-thirds of the enrollment were attending interracial schools and a number of black teachers were transferred to these schools.
[52] In Hazelwood School District v. United States, 433 U.S. 299, 303, 310-12, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977), the Supreme Court took favorable notice of the efforts of the St. Louis Board to recruit and maintain a 50 percent black teaching staff (referring to the 1970 school year).
[53] Counsel for the Board in the 1960's wrote a 13 page legal memorandum which advised that compulsory transfers were not required under the reported decisions then in effect and that they would probably be in violation of the Fourteenth Amendment.
[54] There is no evidence that any racially imbalanced distribution of teachers resulted in inferior teaching of black students. An examination in 1962 in a Report to the Civil Rights Commission of teacher qualifications, operating costs per pupil, and pupil-teacher ratios revealed that black students as a class did not suffer from comparatively inferior instructional standards.
[55] Parochial schools in north St. Louis retained white faculties as the student populations in those schools, as well as in the public schools, became black.
[56] See also Raney v. Board of Education, 391 U.S. 443, 88 S.Ct. 1697, 20 L.Ed.2d 727 (1968).
[57] The suggestion that "schools which have a majority of Negro students are not `desegregated,' whatever the racial makeup of the school district's population and however neutrally the district lines have been drawn and administered, finds no support in our prior cases." Milliken I, supra, 418 U.S. at 747, n. 22, 94 S.Ct. at 3128.
[58] Although Davis is a race discrimination in employment case, the Court directly addresses school desegregation issues.
[59] Wright v. Council of City of Emporia, 407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972), indicates that in proper circumstances, the racial impact of a law, rather than its discriminatory purpose, is the critical factor. In that case a constitutional violation had already been determined and thus there was no need to find an independent constitutional violation.
[60] The determination of a constitutional violation was made in United States v. School District of Omaha, 521 F.2d 530 (8th Cir.), cert. denied, 423 U.S. 946, 96 S.Ct. 361, 46 L.Ed.2d 280 (1975). That decision employed a legal presumption to shift the burden to the school authorities to establish that segregative intent was not among the factors that motivated their actions. The presumption used arises "once it is established that school authorities have engaged in acts or omissions, the natural, probable and foreseeable consequence of which is to bring about or maintain segregation." Id. at 535-36. Since the record on appeal did not rebut this presumption, the Court of Appeals for the Eighth Circuit remanded for the formulation of a system-wide remedy.
[61] The Court also vacated the decision in Amos v. Board of School Directors, 408 F.Supp. 765 (E.D.Wis.), aff'd, sub nom. Brennan v. Armstrong, 539 F.2d 625 (7th Cir. 1976), cert. granted, vacated and remanded, 433 U.S. 672, 97 S.Ct. 2907, 53 L.Ed.2d 1044 (1977).
[62] Columbus Board of Education v. Penick, 583 F.2d 787 (6th Cir. 1978), application for stay of execution granted, ___ U.S. ___, 99 S.Ct. 24, 58 L.Ed.2d 55 (Aug. 11, 1978), cert. granted, ___ U.S. ___, 99 S.Ct. 831, 59 L.Ed.2d 31 (1979). Other questions presented by this case include the proper application of incremental segregative effect and the extent that segregative intent may be inferred by adherence to a neighborhood school policy where the foreseeable effect of the assignment policy is to follow segregated housing patterns, thus resulting in some racially imbalanced schools. Also under review is the remand ruling in Dayton Board of Education v. Brinkman (Brinkman IV), 583 F.2d 243 (6th Cir. 1978), cert. granted, ___ U.S. ___, 99 S.Ct. 831, 59 L.Ed.2d 31 (1979).
[63] "The Congress declares it to be the policy of the United States that . . . (2) the neighborhood is the appropriate basis for determining public school assignments." Equal Educational Opportunities Act of 1974, 20 U.S.C. ง 1701 et seq.
[64] In Austin Independent School District v. United States, 429 U.S. 990, 97 S.Ct. 517, 50 L.Ed.2d 603 (1976), the Supreme Court granted certiorari and vacated the decision of the Fifth Circuit and remanded the case for reconsideration in light of Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). The decision which was vacated held that:

"school authorities may not constitutionally use a neighborhood assignment policy [that creates] segregated schools in a district with ethnically segregated residential patterns. A segregated school system is the foreseeable and inevitable result of such an assignment policy. When this policy is used, we may infer that the school authorities have acted with segregative intent. [532 F.2d 380, 392 (CA 5 1976)]." Austin, supra, 429 U.S. at 991-92, n. 1, 97 S.Ct. at 518.
Justice Powell, in a concurring opinion to the granting of certiorari, stated that in this holding:
"As suggested by this Court's remand premised upon Washington v. Davis, supra, the Court of Appeals may have erred by a readiness to impute to school officials a segregative intent far more pervasive than the evidence justified."
Austin, supra, 429 U.S. at 991, 97 S.Ct. at 517.
[*] The 1977 figure is an estimate.
[*] O'Fallon students were counted in the racial count of their academic high school for this year.
[*] Those schools marked with an asterisk enrolled black students primarily as a result of intact busing. Even in this situation, black faulty was not closely matched to the black student population.
[*] O'Fallon students are counted in the racial count of their academic high school
[*] O'Fallon students are counted in the racial count of their academic high school.
[*] Special #80 is now housed in Hodgen School Building. The enrollment is included with Hodgen School.
[*] Pruitt Alternative High School is in this district. Enrollment data are shown with Specialized High Schools.
[*] Shaw School Kg. and Primary in Southwest Sub-District. Enrollment included in Magnet School location tabulation.
[*] Metro High School and Rock Spring Alternative High School are in this district. Enrollment data are shown with Specialized High Schools.
[*] Pupil count shows total enrollment in the location, comprising those pupils in Magnet School programs (as shown on following page) and others, including Kindergarten and Primary.
[*] This tabulation shows the numbers of pupils in the locations indicated who are enrolled in the Magnet School programs. (See preceding page for total enrollment in these locations.)
[*] O'Fallon Co-op students in Gr. 11-12 are counted in the enrollment data of their respective academic high schools, as are O'Fallon Branch Co-ops.
[**] Special Schools with separate administrators; not part of other schools. Provision is made for high-school students as needed.